# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MARY LOUIS AND MONICA
DOUGLAS, ON BEHALF OF
THEMSELVES AND SIMILARLY
SITUATED PERSONS, AND
COMMUNITY ACTION AGENCY OF
SOMERVILLE, INC.
                             Plaintiffs,

                                              NO.  1:22-CV-10800

vs.

SAFERENT SOLUTIONS, LLC AND
METROPOLITAN MANAGEMENT
GROUP, LLC
                        Defendants.

Plaintiffs Mary Louis, Monica Douglas, and Community Action Agency of Somerville,

Inc. seek to vindicate the rights of low-income, minority housing voucher-holders who are

effectively blackballed from rental housing by Defendant SafeRent Solutions, LLC based on

credit histories and other information which bears little to no relationship to the risk that their

rent will not be paid.  In furtherance of these claims, they allege as follows:

## NATURE OF ACTION

1.      SafeRent Solutions, LLC ("SafeRent"), formerly known as CoreLogic Rental

Property Solutions, LLC, provides tenant screening services which discriminate against Black

and Hispanic rental applicants who use federally funded housing choice vouchers ("housing

vouchers") to pay all or part of their rent, in violation of the Fair Housing Act 42 U.S.C. § 3604

et seq., Massachusetts General Laws c.93A § 9, and Massachusetts General Laws c. 151B § 4 (6)

and § 4(10).

2.      SafeRent assigns disproportionately lower SafeRent Scores to Black and Hispanic

rental applicants compared to white rental applicants.  This is due in part to SafeRent's use of

credit history, which primarily includes non-tenancy debts.

3.      SafeRent Scores are designed, marketed, and used to decide if prospective tenants will be accepted for rental housing.

4.      SafeRent Scores cause Black and Hispanic rental applicants to be disproportionately likely to be denied housing; and doing so cannot be justified as a necessary business practice for evaluating applicants who are voucher-holders, since a tenant's housing voucher uniquely protects their housing provider's receipt of monthly rent.

5.      SafeRent Scores also have a disparate impact on renters of all races who use housing vouchers, and no business necessity can justify that disparate impact on individuals whose source of income includes a housing voucher.

6.      Plaintiffs seek to end Defendants' discriminatory tenant screening practices and remove the illegal barriers imposed by Defendants which create an uneven playing field for Black and Hispanic rental applicants, and others using housing vouchers, making them less likely to be able to rent properties managed by housing providers, like Defendant Metropolitan Management Group LLC ("Metropolitan"), who use SafeRent Scores to decide to whom they will rent.

7.      Plaintiffs Mary Louis and Monica Douglas, both Black women, are voucher-holders who currently pay some of their monthly rent through their housing vouchers and who have been denied housing due to their SafeRent Scores.  They bring their claims against SafeRent on behalf of themselves and a class of all other similarly situated Black or Hispanic individuals who pay some or all of their monthly rent through housing vouchers and have had their rental applications denied based on their SafeRent Score, as well as on behalf of a class of all other similarly situated users of housing vouchers who have had their rental applications

denied based on their SafeRent Score.

8.     Plaintiff Community Action Agency of Somerville ("CAAS"), a non-profit organization that works directly with renters who have been issued housing vouchers and helps them to locate, apply for, and secure housing where they can use their vouchers, brings its claims against SafeRent on behalf of itself.

9.     Plaintiff Mary Louis brings her claims against Metropolitan on behalf of herself.

10.    By these and other discriminatory and illegal acts, SafeRent and Metropolitan have violated Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. § 3604 *et seq*., Massachusetts General Laws c.93A § 9, and Massachusetts General Laws c. 151B, § 4 (6) and § 4(10).

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over Plaintiffs' federal Fair Housing Act claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 3613.  The Fair Housing Act ("FHA") explicitly provides for federal jurisdiction over FHA claims, 42 U.S.C. § 3613, and FHA claims also raise federal questions which fall under 28 U.S.C. § 1331.  Because the federal and state law claims alleged within this complaint arise from the same facts and similar legal theories, this Court has supplemental jurisdiction over Plaintiffs' claims under Massachusetts General Laws c.93A and c.151B pursuant to 28 U.S.C. § 1367.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants conduct business in this District, the events or omissions giving rise to the claims herein occurred in this District, and the properties at issue are situated in this District.

## PARTIES

**Plaintiffs**

13.    Plaintiff Mary Louis is a 54-year-old Black woman who resides in Malden,

Massachusetts.  Ms. Louis has a housing voucher which pays for approximately 69% of her rent.

14.     Ms. Louis' rental application for an apartment at Granada Highlands (recently renamed "Altitude Apartments") was denied solely because of her SafeRent Score, which was calculated using her non-tenancy related debt.

15.     Plaintiff Monica Douglas is a 65-year-old Black woman who resides in Canton, Massachusetts.  Ms. Douglas has a housing voucher which pays for approximately 57% of her rent.

16.     Ms. Douglas' rental application for an apartment at Millside at Heritage Park was denied solely because of her SafeRent Score, which was calculated using her non-tenancy related debt, and which also considered an eviction she was subjected to after she could not vacate her unit quickly enough when her landlord wanted to offer the unit to a relative of the landlord.

17.     Plaintiff CAAS is a non-profit organization whose mission is to help local families and individuals achieve financial security while working to eliminate the root causes of economic injustice.  CAAS' programs include a Housing Advocacy Program which works with tenants to avoid homelessness and find apartments that will accept their housing choice vouchers.  CAAS is organized under the laws of Massachusetts. Its principal place of business is Somerville, Massachusetts.

18.     28% of the people who qualify for CAAS' housing search services identify as Black and 20% identify as Hispanic; many of those who CAAS works with in its Housing Advocacy Program hold housing vouchers.  CAAS worked with 29 tenants with vouchers in the last year or about 36% of their entire housing caseload.

**Defendants**

19.     Defendant SafeRent Solutions, LLC is incorporated in Delaware, and its principal place of business is in Irving, Texas.  SafeRent sells a variety of tenant screening services,

4

including SafeRent Score reports, to housing providers throughout Massachusetts, including Metropolitan Management Group, LLC and Corcoran Management Company, among others.

20.     Metropolitan Management Group, LLC is a housing provider incorporated in Maryland with a principal place of business in Boston, Massachusetts.  Metropolitan manages at least seven residential rental properties, including several apartment complexes within Massachusetts, including apartments at Granada Highlands (recently renamed "Altitude Apartments") in Malden, Massachusetts.  Metropolitan managed Granada Highlands on May 27, 2021 when Mary Louis' rental application was rejected due to her SafeRent Score.  Defendant Metropolitan uses Defendant SafeRent's SafeRent Score screening service and adopts its discriminatory decision-making in denying apartments to Black and Hispanic rental applicants who use housing vouchers such as Plaintiff Mary Louis.

## FACTUAL ALLEGATIONS

### SafeRent Scores

21.     SafeRent sells a variety of tenant screening products, including SafeRent Scores, both nationwide and within Massachusetts.[1]

22.     SafeRent offers its tenant screening products through its online "MyRental" platform, which "offers self-service tenant screening solutions to landlords, real estate agents, brokerages, MLS, [and] property managers, so that they can identify top quality applicants."[2]

23.     SafeRent provides tenant screening services for at least hundreds of properties for several different housing providers.

---

[1] SafeRent Solutions, L.L.C., *Resident Screening*, SAFERENTSOLUTIONS.COM, https://saferentsolutions.com/resident-screening/#solutions (last visited May 12, 2022).

[2] SafeRent Solutions, L.L.C., *Resident Screening*, SAFERENTSOLUTIONS.COM, https://saferentsolutions.com/resident-screening/#solutions (last visited May 12, 2022).

24.     This case concerns the SafeRent Score reporting service, which generates tenant screening reports which explicitly instruct housing providers to either accept or reject a rental application based upon a numerical screening score.

25.     SafeRent describes the algorithm that calculates SafeRent Scores—called "the Registry Score-Plus Model" or "Registry ScorePLUS"—as a "rules-based tenant screening tool" which calculates "lease performance risk score[s]"—called a SafeRent Score—for rental applicants by aggregating several factors.  These factors are allegedly "selected, weighted, and assessed according to their statistical significance in predicting lease performance."[3]  SafeRent asserts that "Rules-based applicant screening methods automate human judgement by assigning a value to positive and negative customer application data, credit and public record information."[4]

26.     As promised by SafeRent in response to a housing provider's request for tenant screening services, "Registry ScorePLUS analyzes multiple data sources to deliver an accept/decline/conditional decision based on your predetermined decision points."[5]

27.     When a housing provider purchases a SafeRent Score report, SafeRent calculates a SafeRent Score ranging between 200 and 800 through use of its proprietary SafeRent Score algorithm, the Registry Score-Plus Model.

---

[3] Corelogic Rental Property Solutions, *Decision Science: Grow Revenue with Better Applicant Lease Screening*, available at https://info.myrental.com/decision-science-ebook?hsCtaTracking=67678d0b-63e3-4487-985b-85c01ae22e5b%7C20eb37df-b1ae-4833-af9b-3bf169e5a02f (last visited Jan. 4, 2022) at 5.

[4] Corelogic Rental Property Solutions, *Decision Science: Grow Revenue with Better Applicant Lease Screening*, available at https://info.myrental.com/decision-science-ebook?hsCtaTracking=67678d0b-63e3-4487-985b-85c01ae22e5b%7C20eb37df-b1ae-4833-af9b-3bf169e5a02f (last visited Jan. 4, 2022) at 3.

[5] *See* Trial Exhibit 7, *Connecticut Fair Housing Ctr et al v. CoreLogic Rental Property Solutions, LLC*, #: 3:18-cv-00705-VLB (D. Conn. 2022) at 8 (admitted into evidence Mar. 14, 2022).

28.     Specifically, SafeRent assigns its rental applicants rank-ordered SafeRent Scores which purport to measure an applicant's "lease performance risk."  For example, SafeRent advertises in the promotional material it distributes to housing providers that housing providers "can generally expect an applicant with a lease score of 395 to outperform an applicant with a lease score of 385."[6]

29.     SafeRent markets its SafeRent Scores as being capable of ranking applicant quality to help housing providers select what they deem to be "better renters."  SafeRent asserts that those it assigns high SafeRent Scores "pay on time, treat the property with care, and stay for longer periods, all of which help management maximize net operating income."[7]

30.     SafeRent considers applicants' credit history, other credit-related information, including non-tenancy debts, and eviction history in calculating SafeRent Scores.

31.     SafeRent's algorithm does not consider the financial benefits of housing vouchers in assigning SafeRent Scores.  Specifically, when a housing voucher is used, on average over 73% of the monthly rental payment is paid by public housing authorities directly to housing providers.[8]  Moreover, the portion of the rent paid by the voucher adjusts with changes to the

---

[6] Corelogic Rental Property Solutions, *Decision Science: Grow Revenue with Better Applicant Lease Screening*, available at https://info.myrental.com/decision-science-ebook?hsCtaTracking=67678d0b-63e3-4487-985b-85c01ae22e5b%7C20eb37df-b1ae-4833-af9b-3bf169e5a02f (last visited Jan. 4, 2022) at 5.

[7] Corelogic Rental Property Solutions, *Decision Science: Grow Revenue with Better Applicant Lease Screening*, available at https://info.myrental.com/decision-science-ebook?hsCtaTracking=67678d0b-63e3-4487-985b-85c01ae22e5b%7C20eb37df-b1ae-4833-af9b-3bf169e5a02f (last visited Jan. 4, 2022) at 3.

[8] As of 2021, voucher-holders in Massachusetts spend an average of $423 per month on rent plus utilities while public housing authorities pay an average of $1159 per month directly to housing providers, or at least 73.26% of a housing provider's total expected monthly payment (since some of the voucher-holder's payment goes to utilities, the housing authority payment should be an even higher percentage of the rent owed). *See* Office of Policy Development and Research, "Assisted Housing: National and Local" HUDUSER.GOV, available at

voucher-holder's income, providing for increased voucher payments if a voucher-holder loses

their job or has income reductions.

32.     This adjustment in the payment based upon variations in a tenant's income makes

the subsidy extremely valuable to tenants and helps ensure that their rent is affordable for the

long term.

33.     SafeRent admits that "[a] landlord cannot change the screening algorithm."[9]

34.     SafeRent does not disclose the breadth or depth of data considered by its SafeRent

Score algorithm or the weights assigned to any of its factors or variables.

35.     SafeRent discloses that it uses "credit bureau data and scores," bankruptcy

records, past due accounts, payment performance, and eviction history as factors within its

SafeRent Score algorithm, but it does not disclose specific sources of its data or how this data is

weighted in its score modeling.[10]

36.     SafeRent thereby keeps the inner workings of its SafeRent Score algorithm

hidden from its housing provider customers, its rental applicants, and the public.

37.     This also means that housing providers cannot alter any of the factors or variables

comprising the SafeRent Score algorithm, in theory or in practice, or the respective weighting of

those factors.  Housing providers cannot exercise any independent judgment as to the scores for

their applicants and can only accept the calculations made by SafeRent, or contract with a

---

https://www.huduser.gov/portal/datasets/assthsg.html#2009-2021_query (last visited May 11, 2022).

[9] Corelogic Rental Property Solutions, *Decision Science: Grow Revenue with Better Applicant Lease Screening*, available at https://info.myrental.com/decision-science-ebook?hsCtaTracking=67678d0b-63e3-4487-985b-85c01ae22e5b%7C20eb37df-b1ae-4833-af9b-3bf169e5a02f (last visited Jan. 4, 2022) at 5.

[10] MyRental, *SafeRent Score*, MYRENTAL.COM, https://www.myrental.com/tenant-screening-products/saferent-score (last visited May 12, 2022).

different vendor.  SafeRent provides housing providers only with the bottom-line score –
SafeRent's determination of whether the applicant will be an acceptable tenant. SafeRent does
not provide them with detailed information about credit history or eviction history that was used
to calculate the score, or any of the other information that might permit the housing provider to
make its own evaluation, separate from the SafeRent Score.

38.     As summarized by one property which screens potential tenants using SafeRent
Scores, "CoreLogic sends us a number, and if it is above the predetermined 'approved' number,
we move forward with the process. If the number comes back under the 'approved' number, we
send the prospect a letter with CoreLogic's contact information. We do not know why they were
denied, other than their score was not high enough. This keeps it subjective [sic], fair, and
protects the prospects' privacy. . . . On our end, the process is pretty simple - pass the info onto
CoreLogic, wait for a passing score. We really don't need to know anything else or details of
why someone did or did not pass" [11]  Another property stated, "the third-party service we utilize
to screen all prospective tenants has denied your tenancy. Unfortunately, the service's SafeRent
tenancy score was lower than is permissible."[12]  Yet another property similarly explained that,
"screening is conducted through CoreLogic Rental Property Solutions LLC. A score is indicated
in conclusion of the screening, which reflects an approve or deny comment. . . .  The Leasing
Manager does not receive the detailed credit information at the time of running the applicant
screening."[13]

39.     Housing providers, in consultation with SafeRent, select the minimum SafeRent

---

[11] Email from John Cullen to Matt Brooks at Greater Boston Legal Services sent
December 2, 2021 at 3:38pm.

[12] Email from Ariel Cohen to Mary ("Nancy") Louis sent May 27, 2021 at 10:43 AM.

[13] Letter from Jeanmarie O'Brien to Monica Douglas sent August 26, 2021.

Score required for a rental application to be approved ("minimum score"). Housing providers make this decision without knowing how scores are calculated, and therefore must rely upon SafeRent's guidance. Once the minimum score is selected, the SafeRent Score and its formula for calculating scores ultimately determines if a rental applicant is approved or denied. There may be either one score for approval, or housing providers, in consultation with SafeRent, may set a minimum score for automatic acceptance, and also establish an "accept with conditions" SafeRent Score range. Thus, housing providers can (a) choose a minimum score, *e.g.* 500, which then also requires the rejection of any rental applicant who has a SafeRent Score below that score, *e.g.* 499 or below; or, (b) set a minimum score, *e.g.* 500 for automatic acceptance, set an "accept with conditions" score range, *e.g.* 450-499, and reject any applicant with a score below that range, *e.g.* 449 or below.

40.     Housing providers who use an "accept with conditions" SafeRent Score range commonly require a higher security deposit as a prerequisite for approving the applicant as compared to the security deposit required of applicants meeting the regular minimum score.

41.     While SafeRent permits housing providers to use SafeRent Scores to accept or deny rental applicants in different ways, *e.g.* with different minimum scores depending on the level of occupancy, or by always choosing the highest scoring applicant for any vacancy rather than choosing the first to apply with an acceptable score, these minor variations share two unalterable characteristics. First, the SafeRent Score assigned to an applicant dictates their rental eligibility; and second, the SafeRent Score is calculated based in large part on factors that produce disproportionately lower SafeRent Scores for Black and Hispanic applicants, and those using housing vouchers.

42.     SafeRent provides a report and score to its housing provider clients for each

applicant, and in doing so effectively tells the housing providers that certain applicants would not be good tenants.

43. When housing providers use SafeRent Scores, the decision of whether any rental application will be approved or denied is inextricably tied to that applicant's SafeRent Score. Thus, SafeRent, which has sole control over how scores are calculated, effectively controls the decision to approve or reject a rental application as it alone determines an applicant's SafeRent Score using its proprietary SafeRent Score algorithm. SafeRent communicates the SafeRent Score to housing providers with "approve" or "deny" language, not simply a numerical score.

44. Housing providers state that they cannot deviate from the "approve" or "deny" decision issued by SafeRent. For example, Metropolitan staff told Ms. Louis that "we do not accept appeals and cannot override the outcome of the Tenant Screening."[14]

**Reliance on Credit History Disproportionately Disadvantages Black and Hispanic Consumers, and Low-Income Consumers Like Those Who Use Housing Vouchers**

45. The SafeRent Score—and thus the decision to accept or decline the applicant—is based in significant part on the applicant's credit score and credit history, including non-tenancy debts.[15]

46. Credit reports and scores are not intended to gauge whether someone will be a good tenant. They are designed to predict the likelihood that a borrower will become 90 days late on a loan—not rent, which is a different sort of obligation.[16] What's more, credit reports tell

---

[14] Email from Ariel Cohen to Mary ("Nancy") Louis sent Jul 6, 2021 at 10:21 AM.

[15] *See* MyRental, *SafeRent Score*, MYRENTAL.COM, https://www.myrental.com/tenant-screening-products/saferent-score (last visited May 12, 2022).

[16] Consumer Fin. Prot. Bureau, Data Point: Credit Invisibles 7 (2015), https://files.consumerfinance.gov/f/201505_cfpb_data-point-credit-invisibles.pdf (last visited May 12, 2022) at 7 (most credit scoring models built to predict likelihood relative to other borrowers that consumer will become 90 or more days past due in the following two years).

a history about past ability to pay in particular instances, not current ability to pay rent.

47.     Credit histories include only a limited set of data, primarily consisting of loan account information, which is another reason they are not good predictors of whether a consumer will pay rent.  For example, credit scores do not consider, and a consumer's credit history does not include, how much income (from all sources) or assets a consumer has available to pay the rent.  Nor do credit histories include a complete record of a consumer's expenses.  Many essential and recurring bills, such as childcare, internet, or cell phone payment histories do not influence a consumer's credit score.

48.     Credit histories rarely, if ever, capture a consumer's complete history as a renter. Credit histories definitely do not consider a consumer's current ability to pay rent because they do not include a consumer's income or assets.  A consumer's credit score does not typically consider how long that consumer has rented property, if that consumer has a history of on-time past rental payments, or even if that consumer has rented property within their lifetime.  While SafeRent claims to consider some data on rental payments in its scoring system, the data it considers is limited and does not capture most rental transactions.

49.     Because tenants recognize the importance of paying their rent, rental payments are paid on-time more than many other kinds of bill, including credit card bills.  A 2019 Federal Reserve study concluded that both consumers expecting to defer on at least one bill and U.S. consumers in general would default on their credit card bills (45 percent and 7 percent respectively) rather than their rent or mortgage payment (23 percent and 4 percent respectively).[17]

---

[17] Board of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2019*, May 14, 2020, at Table 9, available at

50.     Credit score and conventional credit history are not accurate predictors of timely rental payments.  Moreover, reliance on such data in scoring potential tenants has a disproportionately adverse impact on Black and Hispanic tenants, and those who use housing vouchers.

51.     As of October 2021, Black consumers have a median credit score of 612 and Hispanic consumers have a median credit score of 661; white consumers have a median credit score of 725.[18]

52.     As of October 2021, approximately 45.1 percent of Black consumers and 31.5 percent of Hispanic consumers have subprime credit scores; 18.3 percent of white consumers have subprime credit scores.[19]  When scores are below a certain cutoff they are deemed "subprime" and the consumer is offered less favorable credit terms, if they are offered credit at all.

53.     Credit scoring models, and the scores that they produce, consider past credit data which is systemically and historically biased against non-white consumers.  As explained by Princeton University's Professor Frederick Wherry, "The data used in current credit scoring models are not neutral; it's a mirror of inequalities from the past. By using this data we're

---

https://www.federalreserve.gov/publications/2020-economic-well-being-of-us-households-in-2019-dealing-with-unexpected-expenses.htm (last visited May 12, 2022); *see also* Matthew Desmond, *The Rent Eats First, Even During a Pandemic*, N.Y. Times (Aug. 29, 2020), www.nytimes.com/2020/08/29/opinion/sunday/coronavirus-evictions-superspreader.html (last visited May 12, 2022) (stating that "the rent eats first").

[18] Urban Institute, "Credit Health During the COVID-19 Pandemic," URBAN.ORG, https://apps.urban.org/features/credit-health-during-pandemic/ (last visited May 17, 2022).

[19] Urban Institute, "Credit Health During the COVID-19 Pandemic," URBAN.ORG, https://apps.urban.org/features/credit-health-during-pandemic/ (last visited May 17, 2022).

amplifying those inequalities today. It has striking effects on people's life chances."[20]

54.      "Racial disparities in credit health reflect historical inequities that reduced wealth and limited economic choices for communities of color."[21]  Racial inequalities in wealth have existed within this country since its founding, and the racial wealth divide within the United States has especially worsened over the last thirty years.[22]  As of 2017, "African American families own less than seven cents for every dollar in wealth owned by white families, while Latino households own less than eight cents for every dollar of white wealth."[23]

55.      Racial disparities in credit health not only *reflect* historical racial disparities in wealth, but also *perpetuate* wealth inequalities through reduced financial opportunities and fewer financial safety nets, which hinder a consumer's ability to accumulate present or intergenerational wealth through homeownership or other financial investments.  "The credit score disparity between predominantly white and nonwhite areas might be a contributing factor to worsening wealth inequality. In 1963, the average wealth of white families was $121,000 higher than the average wealth of nonwhite families. By 2016, the average wealth of white

---

[20] *See* Natalie Campisi, "From Inherent Racial Bias to Incorrect Data—The Problems With Current Credit Scoring Models" *Forbes*, 26 Feb. 2021, https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/ (last visited May 12, 2022) at 5.

[21] Urban Institute, "Credit Health During the COVID-19 Pandemic," URBAN.ORG, https://apps.urban.org/features/credit-health-during-pandemic/ (last visited May 12, 2022) at 1.

[22] Board of Governors of the Federal Reserve System, *Survey of Consumer Finances 1989-2019*, available at https://www.federalreserve.gov/econres/scf/dataviz/scf/chart/#series:Net_Worth;demographic:racecl4;population:all;units:median;range:1989,2019 (last visited May 12, 2022).

[23] The National Consumer Law Center, "Past Imperfect: How Credit Scores and Other Analytics "Bake In" and Perpetuate Past Discrimination," May 2016, available at https://www.nclc.org/images/pdf/credit_discrimination/Past_Imperfect050616.pdf (last visited May 11, 2022) at 1.

families was more than $700,000 higher than that of black and Hispanic families."[24]

56.     Because Black consumers historically have not had equal footing to establish intergenerational wealth, "[t]he burden of poverty can trickle down to children who are at a disadvantage when it comes to being scored using today's methods."  Black consumers are not likely to have the same payment history as their white peers given "the enormous disparity in wealth-generating opportunities."[25]

57.     In the U.S., majority-Black communities have the lowest median credit scores, the highest debt in collection rates, the highest subprime credit score rates, and the highest use of high-cost payday and other Alternative Financial Services loans.[26]

58.     Individuals who apply for housing vouchers can only receive a housing voucher if, *inter alia*, they meet certain household income requirements.  Housing voucher recipients are required, at admission, to have an "extremely low-income," *i.e.* 30 percent or less than their area's median income level, a "very low-income," *i.e.* 50 percent or less than their area's median income level, or a "low-income," 80 percent or less than their area's median income level.[27]

59.     Not surprisingly, many individuals with lower incomes have lower credit scores

---

[24] Caroline Ratcliffe and Steven Brown, "Credit scores perpetuate racial disparities, even in America's most prosperous cities, " *Urban Institute*, Nov. 20, 2017, available at https://www.urban.org/urban-wire/credit-scores-perpetuate-racial-disparities-even-americas-most-prosperous-cities (last visited May 12, 2022) at 4.

[25] *See* Natalie Campisi, "From Inherent Racial Bias to Incorrect Data—The Problems With Current Credit Scoring Models" *Forbes*, Feb. 26, 2021, available at https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/ (last visited May 12, 2022) at 6.

[26] Urban Institute, "Credit Health During the COVID-19 Pandemic," URBAN.ORG, https://apps.urban.org/features/credit-health-during-pandemic/ (last visited May 12, 2022) at 3.

[27] *See* HUD Notice PDR-2021-02, issued April 1, 2021, available at https://www.huduser.gov/portal/datasets/il/il21/HUD-sec8-FY21.pdf (last visited May 11, 2022) at 1.

than those with higher incomes.  A 2012 Consumer Financial Protection Bureau report found that the median FICO score in low-and moderate-income (LMI) areas was in the 34th percentile while the median FICO score in non-LMI areas was in the 52nd percentile.[28]  Similarly, in 2007, a study by the Board of Governors of the Federal Reserve System found that the mean normalized credit score of a low-income Census tract was 32.5 out of 100, while it was 57.9 for a high-income Census tract.[29]  A 2018 study by Federal Reserve researchers also found a correlation between a person's income and credit score, particularly when considering age.[30]

60.     These disparities begin at a young age and persist throughout life.  As explained by Aaron Klein, Senior Fellow of Economic Studies at the Brookings Institution, "Children of wealth have been in the system for a long time. Their parents might open a credit card in their name and help them make payments each month. Children in poverty do not enter the system at an early age and, if they do, it's to inherit debt from parents. Plenty of parents in financial difficulty take out credit in their children's names."[31]

61.     While both credit scoring and credit reporting generally fail to identify the

---

[28] Consumer Financial Protection Bureau, Analysis of Differences Between Consumer- and Creditor-Purchased Credit Scores, at 18, Sept. 2012, https://files.consumerfinance.gov/f/201209_Analysis_Differences_Consumer_Credit.pdf (last visited May 11, 2022).

[29] Board of Governors of the Federal Reserve, Report to Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit 80-81 (Aug. 2007), www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf (last visited May 12, 2022).

[30] Rachael Beer, Felicia Ionescu, and Geng Li, Are Income and Credit Scores Highly Correlated?, FEDS Notes, Aug. 13, 2018, www.federalreserve.gov/econres/notes/feds-notes/are-income-and-credit-scores-highly-correlated-20180813.htm (last visited May 12, 2022).

[31] See Natalie Campisi, "From Inherent Racial Bias to Incorrect Data—The Problems With Current Credit Scoring Models" Forbes, 26 Feb. 2021. https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/ (last visited May 12, 2022) at 6.

likelihood that one rental applicant will be a better renter than another, they especially fail in predicting if applicants who use housing vouchers would make quality tenants.

### The Housing Choice Voucher Program

62.     Federal housing choice vouchers, also known as "Section 8 vouchers",  are long-term subsidies which provide a direct payment from the issuing agency to the housing provider for all or part of a voucher-holder's monthly rent.  As the U.S. Department of Housing and Urban Development ("HUD") explains, "[a] housing subsidy is paid to the landlord directly by the [Public housing authority] on behalf of the participating family. The family then pays the difference between the actual rent charged by the landlord and the amount subsidized by the program."[32]  These subsidies can stabilize families and provide life-long benefits for family members, including better health and education outcomes for children.

63.     Local housing authorities, pursuant to federal regulations, calculate the maximum amount of housing assistance available to any given federal housing voucher recipient.  A voucher-holder's subsidy is based on a local "payment standard" that reflects the cost to lease a unit in the local housing market.  If the rent is less than the payment standard, the family generally pays 30 percent of their adjusted monthly income[33] towards rent, and the voucher pays

---

[32] U.S. Dept. of Housing and Urban Development, "Housing Choice Voucher Fact Sheet," HUD.GOV, https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/about/fact_sheet (last visited May 12, 2022) at 3.

[33] Calculations are based upon a households' "adjusted" annual income which deducts (1) $480 for each dependent, (2) $525 for any family member who is elderly or disabled, (3) unreimbursed medical expenses of any family member who is elderly or disabled (up to 3% of annual income), (4) unreimbursed reasonable attendant care and auxiliary apparatus expenses for each member of the family who is a person with disabilities, and (5) any reasonable child care expenses necessary to enable a member of the family to be employed or to further their education. *See* 24 CFR § 5.611; *see also,* Housing Opportunity Through Modernization Act of 2016 -- Implementation of Sections 102, 103 and 104, 84 FR 48820, 48827 (final rule passed

the remainder.  If the rent is more than the payment standard, but approved by the local housing authority, the voucher-holder pays a larger share of their income towards the rent.[34]

64.     Voucher-holders can only rent units where their share of the monthly rental payment is less than 40% of their monthly adjusted gross income.[35]

65.     Accordingly, housing providers who rent to tenants with housing vouchers are always guaranteed to receive all or most of their tenants' monthly rental payments because those funds are directly disbursed to the housing provider by its tenants' local public housing authority.

66.     In contrast, housing providers cannot guarantee they will receive any portion of the monthly rental payments due from tenants who do not use housing vouchers.

67.     Importantly, voucher-holders can seek exemptions from their minimum rent so that housing providers are still paid their full monthly rental payments even when their tenants undergo financial hardship.  These vouchers effectively insulate a housing provider from lost rental income due to a voucher-holder's changed circumstances.  Voucher-holders can request exemptions when the household: (1) has lost eligibility for or is awaiting an eligibility determination for a Federal, State, or local assistance program; (2) would be evicted because it is unable to pay the minimum rent; (3) has decreased income because of changed circumstances, including loss of employment; (4) has a death occur; and (5) meets any other circumstances which demonstrate financial hardship per HUD or public housing authority guidance.[36]

---

March 1, 2022)  Public housing authorities may also adopt additional deductions from annual income so long as they do so by written policy. *Id.* These adjustments can significantly reduce the tenant's required rental contribution

[34] 24 CFR § 982.1(a)(3).

[35] 24 CFR § 982.508.

[36] 24 CFR § 5.630.

68.     "If a family requests a financial hardship exemption, the PHA [public housing authority] must suspend the minimum rent requirement beginning the month following the family's request for a hardship exemption, and continuing until the PHA determines whether there is a qualifying financial hardship and whether it is temporary or long term."[37]

69.     Voucher-holders who can demonstrate financial hardship receive an exemption from paying their minimum rent from their public housing authority, thereby eliminating their housing providers' risk of lost rental income.  In contrast, as explained in ¶ 66 *supra*, housing providers receive no similar guarantees from renters who do not use housing vouchers.

70.     Voucher-holders also have substantially longer lengths of tenancies than non-voucher-holders.  As of 2021, the average voucher-holder in Massachusetts rents the same unit for more than 21 years.[38]

71.     A voucher-holder's rental payment is more affordable, and the tenancy more sustainable, than those of tenants without vouchers because housing vouchers subsidies increase their support when a household's earned income decreases.

72.     Because housing vouchers uniquely protect a housing provider from losing monthly rental income, especially compared to the lack of any payment guarantees from its non-voucher tenants, the potential loss of monthly rental income that SafeRent Scores purports to protect housing providers from is not a legitimate business interest which can justify SafeRent

---

[37] 24 CFR § 5.630(2)(A).

[38] *See* Office of Policy Development and Research, "Assisted Housing: National and Local" HUDUSER.GOV, available at https://www.huduser.gov/portal/datasets/assthsg.html#2009-2021_query (last visited May 11, 2022); *see also* ¶ 29 *supra* ("SafeRent markets its SafeRent Scores as being capable of ranking applicant quality to help housing providers select what they deem to be 'better renters' with high SafeRent scores who 'pay on time, treat the property with care, and stay for longer periods, all of which help management maximize net operating income.'") (internal citation omitted).

Scores' consideration of credit history for applicants who use housing vouchers.

73.    There are several alternative practices which would accomplish SafeRent's goal of identifying "better renters" with less discriminatory impact than the algorithm used by SafeRent Scores.[39]  For example, SafeRent could end the SafeRent Score's consideration of non-tenancy related debts, or it could limit the use of these records to applicants lacking landlord references.[40]

### Named Plaintiffs' Experiences

74.    Plaintiff Mary Louis applied to rent an apartment at Granada Highlands (recently renamed "Altitude Apartments") because the unit has two full bathrooms, an in-unit washer and dryer, and ample amenities, including a pool, in a safe neighborhood. Granada Highlands is managed by Metropolitan.

75.    Ms. Louis' rental application was denied solely because of her SafeRent Score.

76.    A Metropolitan staff member sent Ms. Louis the following email on May 27, 2021: "Mary, we regret to inform you that the third-party service we utilize to screen all prospective tenants has denied your tenancy. Unfortunately, the service's SafeRent tenancy score was lower than is permissible under our tenancy standards. Please see the attached report. If you have any questions about this report or believe information on it may be incorrect, please feel free to contact the Third Party Screening Service, CoreLogic, at the number that is listed on the

---

[39] *See* Corelogic Rental Property Solutions, *Decision Science: Grow Revenue with Better Applicant Lease Screening*, available at https://info.myrental.com/decision-science-ebook?hsCtaTracking=67678d0b-63e3-4487-985b-85c01ae22e5b%7C20eb37df-b1ae-4833-af9b-3bf169e5a02f (last visited Jan. 4, 2022) at 3.

[40] *See, e.g.,* MassHousing, *Model Tenant Selection Plan, Revised October 2018* available at https://www.masshousingrental.com/portal/server.pt/community/library/332/rental_owners_managers_forms___documents (last visited May 17, 2022) at B1-2.

report."[41]

77.     In response to this email, Ms. Louis offered two landlord references, as well as

employment references, so that she could show Metropolitan that she has been an on-time or

early rent-payer for at least the past 16 years despite her less-than ideal credit history.[42]

78.     On July 6, 2021, Metropolitan replied that "Unfortunately, we do not accept

appeals and cannot override the outcome of the Tenant Screening.  As stated in my previous

email, please feel free to re-apply to Altitude Apartments when you feel that the outcome of the

Tenant Screening will be different! We would be more than happy to assist you in finding a unit

at that time."[43]

79.     As a direct result of this rejection, Ms. Louis moved into an apartment without a

pool, without two full bathrooms, and with many fewer amenities.  Despite the less desirable

housing conditions, this current rental costs Ms. Louis $200 *more* per month than if she had

leased with Metropolitan.

80.     As a direct result of this rejection, Ms. Louis' current apartment is also in a much

less desirable area due to the area's high crime rate. [44]

81.     As a direct result of this rejection, Ms. Louis felt disappointed, frustrated and

---

[41] Email from Ariel Cohen to Mary ("Nancy") Louis sent May 27, 2021 at 10:43 AM.

[42] Email from Mary ("Nancy") Louis to Ariel Cohen sent July 6, 2021 at 10:17AM.

[43] Email from Ariel Cohen to Mary ("Nancy") Louis sent July 6, 2021 at 10:21 AM.

[44] *Compare* CrimeGrade.Org, "The Safest and Most Dangerous Places in Malden, MA: Crime Maps and Statistics," available at https://crimegrade.org/safest-places-in-malden-ma/ (last visited May 12, 2022) *with* Altitude Apartments, 211Kennedy Dr., Malden, MA, 02148, map available at https://www.google.com/maps/place/Altitude+Apartments/@42.4373053,-71.0312049,15z/data=!4m5!3m4!1s0x0:0x921edd7c2626ee98!8m2!3d42.4373053!4d-71.0312049 (last visited May 12, 2022) *and* 29 A Lisbon St., Malden, MA, 02418, map available at https://www.google.com/maps/place/29A+Lisbon+St,+Malden,+MA+02148/@42.4286399,-71.0525933,17z/data=!3m1!4b1!4m5!3m4!1s0x89e373015cd836db:0x75f1ab443b291436!8m2!3d42.4286399!4d-71.0504046 (last visited May 12, 2022).

worried that she would not be able to find an apartment with her voucher.  SafeRent effectively

told Metropolitan that Ms. Louis would not be a good tenant, and Metropolitan accepted that

characterization and would not even consider the substantial evidence Ms. Louis offered to show

that she was a good tenant.

82.     As a result of the SafeRent score and the denial of her housing application, Ms.

Louis was forced to rent an apartment that was less desirable, as described above.  She would

like to move to a suitable apartment, but she is pessimistic about her chances of doing so in her

rental market given her experiences with Metropolitan and SafeRent.

83.     Plaintiff Monica Douglas applied to rent an apartment at Millside at Heritage Park

in Canton, Massachusetts because she wanted to leave her poorly maintained apartment after an

on-site shooting occurred.

84.     Ms. Douglas' rental application was initially rejected solely due to her SafeRent

Score.

85.     Ms. Douglas was informed by Corcoran that her application was rejected on July

22, 2021, by a letter stating that, "screening is conducted through CoreLogic Rental Property

Solutions LLC. A score is indicated in conclusion of the screening, which reflects an approve or

deny comment. Ms. Douglas's screening came back with a deny comment based on

unsatisfactory credit history as well as landlord tenant court record."[45]  This letter continued,

"The Leasing Manager does not receive the detailed credit information at the time of running the

applicant screening."[46]

86.     In response to her rejection, Ms. Douglas first sent an appeal letter in her

---

[45] Letter from Jeanmarie O'Brien to Monica Douglas sent August 26, 2021.

[46] Letter from Jeanmarie O'Brien to Monica Douglas sent August 26, 2021.

individual capacity.  In that letter, Ms. Douglas explained that while she had an eviction record, it was because "the landlord wanted the unit for a family member."  Ms. Douglas also wrote that she had over 26 years of positive rental history with one of her previous landlords.[47]

87.     Metropolitan denied Ms. Douglas' appeal letter in a letter sent August 26, 2021.

88.     After this denial, Ms. Douglas worked with a local housing advocacy group, City Life/Vida Urbana, to draft a new appeals document which was delivered to Corcoran between September 1, 2021 and September 8, 2021.

89.     Due to advocacy from City Life/Vida Urbana on behalf of Ms. Douglas, Corcoran eventually did accept Ms. Douglas' rental application.

90.     To date, Ms. Douglas has paid her rent on time and continues to be an ideal tenant.

91.     As a result of her initial rejection Ms. Douglas continued to live in the apartment which she sought to leave through November 14, 2021, despite her safety concerns, because she had no other viable options.

92.     As a direct result of her initial rejection, Ms. Douglas felt disappointed, distressed, depressed and rejected.  SafeRent told Corcoran to deny Ms. Douglas, and that her history was "unsatisfactory;" Corcoran then conveyed those negative characterizations from SafeRent to Ms. Douglas, when it initially denied her application.

## CAAS Was Injured by SafeRent's Conduct

93.     CAAS provides a multitude of services to low-income housing-seekers, including (a) addressing benefit needs associated with independent living options, such as housing voucher programs; (b) consultation on available housing assistance; (c) providing housing advocacy for

---

[47] Letter from Monica Douglas sent early August 2021.

persons at risk of homelessness; (d) finding available and affordable housing opportunities for persons at risk of homelessness.

94.     CAAS has several housing advocates who work with prospective renters who have recently been issued housing vouchers in its Housing Advocacy Program.   CAAS' housing search advocates are trained to help voucher-holders locate, apply for, and secure apartments where they can use their housing vouchers.   CAAS works one-on-one with voucher-holders to evaluate their rental histories and overcome potential obstacles to securing housing.

95.     If a voucher-holder cannot secure a housing unit which accepts their voucher within an initial term of 120 days, the voucher-holder must request an extension.   The housing authority has discretion to grant or deny the extension.   If the housing authority denies the extension, the voucher-holder loses their housing voucher.[48]  Thus, CAAS must try to ensure each voucher-holder "leases up" before the deadline to avoid losing the housing voucher.

96.     CAAS advocates frequently encounter clients who have excellent tenancy histories but have non-tenant related debt, most often store credit cards that are in collection.

97.     Leasing agents regularly tell CAAS advocates that only applicants with a clean credit history and/or a good credit score will be able to pass the screening.

98.     Whenever an applicant is denied an apartment because of credit screening or a low SafeRent Score, CAAS staff must expend additional time trying to help that applicant find another apartment.

99.     Given the time limitations on using a housing voucher, voucher-holders cannot risk taking time to apply to places where they are likely to be denied, and CAAS cannot devote its limited staff resources to supporting futile efforts.   CAAS lacks confidence that their clients

---

[48] 24 CFR 982.303.

will not be rejected outright when applying to places that use SafeRent. Not being able to regularly encourage their clients to apply to housing providers who use SafeRent's tenant screening services limits the number of housing providers their clients can apply to. That, in turn, makes it harder for CAAS to accomplish its mission, particularly because the largest property management companies, with the most units, are most likely to use SafeRent or similar screening vendors.

100.    CAAS' experience of their clients' applications for tenancies being rejected based upon non-tenancy related debt is consistent with the experience of Plaintiffs Mary Louis and Monica Douglas.

101.    CAAS has expended time and resources addressing the barriers that tenant screening companies impose on their clients. CAAS must therefore expend more money and resources in order to place their clients into other properties where they are not turned away because of their credit or other non-tenancy debt histories.

102.    Defendants' actions have frustrated CAAS' mission by interfering with its ability to assist voucher-holders in Massachusetts obtain housing. CAAS' mission has been directly harmed by Defendant SafeRent's design, marketing, and sale of its SafeRent Scores product, and by Defendant Metropolitan's use of the SafeRent Score service because the disproportionate denial of housing to voucher-holders, especially Black and Hispanic voucher-holders, has diverted CAAS' resources from the efficient placement of voucher-holders into housing, and made placement far more time-consuming, and thus costly.

## CLASS ALLEGATIONS

103.    Plaintiffs Mary Louis and Monica Douglas bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of five classes.

104.    First, Plaintiffs Mary Louis and Monica Douglas bring this action pursuant to

Rule 23 of the Federal Rules of Civil Procedure on behalf of the "Fair Housing Act Class"

consisting of:

> All Black and Hispanic rental applicants who use publicly funded
> housing vouchers and sought but were denied housing in
> Massachusetts because of their SafeRent Score at any property
> using Defendants' tenant screening services at any time on or after
> May 25, 2020.

105.   Second, Plaintiffs Mary Louis and Monica Douglas bring this action pursuant to

Rule 23 of the Federal Rules of Civil Procedure on behalf of the "Race Discrimination MGL

Class" consisting of:

> All Black and Hispanic rental applicants who use publicly funded
> housing vouchers and sought but were denied housing in
> Massachusetts because of their SafeRent Score at any property
> using Defendants' tenant screening services at any time on or after
> May 25, 2021.

106.   Third, Plaintiffs Mary Louis and Monica Douglas bring this action pursuant to

Rule 23 of the Federal Rules of Civil Procedure on behalf of the "Source of Income

Discrimination Class" consisting of:

> All rental applicants who use publicly funded housing vouchers
> and sought but were denied housing in Massachusetts because of
> their SafeRent Score at any property using Defendants' tenant
> screening services at any time on or after May 25, 2021.

107.   Fourth, Plaintiffs Mary Louis and Monica Douglas bring this action pursuant to

Rule 23 of the Federal Rules of Civil Procedure on behalf of the "Unfair or Deceptive Practices

Voucher Class" consisting of:

> All rental applicants who use federal housing choice vouchers and
> sought but were denied housing in Massachusetts because of their
> SafeRent Score at any property using SafeRent's tenant screening
> services at any time on or after June 21, 2018.

108.   Fifth, Plaintiffs Mary Louis and Monica Douglas bring this action pursuant to

Rule 23 of the Federal Rules of Civil Procedure on behalf of the "Unfair or Deceptive Practices

26

Race Class" consisting of:

> All Black and Hispanic rental applicants who use federal housing
> choice vouchers and sought but were denied housing in
> Massachusetts because of their SafeRent Score at any property
> using SafeRent's tenant screening services at any time on or after
> June 21, 2018.

109. Plaintiffs Mary Louis and Monica Douglas are members of each class they seek to represent.

110. The members of each class are sufficiently numerous that joinder of all members is impracticable as (i) there are approximately 22,000 Black voucher-holders and 28,000 Hispanic voucher-holders within Massachusetts; and (ii) given the percentage of voucher-holders who move in a year, there are over 1500 Black voucher-holders and over 1900 Hispanic voucher-holders in Massachusetts who searched for, and were screened for, an apartment that would accept their voucher in a year. The members of each class are sufficiently numerous that joinder of all members is impracticable as (i) there are approximately 22,000 Black voucher-holders and 28,000 Hispanic voucher-holders within Massachusetts; and (ii) given the percentage of voucher-holders who move in a year, there are over 1500 Black voucher-holders and over 1900 Hispanic voucher-holders in Massachusetts who searched for, and were screened for, an apartment that would accept their voucher in a year. [49]

111. There are questions of law or fact common to each class. Such questions include, without limitation: (a) whether Defendants' use of SafeRent Scores, calculated through the

---

[49] Approximately 24% of voucher-holders in Massachusetts are Black, and 31% are Hispanic, and over 91,000 housing vouchers are in use. Approximately 7% of voucher-holders moved in the past year. *See* Office of Policy Development and Research, "Assisted Housing: National and Local" HUDUSER.GOV, available at https://www.huduser.gov/portal/datasets/assthsg.html#2009-2021_query (last visited May 11, 2022).

Registry Score-Plus Model, disproportionally rejects Black and Hispanic rental applicants; (b) whether Defendants' use of SafeRent Scores, calculated through the Registry Score-Plus Model, disproportionally rejects rental applicants who use housing vouchers; (c) whether such a disparate impact can be justified by business necessity as to applicants who use housing vouchers; (d) whether there are alternatives available that would have a less discriminatory impact; (e) whether SafeRent communicating to housing providers that class members would not be good tenants, causing them to be denied housing, caused embarrassment and distress to class members, and forced them to live in less desirable housing.

112.    The claims alleged by the proposed class representative Plaintiffs are typical of the claims of each class.

113.    Each proposed class representative Plaintiff identifies as Black or Hispanic uses a publicly funded housing voucher to pay all or part of her monthly rental payment.

114.    Each proposed class representative Plaintiff submitted a rental application for a vacant unit at a property which screens their tenants using SafeRent Score reports and had her rental application denied because of her SafeRent Score.

115.    The proposed class representative Plaintiffs will fairly and adequately represent and protect the interests of each of the classes.  They have no interests which conflict with those of the class as a whole.

116.    Plaintiffs are represented by counsel experienced in class action litigation who will adequately represent each of the classes.

117.    Each class is certifiable under Federal Rule of Civil Procedure 23(b)(2) as to liability and injunctive relief, because Defendant has acted or refused to act on grounds generally applicable to each class, thereby making appropriate final injunctive relief or corresponding

declarative relief with respect to each class as a whole.

118.     Each class is certifiable under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to each class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

119.     Alternatively, class-wide liability and punitive damages liability under the theories advanced in this action are properly certified under Federal Rule of Civil Procedure 23(c)(4) for each class because such claims present only common issues, the resolution of which would advance the interests of the parties in an efficient manner.

## CAUSES OF ACTION

### COUNT ONE
### Fair Housing Act, 42 U.S.C. § 3604 *et seq*.
### Disparate Impact Claims by Plaintiffs and Proposed Fair Housing Act Class Against SafeRent Solutions, LLC

120.     Plaintiffs repeat and reallege the allegations in ¶ 1 to ¶ 119 as if fully set forth herein.

121.     Plaintiffs Mary Louis and Monica Douglas, on behalf of themselves and the proposed Fair Housing Act Class as defined in ¶ 100, with the Community Action Agency of Somerville, bring Count One against Defendant SafeRent Solutions, LLC.

122.     Defendant SafeRent's policies and practices have a disproportionate adverse impact on Black and Hispanic rental applicants.  This disproportionate impact is the direct result of Defendant's SafeRent Score tenant screening report, which automatically determines and reports to a housing provider if a rental applicant is approved or denied solely based upon their numerical SafeRent Score, calculated by the Registry Score-Plus Model, which considers, *inter alia*, said applicant's credit and other non-tenancy debt histories.

123.     Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers.  Thus, SafeRent's scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

124.     This disparate impact cannot be justified by business necessity with respect to the voucher-holders who comprise the proposed plaintiff class, as well as the population Plaintiff CAAS serves. Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.  This is especially true for class members, who all use federal housing choice vouchers which ensure that housing providers will receive all or most of the rent due irrespective of any action taken by the tenant.

125.     There are less discriminatory alternatives available that could be used for screening tenants.

126.     SafeRent's policies and practices constitute unlawful discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604, by:

      a.     making housing unavailable on the basis of race and national origin in violation of 42 U.S.C. § 3604(a); and

      b.     providing different terms and conditions and discriminating in the provision of services in connection with housing on the basis of race and national origin in violation of 42 U.S.C. § 3604(b).

**COUNT TWO**
**Fair Housing Act, 42 U.S.C. § 3604 *et seq*.**
**Disparate Impact Claims by Plaintiff Mary Louis Against Metropolitan**
**Management Group, LLC**

127.     Plaintiffs repeat and reallege the allegations in ¶ 1 to ¶ 119 as if fully set forth

herein.

128.     Plaintiff Mary Louis brings Count Two against Defendant Metropolitan Management Group, LLC.

129.     Defendant Metropolitan's practice of using SafeRent Scores to screen rental applications has a disproportionate adverse impact on Black and Hispanic rental applicants.  This disproportionate impact is the direct result of Defendant's practice of using SafeRent Scores, which automatically determine and report to a housing provider if a rental applicant is approved or denied solely based upon their numerical SafeRent Score, calculated by the Registry Score-Plus Model, which considers, *inter alia*, said applicant's credit and other non-tenancy debt histories.

130.     Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers.  Thus, SafeRent's scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

131.     This disparate impact cannot be justified by business necessity with respect to voucher-holders like Plaintiff Louis. Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.  This is especially true for Plaintiff Louis, who uses a federal housing choice voucher which ensures that her housing providers will receive all or most of the rent due irrespective of any action taken by Ms. Louis.

132.     There are less discriminatory alternatives available that could be used for screening tenants.

133.     Metropolitan's policies and practices constitute unlawful discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604, by:

     a.     making housing unavailable on the basis of race and national origin in violation of 42 U.S.C. § 3604(a); and

     b.     providing different terms and conditions and discriminating in the provision of services in connection with housing on the basis of race and national origin in violation of 42 U.S.C. § 3604(b).

## COUNT THREE
### Massachusetts Anti-Discrimination Law,
### Massachusetts General Laws, c. 151B § 4(6)
### Disparate Impact Claims by Plaintiffs and Proposed MGL Race Discrimination Class Against SafeRent Solutions, LLC

134.    Plaintiffs repeat and reallege the allegations in ¶ 1 to ¶ 119 as if fully set forth herein.

135.    Plaintiffs Mary Louis and Monica Douglas, on behalf of themselves and the proposed MGL Race Discrimination Class as defined in ¶ 101, with the Community Action Agency of Somerville, bring Count Three against Defendant SafeRent Solutions, LLC.

136.    Defendant SafeRent's policies and practices have a disproportionate adverse impact on Black and Hispanic rental applicants.  This disproportionate impact is the direct result of Defendant's SafeRent Score tenant screening report, which automatically determines and reports to a housing provider if a rental applicant is approved or denied solely based upon their numerical SafeRent Score, calculated by the Registry Score-Plus Model, which considers, *inter alia*, said applicant's credit and other non-tenancy debt histories.

137.    Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers.  Thus, SafeRent's scoring system has had and will continue to have an adverse impact on Black and Hispanic renters.

138.    This disparate impact cannot be justified by business necessity with respect to the

voucher-holders who comprise the proposed plaintiff class, as well as the population Plaintiff

CAAS serves.  Although Black and Hispanic renters have disproportionately poorer credit and

non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's

current lease performance risk.  This is especially true for class members, who all use federal

housing choice vouchers which ensure that housing providers will receive all or most of the rent

due irrespective of any action taken by the tenant.

139.    There are less discriminatory alternatives available that could be used for

screening tenants.

140.    Defendant's policies and practices constitute unlawful discrimination in violation

of the Massachusetts General Laws, c. 151B § 4(6)(b).

141.    As described above, Defendants qualify as an assignee, an agent of persons

having the right of ownership or possession or right to rent or lease housing accommodations

under Massachusetts General Laws, c. 151B § 4(6).

## COUNT FOUR
### Massachusetts Anti-Discrimination Law,
### Massachusetts General Laws, c. 151B § 4(6)
### Disparate Impact Claims by Plaintiff Mary Louis Against Metropolitan
### Management Group, LLC

142.    Plaintiffs repeat and reallege the allegations in ¶ 1 to ¶ 119 as if fully set forth

herein.

143.    Plaintiff Mary Louis brings Count Four against Defendant Metropolitan

Management Group, LLC.

144.    Defendant Metropolitan's practice of using SafeRent Scores to screen rental

applications has a disproportionate adverse impact on Black and Hispanic rental applicants.  This

disproportionate impact is the direct result of Defendant's practice of using SafeRent Scores,

which automatically determine and report to a housing provider if a rental applicant is approved or denied solely based upon their numerical SafeRent Score, calculated by the Registry Score-Plus Model, which considers, *inter alia*, said applicant's credit and other non-tenancy debt histories.

145.     Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers.  Thus, SafeRent's scoring system will continue to have an adverse impact on Black and Hispanic renters.

146.     This disparate impact cannot be justified by business necessity with respect to Plaintiff Louis.  Although Black and Hispanic renters have disproportionately poorer credit and non-tenancy debt histories than their white counterparts, these histories do not reflect a renter's current lease performance risk.  This is especially true for Plaintiff Louis, who  uses a federal housing choice voucher which ensure that her housing provider will receive all or most of the rent due irrespective of any action taken by Ms. Louis.

147.     There are less discriminatory alternatives available that could be used for screening tenants.

148.     Metropolitan's policies and practices constitute unlawful discrimination in violation of the Massachusetts General Laws, c. 151B § 4(6)(b).

149.     As described above, Defendants qualify as an assignee, an agent of persons having the right of ownership or possession or right to rent or lease housing accommodations under Massachusetts General Laws, c. 151B § 4(6).

<u>**COUNT FIVE**</u>
**Massachusetts Anti-Discrimination Law,**
**Massachusetts General Laws, c. 151B § 4(10)**
**Disparate Impact Claims by Plaintiffs and Proposed MGL Source of Income**
**Discrimination Class Against SafeRent Solutions, LLC**

150.   Plaintiffs repeat and reallege the allegations in ¶ 1 to ¶ 119 as if fully set forth herein.

151.   Plaintiffs Mary Louis and Monica Douglas, on behalf of themselves and the proposed MGL Source of Income Discrimination Class as defined in ¶ 102, with the Community Action Agency of Somerville bring Count Five against Defendant SafeRent Solutions, LLC.

152.   Defendant SafeRent's policies and practices have a disproportionate adverse impact on rental applicants who hold housing vouchers.  This disproportionate impact is the direct result of Defendant SafeRent's SafeRent Score tenant screening report, which automatically determines and reports to a housing provider if a rental applicant is approved or denied solely based upon their numerical SafeRent Score, calculated by the Registry Score-Plus Model, which considers, *inter alia*, said applicant's credit and other non-tenancy debt histories.

153.   Individuals who use housing vouchers have disproportionately lower credit scores and worse non-tenancy debt histories than individuals who do not use housing vouchers.  Thus, SafeRent's scoring system had had and will continue to have an adverse impact on individuals who use housing vouchers.

154.   This disparate impact cannot be justified by business necessity.  Although renters who use housing vouchers have disproportionately poorer credit and non-tenancy debt histories than renters who do not use housing vouchers, these histories do not reflect a renter's current lease performance risk.  This is especially true for proposed plaintiff class members and the population served by Plaintiff CAAS, who all use federal housing choice vouchers which ensure that housing providers will receive all or most of the rent due irrespective of any action taken by the tenant.

155.   There are less discriminatory alternatives available that could be used for

35

screening tenants.

156.    As described above, SafeRent's conduct constitutes an unlawful discrimination by persons who furnish credit, services, or rental accommodations against individuals who receive federal, state, or local public assistance in violation of Massachusetts General Laws, c. 151B § 4(10).

157.    As described above, Defendants qualify as an assignee, an agent of such persons as owners, and an agent of such persons as licensed real estate brokers under Massachusetts General Laws, c. 151B § 4(10).

**COUNT SIX**
**Massachusetts Anti-Discrimination Law,**
**Massachusetts General Laws, c. 151B § 4(10)**
**Disparate Impact Claims by Plaintiff Mary Louis Against Metropolitan**
**Management Group, LLC**

158.    Plaintiffs repeat and reallege the allegations in ¶ 1 to ¶ 119 as if fully set forth herein.

159.    Plaintiff Mary Louis brings Count Six against Defendant Metropolitan Management Group, LLC.

160.    Defendant Metropolitan's practice of using SafeRent Scores to screen rental applications has a disproportionate adverse impact on rental applicants who hold housing vouchers. This disproportionate impact is the direct result of Defendant's practice of using SafeRent Scores, which automatically determine and report to a housing provider if a rental applicant is approved or denied solely based upon their numerical SafeRent Score, calculated by the Registry Score-Plus Model, which considers, *inter alia*, said applicant's credit and other non-tenancy debt histories.

161.    Individuals who use housing vouchers have disproportionately lower credit scores

and worse non-tenancy debt histories than individuals who do not use housing vouchers. Thus, SafeRent's scoring system has had and will continue to have an adverse impact on individuals who use housing vouchers.

162.    This disparate impact cannot be justified by business necessity. Although renters who use housing vouchers have disproportionately poorer credit and non-tenancy debt histories than renters who do not use housing vouchers, these histories do not reflect a renter's current lease performance risk. This is especially true for Ms. Louis who uses a federal housing choice voucher which ensures that her housing provider will receive all or most of the rent due irrespective of any action taken by Ms. Louis.

163.    There are less discriminatory alternatives available that could be used for screening tenants.

164.    As described above, Metropolitan's conduct constitutes an unlawful discrimination by persons who furnish credit, services, or rental accommodations against individuals who receive federal, state, or local public assistance in violation of Massachusetts General Laws, c. 151B § 4(10).

## COUNT SEVEN
**Massachusetts Consumer Protection Law,**
**Massachusetts General Laws, c. 93A § 9**
**Claims by Plaintiffs and Proposed Unfair or Deceptive Practices Voucher Class**
**Against SafeRent Solutions, LLC**

165.    Plaintiffs repeat and reallege the allegations in ¶ 1 to ¶ 119 as if fully set forth herein.

166.    Plaintiffs Mary Louis and Monica Douglas, on behalf of themselves and the proposed Unfair or Deceptive Practices Voucher Class as defined in ¶ 103, bring Count Seven against Defendant SafeRent Solutions, LLC.

167.    Defendant SafeRent's practice of using SafeRent Scores to screen rental applications has a disproportionate adverse impact on rental applicants who use housing vouchers, and a disproportionate adverse impact on Black and Hispanic rental applicants. This disproportionate impact is the direct result of Defendant's practice of calculating SafeRent Scores based on applicants' credit and other non-tenancy debt histories, and reporting to housing providers if rental applicants are approved or denied based upon their numerical SafeRent Score.

168.    Individuals who use housing vouchers have disproportionately lower credit scores and worse non-tenancy debt histories than individuals who do not use housing vouchers. Thus, SafeRent's scoring system has had and will continue to have an adverse impact on individuals who use housing vouchers in general.

169.    This disparate impact cannot be justified by business necessity. Although renters who use housing vouchers have disproportionately poorer credit and non-tenancy debt histories than renters who do not use housing vouchers, these histories do not reflect a renter's current lease performance risk. This is especially true for proposed plaintiff class members who all use federal housing choice vouchers which ensure that housing providers will receive all or most of the rent due irrespective of any action taken by the tenant.

170.    There are less discriminatory alternatives available that could be used for screening tenants.

171.    SafeRent's conduct, as described above, is unfair or deceptive in violation of Mass. Gen. Laws c. 93A § 9 because it is oppressive or otherwise unconscionable.

172.    SafeRent's conduct, as described above, is also unfair or deceptive in violation of Mass. Gen. Laws c. 93A § 9 because it fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare, and Mass. Gen. Laws c.

151B § 4(10), promulgated by the Commonwealth, and the Fair Housing Act 42 U.S.C. § 3604

*et seq.*, a federal consumer protection statute within the purview of M.G.L. c. 93A, § 2, as set

forth above in ¶1 to ¶119.

173.    SafeRent's conduct violates Mass. Gen. Laws c. 93A § 9 with respect to Ms.

Louis, Ms. Douglas, and each class member by engaging in tenant screening practices that are

unfair or deceptive.

**COUNT EIGHT**
**Massachusetts Consumer Protection Law,**
**Massachusetts General Laws, c. 93A § 9**
**Claims by Plaintiffs and Proposed Unfair or Deceptive Practices Race Class Against**
**SafeRent Solutions, LLC**

174.    Plaintiffs repeat and reallege the allegations in ¶ 1 to ¶ 119 as if fully set forth

herein.

175.    Plaintiffs Mary Louis and Monica Douglas, on behalf of themselves and the

proposed Unfair or Deceptive Practices Race Class defined in ¶104, bring Count Seven against

Defendant SafeRent Solutions, LLC.

176.    Defendant SafeRent's practice of using SafeRent Scores to screen rental

applications has a disproportionate adverse impact on Black and Hispanic rental applicants.  This

disproportionate impact is the direct result of Defendant's practice of calculating SafeRent

Scores based on applicants' credit and other non-tenancy debt histories, and reporting to housing

providers if rental applicants are approved or denied based upon their numerical SafeRent Score.

177.    Defendant SafeRent's practice of using SafeRent Scores to screen rental

applications has a disproportionate adverse impact on rental applicants who use housing

vouchers, and a disproportionate adverse impact on Black and Hispanic rental applicants. Thus,

SafeRent's scoring system has had and will continue to have an adverse impact on Black and

Hispanic housing voucher users in particular.

178.    This disparate impact cannot be justified by business necessity.  Although renters who use housing vouchers have disproportionately poorer credit and non-tenancy debt histories than renters who do not use housing vouchers, these histories do not reflect a renter's current lease performance risk.  This is especially true for proposed plaintiff class members who all use federal housing choice vouchers which ensure that housing providers will receive all or most of the rent due irrespective of any action taken by the tenant.

179.    There are less discriminatory alternatives available that could be used for screening tenants.

180.    SafeRent's conduct, as described above, is unfair or deceptive in violation of Mass. Gen. Laws c. 93A § 9 because it is oppressive or otherwise unconscionable.

181.    SafeRent's conduct, as described above, is also unfair or deceptive in violation of Mass. Gen. Laws c. 93A § 9 because it fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare, including Mass. Gen. Laws c. 151B § 4(6), promulgated by the Commonwealth, and the Fair Housing Act 42 U.S.C. § 3604 *et seq.*, a federal consumer protection statute within the purview of M.G.L. c. 93A, § 2, as set forth above in ¶1 to ¶119.

182.    SafeRent's conduct, as described above,  creates and publishes tenant screening reports which unfairly characterize Ms. Louis, Ms. Douglas, and the class members they seek to represent, as unfit tenants based upon invalid and otherwise discriminatory criteria, also violating Mass. Gen. Laws c. 93A § 9.

183.    SafeRent's conduct violates Mass. Gen. Laws c. 93A § 9 with respect to Ms. Louis, Ms. Douglas, and each class member by engaging in tenant screening practices that are

unfair or deceptive.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

184.    Certification of (1) the Fair Housing Act Class, (2) the Race Discrimination MGL Class, (3) the Source of Income Discrimination Class, (4) the Unfair or Deceptive Practices Voucher Class, and (5) the Unfair or Deceptive Practices Race Class as class actions under Federal Rule of Civil Procedure 23(b)(2) and (b)(3), and designation of Mary Louis and Monica Douglas as representatives of all three classes, as well as counsel of record as Class Counsel for all three classes; or, in the alternative, certification of (1) the Fair Housing Act Class, (2) the Race Discrimination MGL Class, (3) the Source of Income Discrimination Class, (4) the Unfair or Deceptive Practices Voucher Class, and (5) the Unfair or Deceptive Practices Race Class as class action under Federal Rule of Civil Procedure 23(c)(4), and designation of Mary Louis and Monica Douglas as representatives of all three classes, as well as counsel of record as Class Counsel for all five classes;

185.    Declaring Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq* and Massachusetts General Laws c. 151B, § 4 *et seq.*

186.    Enjoining Defendants, Defendants' agents, employees and successors, and all other persons in active concert or participation from:

        a.    Creating tenant screening reports or compiling information for dissemination to housing providers that includes derogatory non-tenant related debt;

   b.  Withholding housing, or otherwise making housing unavailable on the basis of race or lawful source of income;

   c.  Refusing to rent to individuals or households using housing choice vouchers or any other publicly funded housing voucher programs as defined by Massachusetts or Federal laws;

   d.  Aiding, abetting, inciting, compelling or coercing the doing of any of the acts forbidden by the federal Fair Housing Act or Massachusetts General Laws;

 187.  Enjoining Defendants and their agents, employees, and successors, and all other persons in active concert or participation to:

   a.  Make all necessary modifications to their policies, practices and procedures to comply with fair housing laws and;

   b.  Train all management, agents and employees on fair housing laws;

   c.  Monitor tenant screening outcome data to prevent discrimination against Black and Hispanic applicants;

 188.  An award of all damages that Plaintiffs, including the Fair Housing Subclass, the MGL Race Discrimination Subclass, the MGL Source of Income Discrimination Subclass, the Unfair or Deceptive Practice Voucher Class, and the Unfair or Deceptive Practice Race Class have sustained as a result of Defendant SafeRent's conduct, including statutory damages;

 189.  An award of all damages that Plaintiff Louis has sustained as a result of Defendant Metropolitan's conduct;

 190.  An award of compensatory damages, including damages for emotional distress, to Plaintiffs Mary Louis and Monica Douglas;

 191.  An award of such damages to Plaintiff CAAS as will fully compensate for the

diversion of resources and frustration of mission caused by Defendants' unlawful practices;

192.    Awarding Plaintiffs reasonable attorneys' fees, costs and expenses incurred in prosecuting this action; and

193.    Granting Plaintiffs such other further relief as may be just and proper.

## **JURY DEMAND**

194.    Plaintiffs hereby demand a trial on the merits by jury pursuant to Federal Rule of Civil Procedure 38.

August 26, 2022                              Respectfully submitted,
                                             *Counsel for Plaintiffs*

                                             */s/  Todd S. Kaplan*
                                             Todd S. Kaplan (Bar No. 634710)
                                             Nadine Cohen (Bar No. 090040)
                                             GREATER BOSTON LEGAL SERVICES
                                             197 Friend Street
                                             Boston, MA, 02114
                                             Tel.: (617) 371-1234
                                             tkaplan@gbls.org
                                             ncohen@gbls.org

                                             Christine E. Webber (*pro hac vice*)
                                             Samantha N. Gerleman (*pro hac vice*)
                                             COHEN MILSTEIN SELLERS & TOLL PLLC
                                             1100 New York Ave., N.W.
                                             Suite 500
                                             Washington, D.C., 20005
                                             Tel.: (202) 408-4600
                                             cwebber@cohenmilstein.com
                                             sgerleman@cohenmilstein.com

                                             Stuart T. Rossman (Bar No. 430640)
                                             Ariel C. Nelson (Bar No. 705704)
                                             NATIONAL CONSUMER LAW CENTER
                                             7 Winthrop Square, Boston, MA, 02110
                                             Tel.: (617) 542-8010
                                             srossman@nclc.org
                                             anelson@nclc.org