# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY LOUIS and MONICA DOUGLAS, on behalf of themselves and similarly situated persons, and COMMUNITY ACTION AGENCY OF SOMERVILLE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SAFERENT SOLUTIONS, LLC, and METROPOLITAN MANAGEMENT GROUP, LLC, <br><br> Defendants. | Case No. 1:22-cv-10800-AK |

## METROPOLITAN MANAGEMENT GROUP, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................................................1

FACTUAL BACKGROUND .....................................................................................................3

LEGAL STANDARD ..................................................................................................................6

ARGUMENT ...............................................................................................................................7

     I.      LOUIS FAILS TO SATISFY THE PLEADING REQUIREMENTS FOR A DISPARATE IMPACT HOUSING DISCRIMINATION CLAIM UNDER FEDERAL AND STATE HOUSING LAW...........................................8

          A.     The Amended Complaint does not plausibly allege that Metropolitan's use of SafeRent Scores creates an "artificial, arbitrary, and unnecessary" barrier for Black, Hispanic, or voucher-holding applicants. .........................................................................9

          B.     The Amended Complaint does not allege the existence of a statistical disparity or discriminatory effect..............................................12

          C.     The Amended Complaint does not allege that Metropolitan's use of SafeRent Scores caused a statistical disparity or discriminatory effect. ...................................................................................................13

     II.     LOUIS DOES NOT HAVE STANDING...........................................................15

CONCLUSION...........................................................................................................................18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Wright,*
468 U.S. 737 (1984) ........................................................................................17

*Aragao v. Mortg. Elec. Reg. Sys., Inc.,*
22 F. Supp. 3d 133 (D. Mass. 2014) ...............................................................6

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................6

*Beaudoin v. Baker,*
530 F. Supp. 3d 169 (D. Mass. 2021) .......................................................17, 18

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........................................................................................6

*Burbank Apartments Tenant Ass'n v. Kargman,*
48 N.E.3d 394 (Mass. 2016) ............................................................... *passim*

*Cobb Cty., Dekalb Cty., & Fulton Cty. v. Bank of Am. Corp.,*
183 F. Supp. 3d 1332 (N.D. Ga. 2016) ...........................................................9

*Cooper v. Southern Co.,*
390 F.3d 695 (11th Cir. 2004) .......................................................................13

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.,*
958 F.3d 38 (1st Cir. 2020) ........................................................................17, 18

*Ellis v. City of Minneapolis,*
860 F.3d 1106 (8th Cir. 2017) .........................................................................9

*Equal Means Equal v. Ferriero,*
478 F. Supp. 3d 105 (D. Mass. 2020) ...........................................................16

*Fla. Ass'n of Med. Equip. Dealers v. Apfel,*
194 F.3d 1227 (11th Cir. 1999) .....................................................................18

*Franklin Tower One v. N.M.,*
725 A.2d 1104 (N.J. 1999)..............................................................................10

*Gladstone, Realtors v. Bellwood,*
441 U.S. 91 (1979)......................................................................................7, 16

ii

*Grajales v. P.R. Ports Auth.*,
  682 F.3d 40 (1st Cir. 2012) ................................................................................6

*Hill v. Grp. Three Hous. Dev. Corp.*,
  799 F.2d 385 (8th Cir. 1986) ...............................................................................11

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...............................................................................15, 16, 17

*Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo*,
  759 Fed. Appx. 828 (11th Cir. 2018) .................................................................13

*Pagan v. Calderon*,
  448 F.3d 16 (1st Cir. 2006) ................................................................................16

*Pasquince v. Brighton Arms Apartments*,
  876 A.2d 834 (N.J. Super. App. Div. 2005) .......................................................10

*Ruiz Rivera v. Pfizer Pharms., LLC*,
  521 F.3d 76 (1st Cir. 2008) ..................................................................................6

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ....................................................................................... *passim*

*Treece v. Perrier Condo. Owners Ass'n*,
  519 F. Supp. 3d 342 (E.D. La. 2021) ...................................................................9

*Tsombanidis, v. W. Haven Fire Department*,
  352 F.3d 565 (2d Cir. 2003) ...............................................................................13

*United States v. AVX Corp.*,
  962 F.2d 108 (1st Cir. 1992) .................................................................................6

*Wards Cove Packing Co. v. Atonio*,
  490 U.S. 642 (1989) ......................................................................................12, 15

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993) ....................................................................................6

**Statutes**

42 U.S.C. § 3604 ...................................................................................................13, 15

G.L. c. 151B, § 4 ..................................................................................................13, 15

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ..............................................................1, 6

HUD Handbook 4350.3,
     4-57 § 4-27(B)(1) (Nov. 2013) ...............................................................................10

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Metropolitan Management Group, LLC ("Metropolitan") submits this memorandum in support of its Motion to Dismiss the Amended Complaint ("the Complaint") of Plaintiff Mary Louis ("Plaintiff" or "Louis").

## INTRODUCTION

Metropolitan is a residential property management company that manages an apartment complex in Malden, Massachusetts known as Granada Highlands.  As a property management company, it evaluates applications from prospective tenants to determine whether to lease apartments to those applicants.  In doing so, it must assess the potential risks of renting to a given applicant, including attempting to determine whether a given tenant is likely to make timely payments, likely to abide by all other terms of the lease, and unlikely to engage in criminal behavior that could compromise the safety of other tenants.  As part of this decision-making process, Metropolitan uses a tenant screening tool known as a "SafeRent Score," which is a service provided by Defendant SafeRent Solutions, LLC ("SafeRent").  The SafeRent Score takes into account, at least in part, a prospective tenant's credit history.  Louis alleges that because Metropolitan considers credit history in making lease decisions, and because Black and Hispanic consumers and those eligible for housing vouchers tend to have lower credit scores than white consumers and those with higher incomes, Metropolitan discriminates against Black and Hispanic applicants and those who have housing vouchers.  This argument fails for a simple reason: the law permits Metropolitan to evaluate an applicant's credit history and reject their application on that basis.

Louis, herself a Black woman who holds a housing voucher for approximately 69% of her rent, was denied an apartment at Granada Highlands based on her SafeRent Score, and she packages her claims against Metropolitan as disparate impact claims challenging Metropolitan's

1

use of the SafeRent Score as a screening tool.  But Louis does not allege that Metropolitan's use of the SafeRent Score has actually caused any disparate impact based on race, either for Louis herself or for the property overall.  She does not allege that more Black or Hispanic applicants are denied apartments at Granada Highlands.  She also does not allege that more voucher-holders are denied apartments at Granada Highlands than non-voucher-holders.  She does not even make a baseline showing of the percentage of Black or Hispanic tenants, or the percentage of tenants holding a housing voucher, at Granada Highlands.

The Amended Complaint alleges troubling societal disparities: that Black families have not had historical opportunities to build intergenerational wealth equal to their white counterparts, and that as a result of this and other societal forces, Black and Hispanic consumers on average have lower credit scores than white consumers, and majority-Black communities experience the highest debt in collection rates and the highest subprime credit score rates. Metropolitan does not dispute that disparities like this exist or that longstanding socioeconomic inequities have exacerbated such disparities.  The Amended Complaint does not, however, allege that this societal problem has actually manifested itself at Granada Highlands through Metropolitan's policy.  A disparate impact claim requires a disproportionate disadvantage or a discriminatory effect to members of a protected class *caused* by a particular decision.  *See Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394, 406-07, 411 (Mass. 2016).  A plaintiff must allege not only a statistical disparity in the result—that is, that more Black and Hispanic applicants and voucher-holders are denied apartments at Granada Highlands—but also that this disparity is caused by Metropolitan's own conduct, and not by other factors.  *Id.* at 411. Without those necessary elements, Louis' disparate impact claims do not pass muster in meeting the "rigorous pleading requirements" for such claims.  *Id.* at 399.

Louis' claims also fail because she has not alleged any cognizable injury. Yes, she was denied an apartment at Granada Highlands, but neither she nor anyone else has a right to rent the specific apartment of their choosing, in the neighborhood, at the price point, and with the amenities of their choosing. Louis alleges that she did secure an alternate apartment, not far from Granada Highlands, and while it allegedly does not have the amenities she may have hoped for, she does not allege that it is uninhabitable or otherwise unfit. Moreover, Louis' injury would not be redressed by the relief she seeks. The Amended Complaint seeks to prevent Metropolitan from relying on "derogatory non-tenant related debt," but it does not guarantee (or even allege) that if Louis applied for a Granada Highlands apartment again and Metropolitan considered factors other than "non-tenant related debt," she would be accepted. The Amended Complaint does not ask that Metropolitan be ordered to lease apartments to Louis or anyone else; it asks only that Metropolitan be required to use permissible criteria for evaluating rental applications. On the allegations in the Amended Complaint, Metropolitan does so. There is no injury, and even if there were, no redressable one.

Counts Two, Four, and Six of the Amended Complaint should be dismissed as to Metropolitan.[1]

### FACTUAL BACKGROUND

Metropolitan manages residential properties in Massachusetts, including Granada Highlands, located in Malden. Am. Compl. ¶ 20.[2] Granada Highlands uses SafeRent for tenant screening services. *Id*. ¶ 6. SafeRent generates a score for each rental applicant based on that

---

[1] Although there are three named plaintiffs in the Amended Complaint, two of whom seek to represent a class of similarly situated persons, only Louis asserts claims against Metropolitan, and only in her individual capacity. *See* Am. Compl. ¶¶ 127-133 (Count Two), 142-149 (Count Four), 158-164 (Count Six).

[2] As is required on a motion to dismiss, the Court must take the allegations alleged in the Amended Complaint as true. Defendant Metropolitan reserves all rights to deny the allegations in the Amended Complaint.

applicant's "lease performance risk," which property managers like Metropolitan use to determine whether to accept an application or not.  *Id*. ¶ 25; *see also id*. ¶¶ 3, 19, 24, 38-41.

The SafeRent Score is generated by a proprietary algorithm called "the Registry Score-Plus Model" or "Registry ScorePLUS" that "analyzes multiple data sources."  *Id*. ¶¶ 25-29.  The SafeRent Score is "based in significant part on the applicant's credit score and credit history, including non-tenancy debts."  *Id.* ¶ 45.  It considers credit-related information by drawing on "'credit bureau data and scores,' bankruptcy records, past due accounts, payment performance, and eviction history."  *Id.* ¶¶ 30, 35, 45.  The SafeRent Score does not consider present ability to pay the rent for the specific apartment, because it is looking at the applicant's past performance.  *See id.* ¶¶ 31, 46, 48, 50.  Precisely how the SafeRent Score is determined is a black box.  *Id.* ¶¶ 34-39.  SafeRent does not allow any changes to the screening algorithm or disclose the details of the data considered by its SafeRent Score algorithm or the weights assigned to any of its factors or variables.  *Id*. ¶¶ 33-34, 37.

SafeRent offers housing providers, including Metropolitan, a limited number of scoring criteria options for rental applications to be approved ("minimum scores").  *Id*. ¶ 39.  Housing providers choose either (1) a minimum score, which leads to the rejection of a potential tenant who scores below a certain threshold, or (2) a minimum score for automatic acceptance, an "accept with conditions" score range, and an option to reject any applicant with a score below a certain range.  *Id*.  "These decisions are made without housing providers knowing how scores are calculated, and require housing providers to rely upon SafeRent's guidance."  *Id*.

The Amended Complaint contends that SafeRent Scores are problematic for Black and Hispanic prospective tenants because historically members of these communities have not had the same wealth-building opportunities as their white counterparts, and as a result experience

greater poverty, lower credit scores, and higher debt in collection rates.  *Id.* ¶¶ 51-57.  It further alleges that SafeRent Scores might be problematic for individuals who receive housing vouchers because voucher-holders are by definition extremely or very low-income, and "many individuals with lower incomes have lower credit scores than those with higher incomes."  *Id.* ¶¶ 58-59.

Louis is a Black woman who receives a federally funded housing choice voucher "which pays for approximately 69% of her rent."  *Id*. ¶ 13.  She acknowledges in the Amended Complaint that she has a "less-than ideal credit history."  *Id.* ¶ 77.  Louis applied to rent an apartment at Granada Highlands, a Metropolitan-managed property, in the spring of 2021.  *Id*. ¶¶ 74, 76.  She was interested in this apartment because "the unit has two full bathrooms, an in-unit washer and dryer, and ample amenities, including a pool, in a safe neighborhood" in Malden.  *Id*. ¶ 74.  Louis' application was denied on May 27, 2021 based on a SafeRent Score that was "lower than is permissible" for tenancy at Granada Highlands.  *Id*. ¶¶ 75-76; *see id.* ¶ 14.  Following her denied application, Louis moved into an apartment about two miles away from Granada Highlands that does not have a pool, two full bathrooms, or as many amenities as Granada Highlands, and costs $200 more per month.  *Id*. ¶ 79.  Louis alleges that as a result of her SafeRent score and the denial of her application to Granada Highlands, she was "forced to rent an apartment that was less desirable."  *Id.* ¶ 82.

Based on these allegations, Louis asserts that "Metropolitan's practice of using SafeRent Scores to screen rental applications has a disproportionate adverse impact on Black and Hispanic rental applicants" that is "the direct result of Defendant's practice using SafeRent Scores," because SafeRent Scores "consider[] [an] applicant's credit and other non-tenancy debt histories," and "Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers."  *Id.* ¶¶ 129-130; *see id.* ¶¶ 144-145.

She contends that use of the SafeRent Score and consideration of credit history cannot be justified by business necessity, and that "[t]here are less discriminatory alternatives available that could be used for screening tenants." *Id.* ¶¶ 131-132, 146-147.  She makes the same allegations with respect to rental applicants who hold housing vouchers. *Id. ¶¶* 160-163.

## LEGAL STANDARD

A complaint must be dismissed if it fails to allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *see also* Fed. R. Civ. P. 12(b)(6).  "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*.  Dismissal is warranted where, as here, the facts as alleged simply do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (internal quotation marks and alterations omitted).

In evaluating a motion to dismiss, the Court "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  This "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992).  The Court is not obliged to "honor subjective characterizations, optimistic predictions, or problematic suppositions." *Id*.  The facts pled must "permit a 'reasonable inference' ... that the defendant is liable" for the misconduct alleged in order for the complaint to survive the motion to dismiss.  *Aragao v. Mortg. Elec. Reg. Sys.*, Inc., 22 F. Supp. 3d 133, 137 (D. Mass. 2014) (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 45 (1st Cir. 2012)).

6

## ARGUMENT

The Amended Complaint should be dismissed as to Metropolitan because Louis fails to plead a *prima facie* case of housing discrimination that satisfies the "rigorous examination" required for disparate impact housing claims to survive. *Burbank*, 48 N.E.3d at 411; *see Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 543 (2015). Specifically, Louis does not and cannot allege any specific facts that show an arbitrary Metropolitan policy or practice that caused or predictably will cause a discriminatory effect. Nor does Louis allege any facts that show a challenged policy sufficiently linked to a specific adverse racial or ethnic disparity resulting in any harm.

Instead, Louis alleges that Black and Hispanic consumers, as well as consumers who hold housing vouchers, have disproportionately lower credit scores. Am. Compl. ¶¶ 130, 145, 161. She also alleges that she is Black and holds a housing voucher, and her application for an apartment at Metropolitan's Granada Highlands was denied because of her SafeRent Score, which was based at least in part on her credit score. *Id.* ¶¶ 13-14, 45. Louis' allegations, however, are devoid of any specific facts outlining how Granada Highlands' practice of using SafeRent Scores creates a disparate impact that imposes an "artificial, arbitrary, and unnecessary barrier[]" to residency at Granada Highlands for a protected class, or establishing the "robust causality" necessary for a *prima facie* housing discrimination claim. *Burbank*, 48 N.E.3d at 411; *see also Inclusive Communities*, 576 U.S. at 543. Louis has also not stated a concrete, particularized, redressable injury sufficient to confer standing to bring these claims. *See Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 120 (1979). What Louis states is a generalized but understandable grievance with the historical inequities in American society and the consequential results of these inequities. That grievance is not one that can be remedied by the relief sought from Metropolitan.

I.   **LOUIS FAILS TO SATISFY THE PLEADING REQUIREMENTS FOR A DISPARATE IMPACT HOUSING DISCRIMINATION CLAIM UNDER FEDERAL AND STATE HOUSING LAW**

Under both federal and state law, disparate impact housing discrimination claims are subject to a burden-shifting framework laid out by the U.S. Department of Housing and Urban Development ("HUD") and adopted by the U.S. Supreme Court and the Massachusetts Supreme Judicial Court.  When alleging such claims, a plaintiff must make a *prima facie* case by pleading (1) that the defendant uses a facially-neutral policy or engages in a facially-neutral practice; (2) that such policy or practice is "artificial, arbitrary, and unnecessary;" (3) the existence of a "statistical disparity" or some other demonstration of a specific adverse racial or ethnic disparity or discriminatory effect as a result of the policy or practice; and (4) "robust causality," that is, that the disparity or discriminatory effect is "caused or predictably will [be] cause[d]" by the defendant's policy or practice, and is not "caused by factors other than the defendant's policy." *Inclusive Communities*, 576 U.S. at 521; *Burbank*, 48 N.E.3d at 411.

Disparate impact housing discrimination claims are subject to a "rigorous examination on the merits at the pleading stage" to determine whether the complaint states a *prima face* case. *Burbank*, 48 N.E.3d at 411.  The purpose of this examination is to balance the interests of property owners and protected classes, while avoiding the risk of interpreting disparate impact liability "to be so expansive as to inject racial considerations into every housing decision." *Inclusive Communities*, 576 U.S. at 543.  Courts must examine, "with care," "whether a plaintiff has made out a prima facie case of disparate impact, and prompt resolution of these cases is important."  *Id.*

**A.** **The Amended Complaint does not plausibly allege that Metropolitan's use of SafeRent Scores creates an "artificial, arbitrary, and unnecessary" barrier for Black, Hispanic, or voucher-holding applicants.**

To satisfy the Fair Housing Act ("FHA") and cognate Massachusetts law, a complaint must identify a practice or policy that imposes "artificial, arbitrary, and unnecessary barriers that create discriminatory effects or perpetuate segregation." *Burbank*, 48 N.E.3d at 410-11 (quoting *Inclusive Communities*, 576 U.S. at 543) (internal quotation marks omitted). District courts have imposed this requirement to prevent abusive use of disparate impact claims. *See*, *e.g.*, *Cobb Cty., Dekalb Cty., & Fulton Cty. v. Bank of Am. Corp.*, 183 F. Supp. 3d 1332, 1347 (N.D. Ga. 2016) (requiring claimants to allege, and then eventually show, that a policy is artificial, arbitrary, and unnecessary); *Treece v. Perrier Condo. Owners Ass'n*, 519 F. Supp. 3d 342, 354 (E.D. La. 2021) (a policy cannot be "artificial, arbitrary, and unnecessary absent the existence of pertinent, contrary factual allegations sufficiently rendering a plaintiff's claimed entitlement to disparate impact relief plausible, rather than merely conceivable or speculative"); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 (8th Cir. 2017) (disparate impact claim rejected where plaintiffs failed to allege facts plausibly demonstrating that the housing code standards are arbitrary or unnecessary to health and safety).

The target of the Amended Complaint is the SafeRent Score. Am. Compl. ¶¶ 1-5. The policy or practice at issue with respect to Metropolitan is its reliance on the SafeRent Score to determine whether to accept or reject a tenant. *E.g.*, *id.* ¶¶ 20, 129. Louis' sole criticism of the SafeRent Score is its reliance on credit history. *See id.* ¶¶ 45, 50, 61. She alleges that Black and Hispanic consumers have disproportionately lower credit scores and worse debt histories, and that because of this, "SafeRent assigns disproportionately lower SafeRent Scores to Black and Hispanic rental applicants compared to white rental applicants." *Id.* ¶ 2. As a result, Louis

alleges, "SafeRent Scores cause Black and Hispanic rental applicants to be disproportionately likely to be denied housing."  *Id.* ¶ 4.

Even assuming that Metropolitan's use of SafeRent Scores did create discriminatory effects—which Louis does not allege, as discussed *infra*—Louis does not plausibly allege that the consideration of credit history is an "artificial, arbitrary, or unnecessary" one.  Although the Amended Complaint draws a distinction between credit histories (past) and considerations of current ability to pay (present/future) by alleging that "[c]redit score and conventional credit history are not accurate predictors of timely rental payments" (*id.* ¶ 50), nowhere does Louis allege that her credit history, or that of anyone else's for that matter, is not an accurate reflection of her past debt history.  And nowhere does Louis allege that a prospective tenant's past debt history is an irrelevant and unnecessary consideration for a landlord.

In reality, credit history is both a common and legally accepted tool used by housing providers to assist in their decision process, because it provides a window into the potential risk of default associated with an applicant.  *See Pasquince v. Brighton Arms Apartments*, 876 A.2d 834, 838-40 (N.J. Super. App. Div. 2005) (finding that, under federal and state law, "it is well established that creditworthiness is a legitimate, non-discriminatory criteria, which landlords are permitted to consider when evaluating prospective tenants, including recipients of Section 8 housing assistance");  *Franklin Tower One v. N.M.*, 725 A.2d 1104, 1108-09 (N.J. 1999) (explaining that federal law explicitly recognizes the right of landlords to perform background checks, including credit checks, on prospective Section 8 tenants).  Credit history is expressly recognized by HUD, for example, as a permissible screening factor.  *See* HUD Handbook 4350.3, at 4-57 § 4-27(B)(1) (Nov. 2013) ("Owners may reject an applicant for a poor credit history," and may use "private companies that can provide owners with a credit report on an

applicant"); *see also Hill v. Grp. Three Hous. Dev. Corp.*, 799 F.2d 385, 389 (8th Cir. 1986) (noting that HUD Transmittal Handbook No. 4350.3 lists "poor credit references" as one of four permitted screening criteria factors).  The Amended Complaint identifies no decisional or other law to the contrary.

Metropolitan's use of SafeRent Scores, as alleged, is therefore a valid, non-arbitrary practice.  The use of credit scores to evaluate potential tenants is permitted by HUD and the case law, because it is a reliable indicator of past performance and ensures that tenants are likely to maintain current on their rent and other charges.  *See Inclusive Communities*, 576 U.S. at 541 (analogizing Title VII analysis to the housing discrimination context).

Louis' claim based on housing voucher status, as opposed to race, fares no better because it similarly relies on the "credit score" rationale.  Specifically, Louis alleges that "SafeRent Scores … have a disparate impact on renters of all races who use housing vouchers," because (i) SafeRent Scores are "based in significant part on the applicant's credit score and credit history," (ii) individuals who use housing vouchers have low incomes, (iii) "many individuals with lower incomes have lower credit scores," and (iv) lower credit scores cause lower SafeRent Scores which, in turn, result in denied rental applications.  Am. Compl. ¶¶ 5, 30, 45, 59, 161.  Credit scores help a housing provider evaluate, at least in part, whether prospective tenants will make good on their future obligations, irrespective of financial ability to pay those obligations (because of wealth, HUD subsidy, or any other factor).  As with her race-based allegations, Louis has not alleged that consideration of credit scores in the housing voucher context creates an arbitrary or impermissible barrier.

**B.    The Amended Complaint does not allege the existence of a statistical disparity or discriminatory effect.**

The Amended Complaint is rife with statistics about median and average credit scores of Black and Hispanic consumers, and asserts that lower income individuals, who often hold housing vouchers, typically have lower credit scores.  Am. Compl. ¶¶ 51-59.  All of these medians, averages, and national snapshots say nothing about the actual people who applied to rent at Granada Highlands and were either accepted or rejected.  The Amended Complaint says nothing about whether Black and Hispanic applicants are more frequently denied apartments at Granada Highlands.  It likewise says nothing about whether voucher holders are more frequently denied apartments at Granada Highlands.  Nor does it allege that fewer Black and Hispanic people reside at Granada Highlands than white people, or that fewer Black, Hispanic, or voucher-holding tenants reside at Granada Highlands than at a comparable property that does not use the SafeRent Score.

Instead, the Amended Complaint relies on generalized statistical data about credit scores and credit histories of Black and Hispanic people versus white people, and voucher-holding people versus higher-income people.  Am. Compl. ¶¶ 51-52, 59.  But it contains no data or even conclusory allegations concerning the actual impact of *Metropolitan's* leasing decisions for Black, Hispanic, and/or voucher-holding applicants.  In other words, the Amended Complaint alleges disparate credit scores amongst the general population, but there are no allegations of a disparate impact at Granada Highlands corresponding with these disparate credit scores.  The proper comparator group is not Black and Hispanic consumers and voucher-holders in the United States overall; it is Black, Hispanic, and voucher-holding applicants to this particular property, or at least to comparable properties in the geographic area.  *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989) (discriminatory impact claim is inadequately pled where the alleged

disparities are not said to be between similarly-situated persons); *Cooper v. Southern Co.*, 390 F.3d 695, 717 (11th Cir. 2004) ("The Supreme Court has emphasized the importance of looking to the proper base 'group' when making statistical comparisons and examining all of the surrounding facts and circumstances which create the statistics themselves"); *Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo*, 759 Fed. Appx. 828, 835-36 (11th Cir. 2018) (comparative analysis necessary to determine whether "the claimed impact might have disparately fallen on certain insular groups" must be conducted at the level the policy actually would affect, and not on some other scale; where a complaint "does not establish a disparate impact, let alone any causal connection between the [challenged policy] and the disparate impact," it does not make a *prima facie* showing).

Without showing a specific disparity between the outcomes of Black and Hispanic rental applicants, and applicants who hold housing vouchers, as compared to applicants who are not in one of these groups, Louis' disparate impact claim fails to show a disparity in outcomes for protected groups.

### C.    The Amended Complaint does not allege that Metropolitan's use of SafeRent Scores caused a statistical disparity or discriminatory effect.

Louis also fails to plead the final element for a *prima facie* disparate impact claim: "robust causation."  This requirement demands a showing that the policy or practice complained of **created** a disproportionately adverse effect for members of a protected class.  *See Burbank, 48 N.E.3d at 411, Inclusive Communities,* 576 U.S. at 543 ("A plaintiff who fails to allege facts ... or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."); 42 U.S.C. § 3604(a)-(b); G.L. c. 151B, § 4(6); *see also Tsombanidis, v. W. Haven Fire Department*, 352 F.3d 565, 575 (2d Cir. 2003) (a mere "inference of discriminatory impact" is insufficient).  Even assuming that the Amended Complaint did allege a

statistical disparity in outcomes (which it does not), the Amended Complaint fails to allege any facts that demonstrate a causal connection between the challenged practice and the alleged racial disparity or the alleged disparity for voucher-holders. Indeed, disparate impact claims frequently fail where, as here, a plaintiff cannot show that any alleged statistical disparity was not "caused by factors *other* than the defendant's policy." *Burbank*, 48 N.E.3d at 411 (emphasis added).

The Amended Complaint singularly focuses on SafeRent's consideration of credit history in generating SafeRent Scores, and use of the same by Metropolitan in deciding whether to accept or reject an applicant. Am. Compl. ¶¶ 129, 144, 160. Louis acknowledges, however, that credit history is only one of several factors considered in formulating her SafeRent Score, *id.* ¶ 25, which as a whole was "lower than is permissible" under Granada Highlands tenancy standards. *Id*. ¶ 76. The existence of "other factors" that could explain a discrepancy in outcomes is precisely what prevents a plaintiff from establishing a *prima facie* case on a disparate impact claim. *Id.* ¶ 25. *See Inclusive Communities*, 576 U.S. at 543 (explaining that it may be "difficult to establish causation" where there are "multiple factors" at issue). Here, as alleged, SafeRent also considers credit bureau data and scores, bankruptcy records, past due accounts, payment performance, and eviction history as factors within its algorithm. Am. Compl. ¶ 35. The Amended Complaint alleges that SafeRent Scores are calculated based "in large part on factors that produce disproportionately lower SafeRent Scores for Black and Hispanic applicants and those using housing vouchers," *id*. ¶ 41, but never indicates which specific factors they are referring to.

The allegations in the Amended Complaint can therefore be summarized as follows: (1) Black and Hispanic consumers have on average lower credit than white consumers; (2) housing-voucher recipients are very low income, and lower income people tend to have lower credit

14

scores; (3) Metropolitan relies on a tenant screening service provided by SafeRent to evaluate the risk of an applicant, and that service relies primarily on credit scores; (4) Louis was denied an apartment at Granada Highlands because of her SafeRent Score; and (5) Louis is Black and has a housing voucher for part of her rent.  It takes too many leaps to make Louis' experience illustrative of, and in fact *caused by*, a discriminatory policy that uses a facially neutral application process to produce a disparity in access for Black and Hispanic prospective tenants and those with housing vouchers.

Put another way, Louis seeks to hold Metropolitan accountable for disparities it didn't create: longstanding inequities in access to wealth and wealth-building mechanisms that have contributed to racial and income disparities in credit scores and credit histories.  *See* Am. Compl. ¶¶ 54-57.  "A robust causality requirement ensures that racial imbalance ... does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create."  *Inclusive Communities*, 576 U.S. at 542 (citing *Wards Cove*, 490 U. S. at 653).  The Amended Complaint fails to allege any facts showing the necessary "robust" causal link between Metropolitan's practice of using the SafeRent Score and considering credit history and a disproportionately adverse impact for members of a protected class in obtaining apartments at Granada Highlands.

## II.    LOUIS DOES NOT HAVE STANDING

Louis lacks standing to state a claim for housing discrimination under 42 U.S.C. § 3604(a)-(b) or G.L. c. 151B, § 4(6) or 4(10) because she has not satisfied the Article III or prudential prerequisites to bring her claims.

To have standing, Louis must allege: (1) an injury-in-fact that is concrete and particularized, and not conjectural or hypothetical; (2) that is fairly traceable to Metropolitan's conduct; and (3) that is likely to be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560-61 (1992).  Moreover, Louis must show that her claim is premised on her own

legal rights, "is not merely a generalized grievance," and "falls within the zone of interests

protected" by the laws she invokes.  *Pagan v. Calderon*, 448 F.3d 16, 27 (1st Cir. 2006).

Similarly, under the FHA, a plaintiff's injury must be "distinct and palpable."  *Gladstone*, 441

U.S. at 100; *see also Lujan*, 504 U.S. at 573.  "[A] generalized grievance shared in substantially

equal measure by all or a large class of citizens" is insufficient.  *Equal Means Equal v. Ferriero*,

478 F. Supp. 3d 105, 114 (D. Mass. 2020).

 Louis asserts that "as a direct result" of her rejection from Granada Highlands, she felt

"disappointed, frustrated and worried that she would not be able to find an apartment with her

voucher."  Am Compl. ¶ 81.  She did in fact find an apartment, but it was allegedly "less

desirable" even though the rent was higher.  *Id*. ¶¶ 79, 80, 82 & n.21.  These are general

grievances shared by almost everyone navigating the greater Boston area housing market.  There

is no right to the apartment of one's choosing, or to rent an apartment in one's preferred area or

in a building that contains all the amenities one might hope for.  What the law requires "is that

the defendants not discriminate against public assistance recipients in general, not that they must

provide the best—or any particular—form of rental assistance."  *Burbank*, 48 N.E.3d at 406.

Louis does allege that she had to pay more for the apartment she ultimately got than she would

have with Metropolitan, but there is no right to pay what you wish for rent, or to get the lowest-

rent apartment you apply for.  Moreover, Louis alleges that she received a housing voucher that,

by definition, puts an upper limit on how much of her monthly income she will need to pay

toward rent; in this context, any alleged financial harm from having to pay more for an apartment

than she would have had to pay at Granada Highlands is necessarily limited.  *See* Am. Compl.

¶¶ 7, 79.  Feelings of disappointment, frustration, and worry, while legitimate, are similarly too

general to constitute a distinct, identifiable, actionable injury.  *See Beaudoin v. Baker*, 530 F.

Supp. 3d 169, 174-75 (D. Mass. 2021) (feeling unsettled or berated amounts to a generalized

grievance).  Again, everyone navigating the Boston housing market experiences such feelings.

These same deficiencies impair Louis' ability to show the necessary causation for

standing.  The feelings of disappointment, frustration, and worry Louis experienced in trying to

find a suitable apartment were not caused by Metropolitan.  They were caused, as the Amended

Complaint acknowledges, by market and societal forces that are not "fairly traceable" to this

particular defendant's conduct.  *See Lujan*, 504 U.S. at 560-61.  Among them are factors that

Louis and her co-plaintiffs describe in the Amended Complaint that have nothing to do with

Metropolitan: historical "[r]acial inequities in wealth," contributing to Black and Hispanic

consumers having lower median credit scores and being more likely to have subprime credit

scores than white consumers, and producing "majority-Black communities [that] have the lowest

median credit scores, the highest debt in collection rates, the highest subprime credit score rates,

and the highest use of high-cost payday…."  Am. Compl. ¶¶ 51-57.  The "line of causation"

between the alleged conduct here (Metropolitan's use of the SafeRent Score as a tenant screening

tool) and the injury (Louis having to rent an apartment that was more expensive, with fewer

amenities, in a less desirable area of the same city) is "too attenuated."  *Allen v. Wright*, 468 U.S.

737, 752 (1984); *see Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d

38, 47 (1st Cir. 2020) ("The 'traceability' or causation element 'requires the plaintiff to show a

sufficiently direct causal connection between the challenged action and the identified harm.'"

(citation omitted)).  Louis' grievances are precisely the type that are dependent on the actions of

countless third parties, any one of whose conduct could have produced the result Louis

experienced in not meeting Metropolitan's rental criteria for an apartment at Granada Highlands.

*See Fla. Ass'n of Med. Equip. Dealers v. Apfel*, 194 F.3d 1227, 1230-31 (11th Cir. 1999) (where there is "myriad other possible causes," the causal chain is too attenuated to establish standing); *Beaudoin*, 530 F. Supp. 3d at 175.

Finally, Louis does not have standing to bring these claims because her alleged injury would not be redressed by the relief she seeks.  The prayer for relief in the Amended Complaint seeks to enjoin Metropolitan from, in essence, relying upon information "that includes derogatory non-tenant related debt," and from refusing to rent to individuals using housing choice vouchers or on the basis of the applicant's race or lawful source of income.  Am. Compl. ¶ 186.  The prayer for relief also seeks monetary damages on behalf of Louis.  *Id.* ¶¶ 189-190.  But it does not go so far as to ask the Court to order Metropolitan to provide housing to Louis, or to accept her rental application, or to provide Louis with some other way to access housing that she perceives to be comparable to the apartment she was not able to rent at Granada Highlands.  Where the Amended Complaint does not demonstrate that Louis' alleged injury "would be alleviated by the relief the district court could … provide[] in this case," she has failed to show redressability.  *Dantzler*, 958 F.3d at 49.

## CONCLUSION

For the reasons articulated herein, the claims asserted against Metropolitan in Counts Two, Four and Six of the Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

METROPOLITAN MANAGEMENT
GROUP, LLC,

By its attorneys,

*/s/ Thomas H. Wintner*
Thomas H. Wintner (BBO # 667329)
Michael A. Pollack (BBO # 704092)
MINTZ, LEVIN, COHN, FERRIS,
  GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000 (tel.)
(617)-542-2241 (fax)
thwintner@mintz.com
mapollack@mintz.com

Dated:  October 27, 2022

## **CERTIFICATE OF SERVICE**

 I, Thomas H. Wintner, hereby certify that on October 27, 2022, this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF, and copies will be sent via electronic mail and first-class mail to those indicated as non-registered participants.

*/s/ Thomas H. Wintner*   
Thomas H. Wintner
