# Exhibit A



# HUD Handbook 4350.3:
# Occupancy Requirements of Subsidized Multifamily Housing Programs

*November 2013*

3. <u>Disability</u>.  Owners may adopt a preference to select families that include a person with a disability. Owners may not create preferences for persons with a specific type of disability unless allowed in the controlling documents for the property.  (See Chapter 3, Section 2.)  Owners may not apply a preference for persons without disabilities.

4. <u>Victims of Domestic Violence, *Dating Violence or Stalking*</u>.  Owners may adopt a preference for admission of families that include victims of domestic violence, *dating violence or stalking*.

5. <u>Specific groups of single persons.</u>  Owners may adopt a preference for single persons who are elderly, displaced, homeless or persons with disabilities over other single persons.

D. **Determining the Relative Weight of Owner-Adopted Preferences**

Owners may decide to assign various importance to owner-adopted preferences. If the owner chooses to do so, a ranking, rating, or combination of preference circumstances must be identified in the Tenant Selection Plan and consistently used.  For example, an owner may choose to provide the highest ranking to working families, though this ranking is subordinate to income targeting requirements and to statutory and regulatory preferences described in paragraphs 4-6 A and B above.  Alternatively, an owner might choose to adopt a policy that provides top priority to an applicant who qualifies for the most preference categories (also known as combining preferences).

**4-7   Screening for Suitability**

Screening is used to help ensure that families admitted to a property will abide by the terms of the lease, pay rent on time, take care of the property and unit, and allow all residents to peacefully enjoy their homes.  Information collected through the screening process enables owners to make informed and objective decisions to admit applicants who are most likely to comply with the terms of the lease.  An effective screening policy will also ensure fair, consistent, and equal treatment of applicants.  All screening criteria adopted by the owner must be described in the tenant selection plan and consistently applied to all applicants in a non-discriminatory fashion and in accordance with all applicable fair housing and civil rights laws.

A. **Screening Versus Determining Eligibility**

*Screening* for suitability of tenancy is not a determination of *eligibility* for the program.

1. <u>Eligibility</u> is a determination that an applicant family meets all of the criteria for the type of subsidy in the property.  To be eligible a family must meet the income limits and provide specific information and documentation of other family information (i.e., SSNs, and citizenship information).  Eligibility is discussed in detail in Chapter 3.

2.  <u>Screening</u> is a determination that an otherwise eligible household has the ability to pay rent on time and to meet the requirements of the lease.

B. **Key Requirements**

1.  Owners are permitted to establish and apply written screening criteria to determine whether applicants will be suitable tenants. If an owner's review of information about the applicant indicates that the applicant will not be a suitable tenant, the owner may reject the application for assistance or tenancy.

2.  Owners must establish written screening criteria to prohibit the admission of certain individuals who have engaged in drug-related criminal behavior, or are subject to a State lifetime sex offender registration program, or are individuals whose abuse or pattern of abuse of alcohol interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents. Owners may choose to expand these requirements regarding prohibition of admission to certain applicants *[24 CFR part 5, subpart I & J]*.

3.  *Owners must establish written procedures for using the EIV Existing Tenant Search. See D below.*

4.  Screening criteria must be included in the tenant selection plan. (See paragraph 4-4.C and Figure 4-2.)

5.  Owners must apply screening criteria uniformly to all applicants to prevent discrimination and avoid fair housing violations.

6.  The screening of live-in aides at initial occupancy and the screening of persons or live-in aides to be added to the tenant household after initial occupancy involve similar screening activities. Both live-in aides and new additions to the tenant household must be screened for drug abuse and other criminal activity, including *State lifetime registration as a sex offender*, by applying the same criteria established for screening other applicants. In addition, owners may apply any other owner established applicant screening criteria to new household members in order to establish suitability for tenancy. Owner established screening criteria may also be applied to live-in aides, except for the criterion regarding the ability to pay rent on time because live-in aides are not responsible for rental payments.

7.  Police officers and other security or management personnel that reside in subsidized units are subject to the same screening criteria as other applicants.

8.  The costs of screening must not be charged to applicants. Such costs may be charged against the project operating account. A variation on this rule applies to cooperatives.

9.  Certain types of screening are prohibited. See paragraph 4-8 below.

C. **Screening For Drug Abuse and Other Criminal Activity**

1. Tenant selection plans <u>must</u> contain screening criteria that include standards for prohibiting admission of those who have engaged in drug-related or criminal activity. The plan <u>may</u>, under certain circumstances, include additional provisions that deny admission to applicants for other drug and criminal activity.

2. Owners <u>must</u> establish standards that prohibit admission of:

   a. Any household containing a member(s) who was evicted in the last three years from federally assisted housing for drug-related criminal activity. The owner may, but is not required to, consider two exceptions to this provision:

      (1) The evicted household member has successfully completed an approved, supervised drug rehabilitation program; or

      (2) The circumstances leading to the eviction no longer exist (e.g., the household member no longer resides with the applicant household).

   b. A household in which any member is currently engaged in illegal use of drugs or for which the owner has reasonable cause to believe that a member's illegal use or pattern of illegal use of a drug may interfere with the health, safety, and right to peaceful enjoyment of the property by other residents;

   c. Any household member who is subject to a State sex offender lifetime registration requirement; and

   d. Any household member if there is reasonable cause to believe that member's behavior, from abuse or pattern of abuse of alcohol, may interfere with the health, safety, and right to peaceful enjoyment by other residents. The screening standards must be based on behavior, not the condition of alcoholism or alcohol abuse.

3. Owners <u>may</u> establish additional standards that prohibit admission if the owner determines that any household member is currently engaging in, or has engaged in, the following activities during a reasonable time before the admission decision:

   a. <u>Drug-related criminal activity</u>. The owner may include additional standards beyond the required standards that prohibit admission in the case of eviction from federally assisted housing for drug-related criminal activity and current drug use.

   b.   Violent criminal activity.

   c.   Other criminal activity that threatens the health, safety, and right to peaceful enjoyment of the property by other residents or the health and safety of the owner, employees, contractors, subcontractors, or agents of the owner.

   **NOTE:**. If an owner's admission policy includes any of the activities above or similar restrictions that uses a standard regarding a household member's current or recent actions, the owner may define the length of time prior to the admission decision during which the applicant must not have engaged in the criminal activity. The owner shall ensure that the relevant reasonable time period is uniformly applied to all applicants in a non-discriminatory manner and in accordance with applicable fair housing and civil rights laws.

4. An owner's screening criteria also may include the following provisions:

   a.   Exclusion of culpable household members.  An owner may require an applicant to exclude a household member when that member's past or current actions would prevent the household from being eligible.

   b.   Drug or alcohol rehabilitation.  When screening applications, an owner may consider whether the appropriate household member has completed a supervised drug or alcohol rehabilitation program.  The owner may require appropriate documentation of the successful completion of a rehabilitation program.

   c.   Length of mandatory prohibition.  The owner may set a period longer than required by the regulation (as described in subparagraph C.2 above) that prohibits admission to a property for disqualifying behavior.  For those behaviors that would result in denial for a reasonable time, the owner must define a reasonable period in the tenant selection plan.

   d.   Reconsideration of previously denied applicants.  An owner may reconsider the application of a previously denied applicant if the owner has sufficient evidence that the members of the household are not and have not engaged in criminal activity for a reasonable period of time.  The owner must define a reasonable period of time in the tenant selection plan. When the owner chooses to adopt this admission provision, the owner must require the household member to submit documentation to support the reconsideration of the decision which includes:

      (1)   A certification that states that she or he is not currently engaged in such criminal activity and has not engaged in such criminal activity during the specified period.

        (2)    Supporting information from such sources as a probation officer, a landlord, neighbors, social service agency worker or criminal record(s) that were verified by the owner.

    e.    <u>Consideration of the circumstances relevant to a particular case</u>. In developing optional screening criteria for a property, and applying the criteria to specific cases, owners may consider all the circumstances relevant to a particular household's case. Such considerations may not be applied to the required screening criteria described in subparagraph C.2 above. These types of circumstances include:

        (1)    The seriousness of the offense;

        (2)    The effect denying tenancy would have on the community or on the failure of the responsible entity to take action;

        (3)    The degree of participation in the offending activity by the household member;

        (4)    The effect denying tenancy would have on nonoffending household members;

        (5)    The demand for assisted housing by persons who will adhere to lease responsibilities;

        (6)    The extent to which the applicant household has taken responsibility and takes all reasonable steps to prevent or mitigate the offending action; and

        (7)    The effect of the offending action on the program's integrity.

D.    **\*Screening Using the EIV Existing Tenant Search**

Owners must establish procedures in their Tenant Selection Plan for using the EIV Existing Tenant Search to determine if the applicant or any member of the applicant's household are being assisted under a HUD rental assistance program at another location  See Chapter 9, Enterprise Income Verification (EIV) for information on using the Existing Tenant Search.*

E.    **Considerations In Developing Screening Criteria**

Specific screening criteria will vary from property to property. In developing screening criteria, owners may want to consider the following factors:

1.    <u>Length of the property's waiting list</u>. An owner of a property that has a long waiting list may consider establishing relatively restrictive screening standards, whereas an owner of a property with little or no waiting list may want to have less restrictive standards. *Regardless of standards established, the owner must screen for State lifetime sex offender

registration in all states where the applicant, or members of the applicant's household, have resided or using a database such as the Dru Sjodin National Sex Offender Database that searches all of the individual state sex offender registries. This searchable database is located at http://www.nsopw.gov.*   Setting standards involves balancing the need to fill vacancies with the long-term effect of accepting higher risk tenants. Thorough screening often makes the project more attractive to applicants, thereby decreasing vacancies and turnover.

2. <u>Application and screening fees</u>.  Screening takes staff time and may require funds to pay for credit reports and other information.

   <u>Rental housing</u>.  Owners may not charge application fees or require applicants to reimburse them for the cost of screening, <u>including scre</u>ening for criminal history.  Therefore, owners will want to carefully weigh the cost of various screening activities against the benefits.  Screening costs may be charged as an operating expense against the property operating account.

   a. <u>Screening criteria for assisted units in cooperatives</u>.

      (1) <u>Application fees</u>.  Cooperatives may require prospective members to pay application fees if such fees are permissible under state and local laws.  The cooperative's board of directors must approve the application fee.  While the fee must be reasonable in amount and consistently applied, cooperatives need not submit the fee for Field Office approval.  The cooperative must treat the application fee as an earnest money deposit.  The application fee is not intended to cover the administrative expenses the cooperative incurs in processing applications.  If the applicant is accepted for membership, the cooperative must apply the application fee to the purchase of the membership.  If the applicant is rejected by the cooperative, the cooperative must refund the full application fee.  The cooperative may retain the application fee only if the applicant backs out of the purchase transaction.  While rental projects may not collect application fees, cooperatives may do so because application fees are traditional for homeownership transactions, and admission to a cooperative requires completion of more complicated paperwork than does admission to a rental.  Collection of an earnest money deposit will minimize instances in which the cooperative spends time and money processing the application and then the applicant backs out.

    (2) <u>Credit report fees</u>.  Cooperatives may charge applicants for the cost of credit reports.  This fee is intended to cover the cooperative's out-of-pocket cost; these fees are not refundable and need not be applied to the applicant's purchase costs.  Cooperatives are permitted to charge these costs to applicants because:

      ➢ Such charges are standard industry practice for homeownership;

      ➢ Costs of these reports for home purchase can be more expensive than those required for rental purposes; and

      ➢ During initial occupancy, HUD requires cooperatives to obtain credit reports on all applicants, and many cooperatives have continued that policy as memberships are resold in later years.

  F. **Permitted Screening Criteria Commonly Used by Owners**

    1. <u>Overview</u>.  Owners are permitted to screen applicants for suitability to help them to determine whether to accept or deny an applicant's tenancy.  Owners should consider at least developing screening criteria related to the following factors and may establish other criteria not specifically prohibited in paragraph 4-8 below.  All screening criteria adopted by the owner must be described in the tenant selection plan and consistently applied to all applicants.

    2. <u>Screening for credit history</u>.  Examining an applicant's credit history is one of the most common screening activities.  The purpose of reviewing an applicant's credit history is to determine how well applicants meet their financial obligations.  A credit check can help demonstrate whether an applicant has the ability to pay rent on time.

      a. Owners may reject an applicant for a poor credit history, but a lack of credit history is not sufficient grounds to reject an applicant.

      b. As part of their written screening criteria, and in order to ensure that all applicants are treated fairly, owners should describe the general criteria they will use for distinguishing between an acceptable and unacceptable credit rating. Owners are most often interested in an applicant's credit history related to rent and utility payments.  A requirement for applicants to have a perfect credit rating is generally too strict a standard.

      c. Owners may determine how far back to consider an applicant's credit history.  Owners generally focus on credit activity for the past three to five years.  It is a good management practice to give priority to current activity over older activity.

    d.    Owners may have to justify the basis for a determination to deny tenancy because of the applicant's credit rating, so there should be a sound basis for the rejection.

3. <u>Minimum Income Requirement</u>. Section 236 and Section 221(d)(3) BMIR applicants who receive no other form of assistance, such as Section 8, may be screened for the ability to pay the Section 236 basic rent or the BMIR rent. Owners may establish a reasonable minimum income requirement to assess the applicant's ability to pay the rent. In the Section 8, RAP, and Rent Supplement programs, owners may **not** establish a minimum income requirement for applicants. (See paragraph 4-8.A.)

4. <u>Screening for rental history</u>. In addition to determining whether applicants are likely to meet their financial obligations as tenants and pay rent on time, owners are also interested in whether applicants have the ability to meet the requirements of tenancy.

    a.    Owners must not reject an applicant for lack of a rental history but may reject an applicant for a poor rental history.

    b.    As part of their written screening criteria, and in order to ensure that all applicants are treated fairly, owners should describe the general criteria they will use for distinguishing between acceptable and unacceptable rental history.

5. <u>Screening for housekeeping habits</u>. Owners may visit the applicant's current dwelling to assess housekeeping habits.

    a.    As part of their written screening criteria, and in order to ensure that all applicants are treated fairly, owners should describe the general criteria they will use for distinguishing between acceptable and unacceptable housekeeping practices.

    b.    Owners must establish reasonable standards which can be consistently applied to all families. Messy living quarters are not the same as safety and health hazards.

    c.    In defining the home visit standards, the owner should establish a geographic radius within which home visits are made, and outside of which home visits are not made. It is impractical to establish a policy requiring home visits for all applicants, which might require the owner to visit units many miles from the property. For example, an owner may determine that 50 miles is the maximum distance that can be traveled to visit an applicant at home.

6. <u>Consideration of extenuating circumstances in the screening process</u>. Owners may consider extenuating circumstances in evaluating information obtained during the screening process to assist in determining the acceptability of an applicant for tenancy. If the applicant is a person

with disabilities, the owner must consider extenuating circumstances where this would be required as a matter of reasonable accommodation.

## 4-8 Prohibited Screening Criteria

Owners are prohibited from establishing any of the following types of screening criteria.

A. **Criteria That Could Be Discriminatory**

Owners must comply with all applicable federal, state or local fair housing and civil rights laws and with all applicable civil rights related program requirements.

1. Owners may not discriminate based on race, color, religion, sex, national origin, age, familial status, or disability.

2. Owners may not discriminate against segments of the population (e.g., welfare recipients, single parent households) or against individuals who are not members of the sponsoring organization of the property. Owners may not require a specific minimum income, except as allowed by paragraph 4-7 E.3 of this Handbook.

3. These prohibitions apply to (1) accepting and processing applications; (2) selecting tenants from among eligible applicants on the waiting list; (3) assigning units; (4) certifying and recertifying eligibility for assistance; and (5) all other aspects of continued occupancy.

4. Complaints alleging violations of these prohibitions must be referred to HUD's Regional Offices of Fair Housing and Equal Opportunity.

B. **Criteria That Require Medical Evaluation or Treatment**

1. Owners may not require applicants to undergo a physical exam or medical testing such as AIDS or TB testing as a condition of admission.

2. Owners may not require pregnant women to undergo medical testing to determine whether she is pregnant in order to assign a unit with the appropriate number of bedrooms.

3. Owners may uniformly require all applicants to provide evidence of an ability to meet the obligations of tenancy, but owners may not impose greater burdens on persons with disabilities. Persons with disabilities may meet the requirements of the lease with the assistance of others, including an assistance animal, a live-in aide, or with services provided by someone who does not live in the unit.

C. **Criteria That Require Meals and Other Services**

Owners may not require tenants to participate in a meals program that is not approved by HUD.

>  **NOTE:** 24 CFR, part 278, prohibits HUD from approving new mandatory meals programs after April 1, 1987.

> D.  **Criteria That Require Donation or Contribution**
>
>    Owners must not require a donation, contribution, membership fee, application fee, or processing fee as a condition of admission.  Cooperative housing projects may charge a membership fee.  Owners may not require any payments that are not described in the lease.
>
> E.  **Criteria That Inquire about Disabled Status**
>
>    It is unlawful for an owner to make an inquiry to determine whether an applicant, or any person associated with the applicant, has a disability or to make an inquiry about the nature or severity of a disability.  However, in accordance with paragraph 4-29, an owner may request supporting documentation in order to verify whether an individual is a qualified individual with a disability when an applicant requests an accessible unit or a reasonable accommodation/modification and must adhere to the guidelines as set forth in 2-31 F.  (Refer to Chapter 2 for more information on fair housing requirements.)
>
> F.  **Criteria Prohibited by State and Local laws**
>
>    Owners must adhere to state and local laws that prohibit certain screening criteria.

**4-9   Rejecting Applicants and Denial of Rental Assistance**

>  A.  **Key Requirements**
>
>    1. <u>Prohibition of discrimination in the denial of tenancy or rental assistance</u>.  Owners must not discriminate against an applicant based on race, color, religion, sex, national origin, familial status, or disability.  (See Chapter 2 for additional information.)
>
>    2. *Prohibition of denying assistance to victims of domestic violence, dating violence or stalking (applicable to the Section 8 program only).  The VAWA protects victims of domestic violence, dating violence or stalking, as well as their immediate family members, from being denied housing assistance if an incident of violence is reported and confirmed.  An applicant's status as a victim of domestic violence, dating violence, or stalking is not a basis for denial of rental assistance or for denial of admission, if the applicant otherwise qualifies for assistance or admission.  (See Chapter 4, Paragraph 4-4.C.9 and Chapter 6, Paragraph 6-5.G.1 for more information on the VAWA protections.)*
>
>    3. <u>Prompt notification</u>.  Owners must promptly notify the applicant in writing of the denial of admission or assistance.

B. **Conditions under Which Owners May Reject Applicants**

An owner may reject an applicant if the applicant:

1. Is ineligible for occupancy in a particular unit or property (see Chapter 3, Sections 1 and 2 for eligibility requirements);

2. *Is unable to disclose and provide verification of SSNs for all household members, except for those household members who do not contend eligible immigration status or tenants who were 62 or older on January 31, 2010, whose initial determination of eligibility was begun before January 31, 2010. *

3. Does not sign and submit verification consent forms or the Authorization for Release of Information (forms HUD-9887 and HUD-9887-A);

4. Has household characteristics that are not appropriate for the specific type of unit available at the time, or has a family of a size not appropriate for the unit sizes that are available;

   **NOTE:** In such cases, the owner may deny the applicant admission to a specific unit, but the applicant may continue to wait for another unit. See the example below.

---

**Example – Denial of Unit**

An owner could deny an applicant family a particular unit and place the family on the waiting list if the only available unit is an accessible unit and the following is true: (a) the applicant household does not include an individual requiring the features of the unit, and (b) there are either tenants in the property or applicants on the waiting list who desire such a unit and who have a member of the household requiring the features of the unit.

**NOTE:** In some programs, eligibility is dependent on the head or spouse meeting particular eligibility criteria.

---

5. Includes family members who did not declare citizenship or noncitizenship status, or sign a statement electing not to contend noncitizen status (see paragraph 4-31). However, an owner should permit families to revise their application to exclude proposed family members who do not declare citizenship or eligible noncitizen status; or

6. Does not meet the owner's tenant screening criteria.

C. **Notification of Applicant Rejection**

1. Rejection notices must be in writing

    2.    The written rejection notice must include:

        a.    The specifically stated reason(s) for the rejection;

        b.    The applicant's right to respond to the owner in writing or request a meeting within <u>14 days</u> to dispute the rejection. and

        c.    That persons with disabilities have the right to request reasonable accommodations to participate in the informal hearing process.

  D.    **Owner Meetings with Applicants to Discuss Rejection Notices**

    1.    Any meeting with the applicant to discuss the applicant's rejection must be conducted by a member of the owner's staff who was not involved in the initial decision to deny admission or assistance.

    2.    Within <u>5 business days</u> of the owner response or meeting, the owner must advise the applicant in writing of the final decision on eligibility.

## Section 2:  Marketing

### 4-10  Key Regulations

This paragraph identifies key regulatory citations pertaining to Section 2: Marketing. The citations and their titles (or topics) are listed below.

**Affirmative Fair Housing Marketing and Fair Housing Poster**

    1.    *24 CFR 1.6   Compliance information for Title VI of the Civil Rights Act (for projects that receive Federal financial assistance):  maintenance and submission to HUD of information on the extent to which members of minority racial and ethnic groups are beneficiaries of and participants in HUD assisted programs

    2.    24 CFR 8.55   Compliance information for Section 504 of the Rehabilitation Act of 1973 (for projects that receive Federal financial assistance):  maintenance and submission to HUD of information on the extent to which individuals with disabilities are beneficiaries of HUD assistance programs

    3.    24 CFR 107.25   Nondiscrimination provisions in legal instruments (per Executive Order 11063)

    4.    24 CFR 107.30   Recordkeeping requirements (per Executive Order 11063):  maintenance of racial, religious, national origin, and sex data in connection with HUD programs and activities, including applicants for and occupants of multifamily housing*

    5.    24 CFR 108.40 (Affirmative fair housing marketing compliance reviews)

    6.    24 CFR, part 110   Fair Housing Poster