# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————

MARY LOUIS AND MONICA
DOUGLAS, ON BEHALF OF
THEMSELVES AND SIMILARLY
SITUATED PERSONS, AND
COMMUNITY ACTION AGENCY OF
SOMERVILLE, INC.

          *Plaintiffs*,

vs.

SAFERENT SOLUTIONS, LLC AND
METROPOLITAN MANAGEMENT
GROUP, LLC

          *Defendants*.

—————————————————————

NO. 1:22-CV-10800-AK

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

Page

Introduction ................................................................................................................... 1

Background ..................................................................................................................... 1

Legal Standard .............................................................................................................. 4

Argument ....................................................................................................................... 5

I.     Plaintiffs Have Stated a Disparate Impact Claim Under Federal and State Fair
       Housing Laws. ..................................................................................................... 5

       A.     Plaintiffs Have Alleged That the Use of SafeRent Scores Presents an
              Artificial, Arbitrary, and Unnecessary Barrier to Accessing Housing. ................. 5

       B.     HUD's Guidance on Credit Checks and Case Law Do Not Protect
              Defendants' Conduct. ...................................................................................... 6

       C.     Plaintiffs Have Properly Pled a Statistical Disparity. .......................................... 10

       D.     Plaintiffs Make Ample Allegations Demonstrating Causation. ............................ 14

       E.     Plaintiffs' Claim Is Squarely Within the Established Scope of Disparate
              Impact Claims. ................................................................................................. 16

II.    The Fair Housing Laws Apply to SafeRent. ......................................................... 17

       A.     The FHA Applies to Tenant Screening Services. ............................................... 17

       B.     SafeRent May Be Held Liable for Violations of Mass. Gen. Laws ch.
              151B, §§ 4(6) and 4(10). .................................................................................. 21

              1.     SafeRent's conduct interferes with rights protected by Mass. Gen.
                     Laws ch. 151B, §§ 4(6) and 4(10), making SafeRent liable for
                     discrimination. ......................................................................................... 21

              2.     SafeRent, as a consumer reporting agency, is a provider of "credit
                     services" and therefore subject to Mass. Gen. Laws ch. 151B, §
                     4(10). ..................................................................................................... 23

III.   Plaintiffs Have Stated a Claim Under ch. 93A. ..................................................... 24

IV.    Defendants' Standing Arguments Are Meritless. ................................................... 27

       A.     Ms. Louis Has Standing to Assert Claims Against Metropolitan. ........................ 27

       B.     Both Individual Plaintiffs Can Assert Claims for Violations of 42 U.S.C. §
              3604(b) and ch. 151B, § 4(6). .......................................................................... 29

       C.     CAAS Has Organizational Standing to Assert Claims Under the FHA and
              Mass. Gen. Laws ch. 151B. .............................................................................. 32

## TABLE OF CONTENTS

<u>Page</u>

Conclusion ...................................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Adams v. United States*,
 964 F.Supp. 511 (D. Mass. 1996) ............................................................................13

*Andover Hous. Auth. v. Shkolnik*,
 820 N.E.2d 815 (Mass. 2005) ..................................................................................31

*Antilles Cement Corp. v. Fortuño*,
 670 F.3d 310 (1st Cir. 2012) ....................................................................................29

*Arthur D. Little, Inc. v. Dooyang Corp.*,
 147 F.3d 47 (1st Cir. 1998) ......................................................................................24

*Baldwin v. Hous. Auth. of Camden*,
 278 F.Supp.2d 365 (D.N.J. 2003) ..............................................................................9

*Barrow v. Barrow*,
 No. 16-11493, 2016 WL 6996996 (D. Mass. Nov. 29, 2016) .................................11

*Beaudoin v. Baker*,
 530 F.Supp.3d 169 (D. Mass. 2021) ........................................................................28

*Bida v. Shuster Mgmt. LLC*,
 No. 18-10975, 2019 WL 1198960 (D.N.J. Mar. 14, 2019) ...........................9, 10, 11

*Binns v. City of Marietta Ga. (Hous. Choice Voucher Program)*,
 704 F. App'x 797 (11th Cir. 2017) ...........................................................................11

*Bronstein v. Prudential Ins. Co.*,
 459 N.E.2d 772 (Mass. 1984) ...................................................................................23

*Brooks v. Martha's Vineyard Transit Auth.*,
 433 F.Supp.3d 65 (D. Mass. 2020) ..........................................................................25

*Burbank Apts. Tenant Ass'n v. Kargman*,
 48 N.E.3d 394 (Mass. 2016) ...................................................................5, 15, 23, 31

*Casa Marie, Inc. v. Super. Ct. of P.R.*,
 988 F.2d 252 (1st Cir. 1993) ..............................................................................18, 19

*Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*,
 236 F.3d 629 (11th Cir. 2000) ..................................................................................32

## TABLE OF AUTHORITIES

Page(s)

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ..................................................................................................20

*Ciardi v. F. Hoffmann-La Roche, Ltd.*,
    762 N.E.2d 303 (Mass. 2002) .................................................................................25

*City of Wyoming v. Procter & Gamble Co.*,
    210 F.Supp.3d 1137 (D. Minn. 2016) ......................................................................29

*Collins v. Yellen*,
    141 S.Ct. 1761 (2021) ..............................................................................................27

*Commonwealth v. DeCotis*,
    316 N.E.2d 748 (Mass. 1974) .................................................................................24

*Commonwealth v. Fremont Inv. & Loan*,
    897 N.E.2d 548 (Mass. 2008) .................................................................................24

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
    369 F.Supp.3d 362 (D. Conn. 2019) ............................................................... *passim*

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
    478 F.Supp.3d 259 (D. Conn. 2020) ........................................................12, 18, 20

*Cruz-Arce v. Mgmt. Admin. Servs. Corp.*,
    19 F.4th 538 (1st Cir. 2021) ......................................................................................4

*Czyzewski v. Jevic Holding Corp.*,
    137 S.Ct. 973 (2017) ................................................................................................27

*Davis v. City of New York*,
    902 F.Supp.2d 405 (S.D.N.Y. 2012) .......................................................................30

*Dickey v. City of Boston*,
    405 F.Supp.3d 195 (D. Mass. 2019) .......................................................................27

*DiLiddo v. Oxford St. Realty, Inc.*,
    876 N.E.2d 421 (Mass. 2007) .................................................................................22

*Dothard v. Rawlinson*,
    433 U.S. 321 (1977) ...........................................................................................12, 16

*Edwards v. Johnston Cnty. Health Dept.*,
    885 F.2d 1215 (4th Cir. 1989) .................................................................................19

## TABLE OF AUTHORITIES

Page(s)

*Ellis v. Safety Ins. Co.*,
   672 N.E.2d 979 (Mass. 1996) ............................................................................26

*Equal Means Equal v. Ferriero*,
   3 F.4th 24 (1st Cir. 2021) .........................................................................33, 34

*Equal Rts. Ctr. v. Equity Residential*,
   798 F.Supp.2d 707 (D. Md. 2011) ......................................................................34

*Evans v. Tubbe*,
   657 F.2d 661 (5th Cir. Unit A Sept. 1981) ...........................................................19

*Exxon Mobil Corp. v Att'y Gen.*,
   94 N.E.3d 786 (Mass. 2018) .............................................................................24

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
   666 F.3d 1216 (9th Cir. 2012) ...........................................................................35

*Fair Hous. of Marin v. Combs*,
   285 F.3d 899 (9th Cir. 2002) .............................................................................32

*Flood v. Kuhn*,
   407 U.S. 258 (1972) ......................................................................................13

*Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*,
   388 F.Supp.3d 145 (E.D.N.Y. 2019) .......................................................12, 33, 35

*FTC v. Sperry & Hutchinson Co.*,
   405 U.S. 233 (1972) ......................................................................................25

*Ga. State Conf. of the NAACP v. City of LaGrange*,
   940 F.3d 627 (11th Cir. 2019) ...........................................................................30

*Gilead Cmty. Servs., Inc. v. Town of Cromwell*,
   432 F.Supp.3d 46 (D. Conn. 2019) .....................................................................18

*Giragosian v. Ryan*,
   547 F.3d 59 (1st Cir. 2008) ...............................................................................7

*Greater New Orleans Fair Hous. Action Ctr. v. HUD*,
   639 F.3d 1078 (D.C. Cir. 2011) .........................................................................13

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971) .......................................................................................5

# TABLE OF AUTHORITIES

Page(s)

*Guilfoile v. Shields*,
 913 F.3d 178 (1st Cir. 2019)...................................................................................4

*Gustavsen v. Alcon Lab'ys, Inc.*,
 903 F.3d 1 (1st Cir. 2018)..............................................................................28, 29

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982)................................................................................32, 33, 34

*Hazelwood Sch. Dist. v. United States*,
 433 U.S. 299 (1977).................................................................................................12

*Hershenow v. Enter. Rent-A-Car of Boston, Inc.*
 840 N.E.2d 526 (Mass. 2006) ..............................................................................26

*Hill v. River Run Homeowners Ass'n*,
 438 F.Supp.3d 1155 (D. Idaho 2020) .................................................................28

*Hoostein v. Mental Health Ass'n (MHA), Inc.*,
 98 F.Supp.3d 293 (D. Mass.), *aff'd* (1st Cir. 2015) ........................................19

*Jersey Heights Neighborhood Ass'n v. Glendening*,
 174 F.3d 180 (4th Cir. 1999) ...............................................................................31

*Karim-Panahi v. 4000 Mass. Apts.*,
 302 F.Supp.3d 330 (D.D.C. 2018) ........................................................................9

*Kattar v. Demoulas*,
 739 N.E.2d 246 (Mass. 2000) ...............................................................................24

*Kolbe v. BAC Home Loans Servicing, LP*,
 738 F.3d 432 (1st Cir. 2013)....................................................................................7

*Laufer v. Acheson Hotels, LLC*,
 50 F.4th 259 (1st Cir. 2022)..................................................................................28

*Lindsey v. Allstate Ins. Co.*,
 34 F.Supp.2d 636 (W.D. Tenn. 1999)..................................................................31

*Linkage Corp v. Trustees of Boston Univ.*,
 679 N.E.2d 191 (Mass. 1997) ...............................................................................24

*Lopez v. Commonwealth*,
 978 N.E.2d 67 (Mass. 2012) ................................................................................21

# TABLE OF AUTHORITIES

Page(s)

*Lowell v. Lyft, Inc.*,
   352 F.Supp.3d 248 (S.D.N.Y. 2018)...................................................................35

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...............................................................................27, 28

*Mackey v. Nationwide Ins. Cos.*,
   724 F.2d 419 (4th Cir. 1984) ............................................................................31

*Marya v. Slakey*,
   190 F.Supp.2d 95 (D. Mass. 2001) ...................................................................18

*Merritt v. Countrywide Fin. Corp.*,
   No. 09-CV-01179, 2015 WL 5542992 (N.D. Cal. Sept. 17, 2015), *aff'd*, 783
   F. App'x 717 (9th Cir. 2019) ...........................................................................11

*Miller v. Countrywide Bank, N.A.*,
   571 F.Supp.2d 251 (D. Mass. 2008) ...........................................................5, 11, 12

*NAACP v. Am. Family Mut. Ins. Co.*,
   978 F.2d 287 (7th Cir. 1992) ........................................................................18, 31

*Nat. Res. Def. Council v. Dep't of Interior*,
   410 F.Supp.3d 582 (S.D.N.Y. 2019)..................................................................32

*Nat'l Ass'n of Consumer Advocs. v. Uejio*,
   521 F.Supp.3d 130 (D. Mass. 2021) ..................................................................32

*Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*,
   208 F.Supp.2d 46 (D.D.C. 2002).......................................................................33

*Ocasio-Hernández v. Fortuño-Burset*,
   640 F.3d 1 (1st Cir. 2011)..................................................................................5

*Ojo v. Farmers Grp., Inc.*,
   600 F.3d 1205 (9th Cir. 2010) (*en banc*) ............................................................20

*Oses v. CoreLogic SafeRent, LLC*,
   171 F.Supp.3d 775 (N.D. Ill. 2016) ...............................................................22, 24

*Pasquince v. Brighton Arms Apts.*,
   876 A.2d 834 (N.J. App. Div. 2005)...................................................................10

*PMP Assocs., Inc. v. Globe Newspaper Co.*,
   321 N.E.2d 915 (Mass. 1975) ...........................................................................25

# TABLE OF AUTHORITIES

Page(s)

*Raso v. Lago*,
   958 F.Supp. 686 (D. Mass. 1997), *aff'd*, 135 F.3d 11 (1st Cir. 1998) .................................... 11

*Rodriguez v. Vill. Green Realty, Inc.*,
   788 F.3d 31 (2d Cir. 2015) ....................................................................................................... 28

*Schubach v. Household Fin. Corp.*,
   376 N.E.2d 140 (Mass. 1978) .................................................................................................. 26

*Snyder v. Collura*,
   812 F.3d 46 (1st Cir. 2016) ...................................................................................................... 31

*Spann v. Colonial Vill., Inc.*,
   899 F.2d 24 (D.C. Cir. 1990) .................................................................................................. 34

*Staub v. Proctor Hosp.*,
   562 U.S. 411 (2011) .......................................................................................................... 19, 20

*Steptoe v. Beverly Area Plan. Ass'n*,
   674 F.Supp. 1313 (N.D. Ill. 1987) ........................................................................................... 19

*Sutton v. Freedom Square Ltd.*,
   No. 07-14897, 2008 WL 4601372 (E.D. Mich. Oct. 15, 2008) ................................................ 9

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*,
   17 F.4th 950 (9th Cir. 2021) ................................................................................................... 14

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
   576 U.S. 519 (2015) ............................................................................................................ 5, 18

*Thurmond v. Bowman*,
   211 F.Supp.3d 554 (W.D.N.Y. 2016) ...................................................................................... 27

*Trafficante v. Metro. Life Ins. Co.*,
   409 U.S. 205 (1972) ................................................................................................................. 18

*United States v. Hylton*,
   944 F.Supp.2d 176 (D. Conn. 2013) ....................................................................................... 30

*United States v. Space Hunters, Inc.*,
   429 F.3d 416 (2d Cir. 2005) .................................................................................................... 19

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
   113 F.Supp.3d 555 (D. Conn. 2015) ....................................................................................... 29

# TABLE OF AUTHORITIES

Page(s)

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ........................................................................................27

*Wards Cove Packing Co. v. Atonio*,
   490 U.S. 642 (1989) ........................................................................................12

*Weber v. Cranston Sch. Comm.*,
   212 F.3d 41 (1st Cir. 2000) ............................................................................28

*Williams v. Compassionate Care Hospice*,
   No. 16-2095, 2016 WL 4149987 (D.N.J. Aug. 3, 2016) .......................................11

*Williamsburg Fair Hous. Comm. v. N.Y.C. Hous. Auth.*,
   493 F.Supp. 1225 (S.D.N.Y. 1980) ...................................................................30

STATUTES

15 U.S.C. § 1681 .................................................................................................23

42 U.S.C. § 3604 ........................................................................................ *passim*

Mass. Gen. Laws ch. 93 .......................................................................................23

Mass. Gen. Laws ch. 93A ...............................................................................24, 25, 26, 27

Mass. Gen. Laws ch. 151B .......................................................................... *passim*

RULES AND REGULATIONS

24 C.F.R. § 100.7 ..........................................................................................20, 21

24 C.F.R. § 100.65 ...............................................................................................30

24 C.F.R. § 100.500 ...............................................................................................5

24 C.F.R. § 982.307 ...............................................................................................9

29 C.F.R. § 1602 ..................................................................................................17

41 C.F.R. § 60-1.12 ..............................................................................................17

Fed. R. Civ. P. 8(a)(2) ............................................................................................4

Fed. R. Evid. 201(b) .............................................................................................13

## TABLE OF AUTHORITIES

Page(s)

Mass. Code Regs. 02.00 § (2)g (2022) ........................................................21

Mass. Code Regs. 2.04 (2022) ...................................................................23

**OTHER AUTHORITIES**

HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily
    Housing Programs available at
    https://www.hud.gov/sites/documents/43503HSGH.PDF (last visited Dec. 15,
    2022) .....................................................................................................9

HUD FHEO, General FAQ - Housing Providers and Fair Housing - Frequently
    Asked Questions (FAQs) on Fair Housing Issues Regarding Exceptions to
    Credit Check Policies and Occupancy Limits, Affirmative Marketing, and
    Language Access available at
    https://www.hud.gov/program_offices/fair_housing_equal_opp/general_faq_h
    ousing_providers_and_fair_housing (last visited Dec. 15, 2022) ...........................7

HUD FHEO, Guidance on Compliance with Title VI of the Civil Rights Act in
    Marketing and Application Processing at Subsidized Multifamily Properties
    available at
    https://www.hud.gov/sites/dfiles/FHEO/documents/HUD%20Title%20VI%20
    Guidance%20Multifamily%20Marketing%20and%20Application%20Processi
    ng.pdf (last visited Dec. 15, 2022) ...........................................................7

## INTRODUCTION

Plaintiffs Mary Louis and Monica Douglas were denied housing and suffered other injuries because of tenant screening by Defendant SafeRent Solutions, LLC. Their experiences are common, and they assert both race discrimination claims on behalf of other Black and Hispanic voucher-holders and source of income discrimination claims on behalf of all voucher-holders denied housing because of SafeRent's actions. Plaintiff Community Action Agency of Somerville ("CAAS"), an organization that helps voucher-holders secure housing, joins those claims. Ms. Louis also raises individual claims against Defendant Metropolitan Management Group, LLC, a property manager.

As detailed in the First Amended Complaint ("FAC"), SafeRent claims that its credit screening services predict renter quality, and it uses these predictions to deliver rental decisions to housing providers. But SafeRent's scoring algorithm incorporates racially biased credit information that fails to predict tenant success, while it does *not* consider the benefits of housing choice vouchers. These practices violate the Fair Housing Act ("FHA") and Massachusetts state law. Many of Defendants' arguments to the contrary were rejected in an analogous case against SafeRent. *See Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 369 F.Supp.3d 362 (D. Conn. 2019).[1] Here too, Defendants' motions to dismiss should be denied.

## BACKGROUND

### SafeRent's Services

Defendant SafeRent sells tenant screening products to housing providers. FAC ¶¶ 19, 21. One product, the SafeRent Score, uses an algorithm to calculate "lease performance risk score[s]" for rental applicants. *Id.* ¶ 25 (alteration in original). The scores purportedly "automate

---

[1] SafeRent was formerly known as "CoreLogic Rental Property Solutions, LLC." FAC ¶ 1.

human judgement by assigning a value to positive and negative customer application data, credit and public record information." *Id.* Each applicant receives a score between 200 and 800, and SafeRent says higher scorers make better renters. *Id.* ¶¶ 27, 29. For example, housing providers "can generally expect an applicant with a lease score of 395 to outperform an applicant with a lease score of 385." *Id.* ¶ 28. In calculating the scores, SafeRent considers factors such as credit history; other credit information, including non-tenancy debts; and eviction history. *Id.* ¶ 30.

Credit data is factored into SafeRent's algorithm but does not predict tenant success. *Id.* ¶ 46. Such data is backward-looking and was neither designed to nor actually shows an applicant's current ability to pay rent. *Id.* ¶¶ 46-48. And the inclusion of non-tenancy debts in credit reports fails to recognize that consumers tend to prioritize rent payments. *Id.* ¶ 49. Credit data is also biased against non-white consumers because it reflects longstanding racial inequalities in wealth-building. *Id.* ¶¶ 53-57. Black and Hispanic consumers have lower median credit scores than do white consumers and are more likely to have subprime credit scores. *Id.* ¶¶ 51-52.

Meanwhile, SafeRent's algorithm ignores the benefits of housing vouchers. *Id.* ¶ 31. Housing vouchers are "long-term subsidies which provide a direct payment from the issuing agency to the housing provider for all or part of a voucher-holder's monthly rent." *Id.* ¶ 62. On average, when tenants use vouchers, public housing authorities ("PHAs") pay almost three-fourths of the monthly rent. *Id.* ¶ 31. Thus, housing providers who rent to voucher-holders are guaranteed to receive all or most of those tenants' rent payments. *Id.* ¶ 65. Vouchers also include protections to ensure housing providers are paid if tenants face financial hardship. *Id.* ¶¶ 67-69. And voucher-holders tend to have longer tenancies than do non-voucher-holders. *Id.* ¶ 70.

In practice, SafeRent "effectively controls the decision to approve or reject a rental application." *Id.* ¶ 43. Housing providers who use SafeRent's algorithm cannot correct the flaws

described above because SafeRent does not disclose the sources of its data or the weights assigned to the factors. *Id.* ¶¶ 33-36. That means housing providers are unable to exercise independent judgment as to which factors are considered or how they are weighted. *Id.* ¶ 37. With SafeRent's guidance, housing providers select minimum scores that applicants must surpass. *Id.* ¶ 39. SafeRent then sends housing providers a bottom-line score for each applicant, along with "approve" or "deny" language based on the minimum score. *Id.* ¶¶ 37-38, 43.

SafeRent does not provide the underlying information—credit-related or otherwise—that the score is based on. *Id.* Without those details, housing providers cannot conduct their own applicant evaluation. *Id.* ¶ 37. As one property explained, this simplifies the process: "On our end, the process is pretty simple - pass the info onto CoreLogic, wait for a passing score. We really don't need to know anything else or details of why someone did or did not pass." *Id.* ¶ 38. Another property noted that the score "reflects an approve or deny comment" and that "[t]he Leasing Manager does not receive detailed credit information." *Id.* Housing providers have said they cannot override the decisions they receive from SafeRent. *Id.* ¶ 44.

**Plaintiffs' Injuries**

Ms. Louis and Ms. Douglas are Black women who hold vouchers covering over half their rent. *Id.* ¶¶ 13, 15. Ms. Louis applied for an apartment at a property managed by Defendant Metropolitan. *Id.* ¶ 74. Metropolitan told her that "the third-party service we utilize to screen all prospective tenants has denied your tenancy. Unfortunately, the service's SafeRent tenancy score was lower than is permissible under our tenancy standards." *Id.* ¶ 76. Ms. Louis offered references to show that her credit history did not reflect her ability to pay, but Metropolitan responded that "we do not accept appeals and cannot override the outcome of the Tenant Screening." *Id.* ¶ 77-78. As a result, Ms. Louis had to pay $200 more per month for an apartment with fewer amenities and felt disappointed, frustrated, and worried. *Id.* ¶¶ 79-82.

Ms. Douglas's application was also denied due to her SafeRent Score. *Id.* ¶ 83-84. The management company reported that her tenant screening "came back with a deny comment based on unsatisfactory credit history as well as landlord tenant court record." *Id.* ¶ 85. Ms. Douglas explained that she had years of positive rental history, but her initial appeal was denied. *Id.* ¶¶ 86-87. She had to remain in her old apartment for months following an on-site shooting before her application was approved. *Id.* ¶¶ 83, 88-89, 91. Ms. Douglas felt disappointed, distressed, depressed, and rejected because of the initial denial. *Id.* ¶ 92.

Plaintiff CAAS works with applicants to find apartments that accept housing vouchers. *Id.* ¶ 17. This search is time-sensitive, as voucher-holders must secure housing within 120 days, unless they get an extension. *Id.* ¶ 95. Because many clients have non-tenancy debts and other credit history blemishes, CAAS cannot encourage them to apply to housing providers that use screening services such as the SafeRent Score. *Id.* ¶¶ 96-99. CAAS must expend additional resources to place those clients in properties that will not summarily reject them based on credit history. *Id.* ¶ 101. Defendants' practices have forced CAAS to divert resources "from the efficient placement of voucher-holders into housing" and have "made placement far more time-consuming, and thus costly." *Id.* ¶ 102.

## LEGAL STANDARD

To avoid dismissal, a plaintiff's complaint "must contain only a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Cruz-Arce v. Mgmt. Admin. Servs. Corp.*, 19 F.4th 538, 543 (1st Cir. 2021) (quoting Fed. R. Civ. P. 8(a)(2)). The court "assume[s] the truth of all well-pleaded facts and give[s] the plaintiff the benefit of all reasonable inferences therefrom." *Guilfoile v. Shields*, 913 F.3d 178, 186 (1st Cir. 2019). The court may neither "disregard properly pled factual allegations" nor "attempt to forecast a plaintiff's

likelihood of success on the merits." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12-13

(1st Cir. 2011).

## ARGUMENT

**I.    PLAINTIFFS HAVE STATED A DISPARATE IMPACT CLAIM UNDER FEDERAL AND STATE FAIR HOUSING LAWS.**

To establish a prima facie case of disparate impact discrimination, a plaintiff must show

"that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. §

100.500(c)(1). Under this standard, plaintiff "must plead (1) a specific and actionable policy, (2)

a disparate impact, and (3) facts raising a sufficient inference of causation." *Miller v.*

*Countrywide Bank, N.A.*, 571 F.Supp.2d 251, 255 (D. Mass. 2008). Plaintiffs satisfy all three

requirements here, for both race and source of income claims.[2]

   A.    Plaintiffs Have Alleged That the Use of SafeRent Scores Presents an Artificial,
         Arbitrary, and Unnecessary Barrier to Accessing Housing.

Disparate impact liability mandates the removal of "artificial, arbitrary, and unnecessary

barriers" to housing "when the barriers operate to discriminate on the basis of racial or other

impermissible classification." *Griggs v. Duke Power Co*., 401 U.S. 424, 431 (1971); *see also*

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc*., 576 U.S. 519, 540 (2015).[3]

---

[2] Disparate impact claims are also recognized under Mass. Gen. Laws ch. 151B, §§ 4(6), (7) and (11) "as they are under the FHA," and Massachusetts also follows the burden-shifting framework laid out by HUD, and explicated in *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc*., 576 U.S. 519, 534-40 (2015). *Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394, 411 (Mass. 2016). Since the same standards are applied to Plaintiffs' federal and state claims, they are addressed together.

[3] To the extent Defendants suggest Plaintiffs must allege that an entire policy is "artificial, arbitrary, and unnecessary," they are incorrect. Plaintiffs can allege that the challenged policy presents an "artificial, arbitrary, and unnecessary" *barrier* to housing. *See Griggs*, 401 U.S. at 431; *see also id*. at 430 ("The Act proscribes . . . practices that are fair in form, but discriminatory in operation."). The Supreme Court has explained that "disparate-impact liability has always been properly limited in key respects," making clear that it has not imposed additional pleading or other requirements. *See Inclusive Cmtys*., 576 U.S. at 540.

Plaintiffs have alleged that the use of SafeRent Scores to deny housing presents an artificial, arbitrary, and unnecessary barrier to housing by rendering Black and Hispanic rental applicants, and others using housing vouchers, less able to rent properties managed by housing providers who use the scores, like Defendant Metropolitan. The FAC alleges that SafeRent Scores are significantly based on an applicant's credit history. FAC ¶¶ 30, 35, 45.[4] This credit information, however, is not an accurate predictor of timely rental payments or whether someone will be a good tenant, including because such data is backward-looking and was neither designed to nor actually shows an applicant's current ability to pay rent. *Id.* ¶¶ 46-50. Moreover, relying on such data in scoring potential tenants disproportionately impacts Black and Hispanic tenants, and those with low-income, like those who use housing vouchers. Black, Hispanic, and low-income individuals all have lower credit scores and worse credit history compared to white individuals. *Id.* ¶¶ 51-60. That means that SafeRent assigns these groups disproportionately lower scores than white applicants, *id.* ¶¶ 4-5, 41, which, in turn, causes the disproportionate denial of housing.

      B.      <u>HUD's Guidance on Credit Checks and Case Law Do Not Protect Defendants' Conduct.</u>

      Neither the Department of Housing and Urban Development's ("HUD") guidance on the use of credit checks, nor the case law that Defendants cite, precludes Plaintiffs' discrimination claims. HUD repeatedly has made clear that the FHA imposes limits on the consideration of prospective tenants' credit history and related information, warning that the use of such information can constitute unlawful discrimination.

      For example, in a Frequently Asked Question ("FAQ") under the heading "Credit Check

---

[4] As discussed below, *see* Section I.C, although Plaintiffs allege that SafeRent Scores are "significantly" based on credit information, *see* FAC ¶ 45, Plaintiffs allege racial disparities across the range of inputs to the SafeRent Score, not merely credit history, *id.* ¶¶ 35, 50-60.

Policy Exceptions," HUD's Office of Fair Housing & Equal Opportunity ("FHEO") states that:

> It is a best practice for landlords and property managers to review
> their credit check policies (and other background check policies) to
> ensure that they do not discriminate unlawfully because of any
> protected characteristics. It is also a best practice to use alternate
> forms of verification for ability to pay for any prospective tenant
> without traditional credit. For example, if an agency will provide
> full rent payments for the family, other verification of ability to
> pay would appear unnecessary since the purpose of the credit
> check would be to provide a reasonable basis for believing that a
> tenant's rent will be paid.

HUD FHEO, General FAQ - Housing Providers and Fair Housing - Frequently Asked Questions

(FAQs) on Fair Housing Issues Regarding Exceptions to Credit Check Policies and Occupancy

Limits, Affirmative Marketing, and Language Access.[5]

Additionally, in 2022, FHEO issued guidance cautioning that "[a]pplicant screening . . .

also may create unnecessary barriers to housing opportunity . . . in a way that disproportionately

excludes individuals based on their race, color, or national origin." HUD FHEO, Guidance on

Compliance with Title VI of the Civil Rights Act in Marketing and Application Processing at

Subsidized Multifamily Properties (Apr. 21, 2022), at 6.[6] FHEO explicitly named credit and

---

[5] Available at
https://www.hud.gov/program_offices/fair_housing_equal_opp/general_faq_housing_providers_and_fair_housing (last visited Dec. 15, 2022).

The Court may consider "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice" in resolving a motion to dismiss. *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citation omitted). The Court therefore may take judicial notice of this FHEO FAQ, as well as the other publicly available HUD materials cited in this subsection. *See Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 479 (1st Cir. 2013) (noting that "certain public materials outside the complaint may properly be part of our inquiry in reviewing the district court's disposition of a motion to dismiss" and therefore referring "liberally to publicly available HUD materials").

[6] Available at
https://www.hud.gov/sites/dfiles/FHEO/documents/HUD%20Title%20VI%20Guidance%20Multifamily%20Marketing%20and%20Application%20Processing.pdf (last visited Dec. 15, 2022).

rental history as screening criteria "that may operate unjustifiably to exclude individuals" based on their protected class. *Id.* Although this guidance is directed at HUD-subsidized multifamily properties, FHEO noted "Title VI applies to all programs or activities receiving federal financial assistance." *Id.* at 1 n.2.

Even the HUD handbook that Defendants cite, *see* SafeRent's Mem. in Support of its Motion to Dismiss, ECF 32 ("SafeRent MTD") at 7-9; Metropolitan's Mem. in Support of its Motion to Dismiss, ECF 30 ("Metropolitan MTD") at 10, includes a warning about credit checks. The handbook, which governs subsidized multifamily housing programs, cautions that "[o]wners may have to justify the basis for a determination to deny tenancy because of a credit rating," and directs that "there should be a sound basis for the rejection." HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Providers (Nov. 2013), at 4-24, § 4-7(F)(2)(d).

Through various pieces of guidance, HUD has cautioned that housing providers do not have a blanket license to use credit history to screen tenants. To the contrary, HUD has repeatedly emphasized that the FHA limits the use of credit information—in addition to rental history and other information—where it may create unnecessary barriers to housing opportunity in a way that disproportionately excludes individuals based on their protected class. That is exactly what Plaintiffs have alleged here.

Further, contrary to Defendant SafeRent's assertion, the FAC does not challenge a landlord's right to screen tenants, but makes a rather narrow allegation: that the Defendants excluded the named plaintiffs, and the classes they seek to represent, based on non-tenancy-related debt and other irrelevant and discriminatory factors which cannot be justified as a business necessity. FAC ¶¶ 2, 4, 5, 14, 16.

The cases Defendant SafeRent cites do not support its position that courts have found tenant screening exempt from challenge—especially when the criteria used are questionable and result in discrimination. For example, in the leading case SafeRent cites, the court found that "24 C.F.R. § 982.307 [allows a PHA] to use creditworthiness as a criterion in screening voucher applications to ensure suitability of tenancy. That determination does not end the Court's analysis of the issues in this case, however, because even if federal regulations permit a PHA to screen applicants for vouchers on the basis of creditworthiness, those regulations also set forth specific procedures which must be followed in the adoption of such a policy by a PHA." *Baldwin v. Hous. Auth. of Camden*, 278 F.Supp.2d 365, 377 (D.N.J. 2003). As noted above, HUD handbooks mandate that procedures must comply with state and federal fair housing laws and warn housing authorities that governing plans (including those that might include any credit screening) must comply with the Fair Housing Act. HUD Occupancy Book Pages 2-1, 2-3 to 2-4 and 4-1, 4-3 to 4-5.[7]

SafeRent's reliance on other cases in this line is also misplaced. For example, two cases did not make disparate impact claims like those here: in *Karim-Panahi* the court never reached the merits of whether the use of tenant screening was discriminatory and dismissed the case because the applicant "alleged no facts to support his specific claims of conspiracy and discrimination based on race, color, ethnicity, religion and age." *Karim-Panahi v. 4000 Mass. Apts.*, 302 F.Supp.3d 330, 336-37 (D.D.C. 2018). Similarly, *Sutton* is not on point as the court granted summary judgment where the applicant claimed intentional discrimination and failure to provide a reasonable accommodation due to his disabilities. *Sutton v. Freedom Square Ltd.*, No.

---

[7] *See* HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs at https://www.hud.gov/sites/documents/43503HSGH.PDF (last visited Dec. 15, 2022).

07-14897, 2008 WL 4601372, at *1-2 (E.D. Mich. Oct. 15, 2008). In *Bida*, the court dismissed the action where the plaintiff had not "factually alleged a discriminatory effect, or that the policies impacted minorities in a more statistically significant way than non-minorities." *Bida v. Shuster Mgmt. LLC*, No. 18-10975, 2019 WL 1198960, at *5-6 (D.N.J. Mar. 14, 2019). The allegations of discriminatory effect in the FAC stand in stark contrast to *Bida*. In *Pasquince*, the court upheld a verdict against an applicant whose sole claim was based upon New Jersey's anti-discrimination law, which included a proviso that "nothing contained in this section shall limit the ability of a person . . . to refuse to rent . . . because of creditworthiness," and the case did not directly address disparate impact claims. *Pasquince v. Brighton Arms Apts.*, 876 A.2d 834, 838, 840-41 (N.J. App. Div. 2005).

Finally, SafeRent asks that the Court dismiss Plaintiffs' claims based upon an assertion that because voucher-using tenants may have to pay a share of their rent each month, this eviscerates Plaintiffs' claims. But as discussed above, *supra* at 2, 6, SafeRent Scores are based on information that is not predictive of whether anyone can pay their rent. Even if those factors were predictive, however, the resources needed to pay 25% of rent are not the same as those needed to pay 100% of rent, yet SafeRent is using the same yardstick for both. Further, if the voucher-using tenant suffers a loss of income, the tenant reports that, and the PHA increases the amount of the voucher accordingly. FAC ¶¶ 67-69.

C.   Plaintiffs Have Properly Pled a Statistical Disparity.

The FAC is replete with allegations, sourced to published studies, that compared to whites, Black and Hispanic consumers have lower credit scores, worse credit health, and lower wealth, FAC ¶¶ 51-57, as do low-income individuals who could qualify for housing vouchers, *id.* ¶¶ 58-60. The FAC also alleges in detail how SafeRent Scores incorporate such information into the score calculation. *Id.* ¶¶ 25-28, 30, 35, 45. Since SafeRent Scores are calculated based, in

significant part, upon the sort of credit history information where the data show Black, Hispanic, and low-income individuals will all have worse histories, the SafeRent Scores of the proposed class members will predictably be lower, on average, than those of white and non-voucher-using applicants.

A predictable disparity is sufficient to satisfy pleading standards. For example, in *Miller*, plaintiffs sued over the mortgage rates offered to African American borrowers, not based on statistics specific to the defendant in that case, but based on general studies showing that African American borrowers are more likely to obtain a high-APR mortgage than white borrowers. *Miller*, 571 F.Supp.2d at 258. The allegations in *Miller* were similar in nature to the allegations Plaintiffs rely upon here, which are equally sufficient to satisfy the pleading standard for alleging that the practice challenged here will predictably cause a disparate impact.[8]

Metropolitan argues that the statistical allegations are irrelevant, because they are not

---

[8] Defendant's reliance on out of circuit authority *Binns v. City of Marietta Ga., (Hous. Choice Voucher Program)*, 704 F. App'x 797, 802 (11th Cir. 2017) is unavailing. In that case, plaintiff provided *no* comparative data of any sort to support the claim of disparate impact, and the case was decided at the summary judgment stage. Similarly, *Bida* did not include *any* statistical allegations, but the court noted that in other cases, government guidance established that using criminal history for screening would have a disparate impact, which is similar to the studies Plaintiffs have cited here. *Bida*, 2019 WL 1198960, at *5 (citing *Williams v. Compassionate Care Hospice*, No. 16-2095, 2016 WL 4149987, at *5 (D.N.J. Aug. 3, 2016)). In *Merritt v. Countrywide Fin. Corp.*, No. 09-CV-01179, 2015 WL 5542992, at *18 (N.D. Cal. Sept. 17, 2015), *aff'd*, 783 F. App'x 717 (9th Cir. 2019), the plaintiff failed to identify any specific policy he was challenging, and the only allegation in support of disparate impact compared the treatment of "European-Americans" with treatment of "African Americans, Latinos, and Women" which, because the groups were not mutually exclusive (some women being included in the group of European-Americans), did not provide the sort of comparative allegations required to support a disparate impact claim. *Raso v. Lago*, 958 F.Supp. 686, 704 (D. Mass. 1997), *aff'd*, 135 F.3d 11 (1st Cir. 1998), while from this Court, also dismissed a disparate impact claim supported solely by a single conclusory allegation that application of the challenged policy "resulted in discrimination." Similarly, in *Barrow v. Barrow*, No. 16-11493, 2016 WL 6996996, at *5 (D. Mass. Nov. 29, 2016), plaintiff did not identify any specific policy as having a disparate impact. These cases are all a far cry from the detailed and specific allegations of the FAC.

analyses of actual applicants to its rental property. Plaintiffs need not rely upon data of actual applicants, however, to establish that a practice will "predictably cause" disparate impact. *Miller*, 571 F.Supp.2d at 258-59; *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308-09 n.13 (1977) (finding data demonstrating pool of eligible candidates is appropriate to consider where reliable applicant flow data was not available); *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F.Supp.3d 145, 170-71 (E.D.N.Y. 2019) (availability pool appropriate to use instead of applicant flow, because defendant did not retain application information for rejected applicants).[9] Indeed, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650 (1989), which Metropolitan cites, directed consideration of qualified persons in the labor market, not actual applicants, and further recognized that even in the employment context, some jobs were such that "figures for the general population might . . . accurately reflect the pool of qualified job applicants." *Id*. at 651 n.6. Unlike with jobs requiring specific skills, the general population is a fair starting point for modeling applicants to rent housing. *See Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F.Supp.3d 259, 295-96 (D. Conn. 2020).

Metropolitan denied Plaintiff Louis housing because of her SafeRent Score, FAC ¶ 14. As outlined above, SafeRent Scores will predictably be lower, on average, for Black, Hispanic, and low-income individuals and thus, Metropolitan's use of SafeRent Scores to make decisions predictably has a disparate impact on Black and Hispanic voucher-using applicants.

SafeRent argues that because credit history is not the only component of the SafeRent Score, disparities in credit history are not sufficient to conclude there will be disparities in

---

[9] Moreover, the pool of eligible candidates can be established based on national or state general population statistics where "there is no reason to suppose" that the local characteristics would differ from the national statistics. *Dothard v. Rawlinson*, 433 U.S. 321, 330 (1977); *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F.Supp.3d 259, 292 (D. Conn. 2020).

SafeRent Scores. SafeRent MTD at 10-11. Plaintiffs specifically allege that the SafeRent Score is "significantly" based upon credit information. FAC ¶ 45. Moreover, other factors referenced as inputs to the SafeRent Score—payment performance, past due accounts, bankruptcy, *id.* ¶ 35— are encompassed by Plaintiffs' allegations of disparities in wealth, credit health, debt in collection rates, and use of payday and other alternative loan sources. *Id.* ¶¶ 50-60. In short, Plaintiffs have alleged disparities across the range of inputs to the SafeRent Score, not merely one element.[10] This is strikingly different from *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1086 (D.C. Cir. 2011), the case relied upon by SafeRent, where the court pointed to evidence[11] that some elements of the challenged formula would *favor* the plaintiff class, potentially offsetting any adverse impact from other elements in the formula. Defendant has not identified any element in its scoring system under which Black, Hispanic, or low-income applicants would be favored.

Finally, SafeRent suggests that disparities with respect to credit history for Black and Hispanic consumers generally might not apply to Black and Hispanic applicants using housing vouchers. SafeRent MTD at 11. This ignores Plaintiffs' well-pled allegations that disparities in

---

[10] SafeRent Scores also consider eviction history. FAC ¶ 35. There are substantial racial disparities in evictions too. The Court should take judicial notice of Peter Hepburn, Renee Louis, and Matthew Desmond, "Racial and Gender Disparities among Evicted Americans," Dec. 16, 2020, available at https://evictionlab.org/demographics-of-eviction/ (last visited Dec. 15, 2022) and City Life Vida Urbana, Evictions in Boston: The Disproportionate Effects of Forced Moves on Communities of Color at 35-48, available at https://www.bostonevictions.org/ (last visited Dec. 15, 2022). The Eviction Lab is a project of Princeton University, and the Evictions in Boston report was a collaboration between MIT and City Life/Vida Urbana. Fed. R. Evid. 201(b) provides that courts may take judicial notice of facts that are "not subject to reasonable dispute." While government documents are routinely given judicial notice, other authoritative sources may be recognized as well. *See, e.g.*, *Adams v. United States,* 964 F.Supp. 511, 514 n.4, 515 n.7 (D. Mass. 1996) (taking judicial notice of medical reference books); *see also Flood v. Kuhn*, 407 U.S. 258, 260-62 (1972) (taking judicial notice of various authoritative books on baseball).

[11] Unlike the case at bar, *Greater New Orleans* concerned a preliminary injunction, and thus there was evidence to consider, and a different burden of proof on plaintiffs there.

credit history also exist for those who are low-income, FAC ¶¶ 59-60, and that in order to qualify

for a voucher, one must be low-income, *id.* ¶ 58. Thus, the very individuals who obtain

vouchers—those who are low-income—are plainly those who are more likely to have a worse

credit history, and Black and Hispanic voucher-holders, combining the risks associated with low

income as well as race or ethnicity, are plausibly alleged to suffer from the alleged disparities.

   D. Plaintiffs Make Ample Allegations Demonstrating Causation.

  Plaintiffs satisfy the requirement for alleging a robust showing of causation. There are

well-documented and large disparities adverse to Black, Hispanic, and low-income individuals

across the factors used to calculate SafeRent Scores. Defendants argue that because SafeRent

Scores are calculated based upon multiple inputs, causation cannot be shown. SafeRent MTD at

11; Metropolitan MTD at 13-14. Defendants' simplistic arguments about "multiple factors" miss

the mark because the FAC identifies the factors going into SafeRent Scores, FAC ¶ 35, which are

related to and reinforcing of each other: credit history, payment performance, past due accounts,

bankruptcy, and evictions for non-payment of rent. Plaintiffs' allegations of disparities in wealth,

credit health, debt in collection rates, and use of payday and other alternative loan sources also

apply to these SafeRent Score factors. *Id.* ¶¶ 50-60. Given that Plaintiffs have alleged disparities

across the range of inputs to the SafeRent Score, how those different inputs are weighted by

SafeRent does not matter, it cannot fail to produce an output score reflecting the disparities

inherent in each of the inputs.

  SafeRent's reliance upon *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water

Improvement Dist.*, 17 F.4th 950, 965 (9th Cir. 2021), is misplaced; the analysis there supports a

finding of causation here. There, defendant required residents in public housing to pay a higher

security deposit, so causation could be seen from the policy itself. Here, Defendant Metropolitan

chose to use SafeRent Scores to determine admission; there is no suggestion any factor other

than her SafeRent Score was the basis of Ms. Louis's being denied housing. Defendant SafeRent chose to create SafeRent Scores based upon data rife with racial disparities—credit history, debt in collection, bankruptcies, and evictions. There is no suggestion of any factor for which there are not racial, ethnic, and income-based disparities, which was included in the SafeRent Scores. This is not a scenario where housing providers consider SafeRent Scores *and* myriad other factors to make housing decisions, leaving us to guess at the reason for denial. The allegations on this point are plain: SafeRent delivers denial decisions, which housing providers follow. *See* FAC ¶¶ 38, 43-44, 75-76.

*Burbank Apartments Tenant Ass'n v. Kargman*, 48 N.E.3d 394 (Mass. 2016), also supports the adequacy of Plaintiffs' pleadings here. In *Burbank,* the court held plaintiffs had not shown any harm; the plaintiffs were better off with the change to an enhanced voucher from project-based assistance. *Id.* at 405. But the court went on to elaborate on cases that would satisfy disparate impact standards, referring to "heartland cases" solidly within the scope of disparate impact coverage, as those are cases where a policy "unfairly functions" to "exclude [members of protected classes] from certain neighborhoods without any sufficient justification." *Id.* at 413. The case at bar is in that "heartland" because it challenges a policy—the use of SafeRent Scores, which rely on credit history and related factors—which unfairly excludes class members from housing without sufficient justification. That policy is unfair and lacking justification because the factors that go into the SafeRent Score are not good predictors of paying rent, FAC ¶¶ 46-49, and, given the class members all use vouchers that will directly pay most of their rent, housing providers lack justification for excluding applicants based on their belief that applicants will be unable to pay their rent, while ignoring that a voucher will actually pay most of the applicants' rent.

15

Defendants complain that the FAC seeks to hold them "liable for disparities they did not create," SafeRent MTD at 11; Metropolitan MTD at 15. But the FAC clearly alleges how policies adopted by each Defendant will predictably cause disparities in who may obtain housing where housing providers use SafeRent Scores. Defendants chose the policies causing the outcome. In suggesting that because disparities exist in the world, Defendants cannot be liable for their own choices, Defendants distort disparate impact claims in an unrecognizable fashion. For example, the Supreme Court has long recognized that height requirements for jobs have a disparate impact based on gender. *Dothard*, 433 U.S. at 329-30. Plainly, defendant in that case did not create height differences by gender. But defendant explicitly adopted a height requirement as a condition of employment, and thus caused the disparity in its own hiring.

Finally, SafeRent argues that causation is disrupted with respect to its conduct because housing providers choose to use SafeRent Scores. SafeRent MTD at 12. But SafeRent decides the score for each applicant, and sells its scoring service to housing providers with "accept" or "decline" decisions as the ultimate product. SafeRent is responsible for its own conduct in "making housing unavailable," as addressed in detail below, *infra* Section II.A.

E.   Plaintiffs' Claim Is Squarely Within the Established Scope of Disparate Impact Claims.

SafeRent asserts that Plaintiffs' claim would require that housing providers and SafeRent collect information about the race of applicants, and that this would inject racial consideration into every housing decision. Neither the premise nor the claimed consequence is correct. Plaintiffs' claim does not require that SafeRent or anyone else collect information about the race of applicants. Plaintiffs' claim relies upon other sources of data to identify when SafeRent's algorithm will predictably have a disparate impact on applicants, as is common in disparate impact housing cases. *See supra* at 11-12. If Plaintiffs' claim succeeds, relief could be ordered

that would have SafeRent revise its algorithm to use more relevant inputs with less discriminatory impact, and test such an algorithm against the same sorts of public data that Plaintiffs cited in order to test whether the revised algorithm would predictably have a disparate impact, all without collecting race data on any applicant.[12]

## II.     THE FAIR HOUSING LAWS APPLY TO SAFERENT.

### A.     The FHA Applies to Tenant Screening Services.

SafeRent advertises and operates SafeRent Scores as a decisionmaking tool; housing providers use it as such. SafeRent "deliver[s] an accept/decline/conditional decision based on [a housing provider's] predetermined decision points" and "explicitly instruct[s] housing providers to either accept or reject a rental application based upon a [SafeRent Score]." FAC ¶¶ 24, 26. Housing providers "cannot change the screening algorithm," *id.* ¶ 33, and SafeRent does not disclose how it calculates a SafeRent Score to anyone outside of its company. *Id*. ¶¶ 33-35. This shielding of information allegedly simplifies the application process for housing providers, to whom SafeRent delivers a score between 200 and 800 without any additional context. *See, e.g., id*. ¶ 38. Housing providers use these scores as authoritative decisions. Ms. Louis's denial letter from Metropolitan stated that "the third-party service we utilize to screen all prospective tenants has denied your tenancy. Unfortunately, the service's SafeRent tenancy score was lower than is permissible." *Id.* Another housing provider confirmed that its "screening is conducted through CoreLogic Rental Property Solutions LLC. A score is indicated in conclusion of the screening,

---

[12] Even if race data were collected on housing applicants, that would no more improperly inject race into the decision than the data that employers are required to keep on employees injects race into every employment decision. *Cf.* 29 C.F.R. § 1602.7, 1602.13 (employers required to report certain data on race of employees); 41 C.F.R. § 60-1.12 (federal contractors required to track race of applicants). However, contrary to SafeRent's claim, Plaintiffs do not seek such a practice as the remedy in this case.

which reflects an approve or deny comment." *Id.* Metropolitan even underscored its understanding by telling Ms. Louis that "we do not accept appeals and cannot override the outcome of the Tenant Screening." *Id.* ¶ 44. SafeRent cannot claim that SafeRent Scores encourage housing providers to exercise independent judgment.

The FHA prohibits all discriminatory conduct which "otherwise makes unavailable" or denies rental housing. 42 U.S.C. § 3604(a) and (f)(1). The phrase "otherwise make unavailable" is a "catchall phrase" that "look[s] to consequences, not intent." *Inclusive Cmtys.*, 576 U.S. at 535; *see also Casa Marie, Inc. v. Super. Ct. of P.R.*, 988 F.2d 252, 257 n.6 (1st Cir. 1993). This is a natural interpretation given the FHA embodies a broad legislative plan to eliminate all traces of discrimination within the housing field. *Marya v. Slakey*, 190 F.Supp.2d 95, 99 (D. Mass. 2001); *see also Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (the "language of the Act is broad and inclusive").

SafeRent makes housing unavailable "when [it] engages in a series of actions that imposes burdens on . . . a protected class of residents or intended residents, making it more difficult for the members of the protected class to obtain housing or conveying a sense that the members of the protected class are unwanted." *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F.Supp.3d 46, 72 (D. Conn. 2019); *see also CoreLogic*, 478 F.Supp.3d at 287. SafeRent Scores are sold as determinations of renter quality, and SafeRent decides if an applicant will be rejected from tenancy based on its own review and weighting of the credit-related records comprising SafeRent Scores. By selling SafeRent Score decisions, SafeRent disproportionately and unjustifiably (1) labels otherwise qualified Black and Hispanic renters who use housing vouchers as being unfit renters and (2) disqualifies them from tenancies. *See* FAC ¶¶ 27-30, 120-26. SafeRent thereby makes housing unavailable at properties using its services.

The FHA "bann[ed] an outcome while not saying who the actor is." *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 298 (7th Cir. 1992). "[H]ousing providers are often the target of FHA claims," but "other entities are frequently held liable under the FHA." *CoreLogic*, 369 F.Supp.3d at 374 (holding SafeRent [then operating as CoreLogic RPS] could be sued under the FHA for delivering decisions on tenant acceptability to housing providers).[13] *Steptoe*, cited by SafeRent, illustrates this proposition. *See Steptoe v. Beverly Area Plan. Ass'n*, 674 F.Supp. 1313, 1320 (N.D. Ill. 1987) (holding liable real estate appraisers or multiple listing services "that do not directly participate in the sale or financing of real estate but that nevertheless exercise sufficient control over the market").[14] SafeRent is liable for making housing unavailable as its SafeRent Score decisions disqualify otherwise qualified applicants in violation of 42 U.S.C. § 3604(a) and (f)(1).

Discriminatory acts may have several proximate causes, and the possibility that one decision may be overridden by another decisionmaker does not "automatically render the link to the [subordinate's] bias 'remote' or 'purely contingent,'" even if the decisionmaker conducts a separate investigation or exercises their own judgment. *Staub v. Proctor Hosp.*, 562 U.S. 411,

---

[13] *See also Casa Marie*, 988 F.2d at 257 n.6 ("Title VIII [of the FHA] may proscribe discriminatory acts by persons who are neither sellers nor lessors of property."); *Edwards v. Johnston Cnty. Health Dept.*, 885 F.2d 1215, 1221 n.14 (4th Cir. 1989) ("[The FHA's] proscriptions are not directed only to those persons who sell, rent or finance real estate."); *Evans v. Tubbe*, 657 F.2d 661, 663 n.3 (5th Cir. Unit A Sept. 1981) ("Section 3604(a) [of the FHA] is not limited to discriminatory practices by actual lessors and vendors of dwellings."); *cf. United States v. Space Hunters, Inc.*, 429 F.3d 416, 424-25 (2d Cir. 2005) (holding that 42 U.S.C. § 3604(c)'s prohibition on discriminatory statements was not limited to owners and their agents).

[14] SafeRent also cites *Hoostein*, where the plaintiffs, who owned an apartment, sued their tenant (a non-profit administering aid programs and providing other services) for ceasing to provide a particular type of housing voucher to the occupant of the apartment. *Hoostein v. Mental Health Ass'n (MHA), Inc.*, 98 F.Supp.3d 293, 298 (D. Mass.), *aff'd* (1st Cir. 2015). *Hoostein* did not hold that "Section 3604(a) applied to only a potential landlord or property owner." SafeRent MTD at 17. Rather, the court concluded that "the [FHA] is not designed to provide landlords with a cause of action against their tenants." *Hoostein*, 98 F.Supp.3d at 298.

419 (2011); *see also CoreLogi*c, 478 F.Supp.3d at 20 (holding that even if a screening

company's applicant rejection "may be overridden by its client [that] does not eliminate its

responsibility—discrimination may have multiple causes and parties other than final

decisionmakers may be liable"). "[I]t is axiomatic under tort law that the decisionmaker's

exercise of judgment does not prevent the earlier agent's action from being the proximate cause

of the harm." *Staub,* 562 U.S. at 419. SafeRent acts hand-in-glove with housing providers to

discriminate against Plaintiffs and the classes they seek to represent. SafeRent "cannot escape

liability by sharing decision making and shielding one another because no single entity is wholly

responsible." *CoreLogic*, 478 F.Supp.3d at 291. SafeRent created, sold, and encouraged reliance

upon SafeRent Scores without business necessity, disparately harming Black and Hispanic

renters who use vouchers. SafeRent also "allowed its customer to conceal from [the customer's]

line staff the basis for an 'unqualified' classification." *Id.* In so doing SafeRent is an "integral

participant in the denial of housing" by its customers. *Id.*

　　　　SafeRent's attempt to distinguish itself from the *CoreLogic* case is unavailing. *See*

SafeRent MTD at 17. The *CoreLogic* court deferred to HUD's interpretation, 24 C.F.R. §

100.7(a), which elaborates on the statutory prohibition "otherwise make unavailable."[15]

*CoreLogic*, 369 F.Supp.3d at 372. These regulations recognize that the FHA is violated when,

*inter alia*, a person's own conduct "results in a discriminatory housing practice" or a person fails

to correct "a discriminatory housing practice by a third-party, where the person knew or should

have known of the discriminatory conduct and had the power to correct it." 24 C.F.R. § 100.7(a).

---

[15] As the agency charged with its enforcement, HUD's interpretation of the FHA is entitled
to *Chevron* deference. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837,
842-43 (1984); *see also Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) (*en
banc*), as amended (Apr. 30, 2010).

SafeRent is liable under 24 C.F.R. § 100.7(a) because of its "own conduct that results in a discriminatory housing practice." 24 C.F.R. § 100.7(a)(i). SafeRent is directly liable for disparities engendered by its SafeRent Scores, and its own decision to market and deliver accept or decline decisions based on those scores. The SafeRent Scores are SafeRent's creation, relying entirely upon its own interpretation of various records or data available. *See* FAC ¶¶120-26. *CoreLogic* ruled that a defendant could be held directly liable under an analogous rationale; "Defendant held itself out as a company with the knowledge and ingenuity to screen housing applicants . . . Plaintiffs allege it failed to do so by categorizing as disqualified a qualified applicant. Defendant had a duty not to sell a product to a customer which would unwittingly cause its customer to violate federal housing law and regulations." *CoreLogic*, 369 F.Supp.3d at 372. SafeRent's conduct also falls within the ambit of § 100.7(a) as it fails to correct housing providers who follow its SafeRent decisions, and thus participates in the creation of a disparate impact in excluding would-be renters—indeed it encourages such conduct by housing providers—and it is within SafeRent's power to correct the housing providers by not selling SafeRent Scores as currently constructed, but to modify the scores to consider information that is more accurate in predicting renter quality, and take the housing vouchers into account in so doing.

        B.      SafeRent May Be Held Liable for Violations of Mass. Gen. Laws ch. 151B, §§ 4(6) and 4(10).

                1.      SafeRent's conduct interferes with rights protected by Mass. Gen. Laws ch. 151B, §§ 4(6) and 4(10), making SafeRent liable for discrimination.

Mass. Gen. Laws ch. 151B applies to SafeRent because SafeRent interfered with rights protected by the statute. *Lopez v. Commonwealth*, 978 N.E.2d 67, 78 (Mass. 2012) ("The first clause of § 4(4A) prohibits 'interfere[nce] with . . . the exercise or enjoyment of any right granted or protected by this chapter.'"); *see also* 804 Mass. Code Regs. 02.00 § (2)g (2022)

("Persons Covered by Mass. Gen. Laws ch. 151B, § 4: Those persons who directly or *indirectly* prevent or attempt to prevent the construction, purchase, sale or rental of any dwelling or land covered by Mass. Gen. Laws ch. 151B, § 4.") (emphasis added).

Defendants who play a role in the tenant selection process have been held liable under § 4(10) even where they are not the final arbiter of tenancy decisions. *See DiLiddo v. Oxford St. Realty, Inc.*, 876 N.E.2d 421, 430 (Mass. 2007) ("[T]he test is whether Oxford…at a minimum, 'aid[ed]' or 'abet[ted]' a violation of G.L. c. 151B, § 4(10)."). In *DiLiddo*, Oxford Street Realty served as a building's property manager and was "responsible for 'locating, interviewing and choosing' tenants for [the building's owner]." *Id.* The court held Oxford liable because § 4(10) applies broadly to "any person furnishing credit, services or rental accommodations" and § 4(5) makes it unlawful "[f]or any person . . . to aid, [or] abet . . . the doing of any of the acts forbidden under this chapter." *Id.*

The analysis of aiding and abetting in *DiLiddo* applies equally here. Section 4(5), which applies to all acts forbidden under the chapter and thus covers § 4(6) in addition to § 4(10), "provides that it is unlawful '[f]or any person, *whether an employer or an employee or not*, to aid, [or] abet . . . the doing *of any of the acts forbidden under this chapter* or to attempt to do so.'" *DiLiddo*, 876 N.E.2d at 430 (alterations and omission in original) (emphasis added). As described above and alleged in the FAC, SafeRent had a clear role in the process of "choosing tenants." *See, e.g.*, FAC ¶ 76 ("[T]he third-party service we utilize to screen all prospective tenants has denied your tenancy . . ."). SafeRent is consequently liable under Mass. Gen. Laws ch. 151B because, at a minimum, SafeRent aided and abetted in the discriminatory denial of Plaintiffs' rental applications. *DiLiddo*, 876 N.E.2d at 430.

2.      SafeRent, as a consumer reporting agency, is a provider of "credit services" and therefore subject to Mass. Gen. Laws ch. 151B, § 4(10).

The Massachusetts Commission Against Discrimination administers Mass. Gen. Laws ch. 151B and interprets § 4(10) to prohibit discrimination "in the furnishing of credit services, or in the renting of accommodations against an individual who is a recipient of federal, state or local assistance." 804 Mass. Code Regs. 2.04 (2022). SafeRent wrongfully asserts it is not liable under § 4(10) because "SafeRent does not furnish credit services (such as mortgage or lending services)." SafeRent MTD at 18.

There is no support for such a limited definition of "credit services" under ch. 151B, which is meant to be broadly construed. *See* Mass. Gen. Laws ch. 151B, § 9 (mandating that "[t]his chapter shall be construed liberally for the accomplishment of its purposes"). The statute's purpose is "to eradicate discrimination in all its forms, be they based on intent or effect" by prohibiting "conduct that results in a 'refus[al] to rent or lease or sell or negotiate for sale' on the basis of membership in a protected class." *Burbank*, 48 N.E.3d at 407. Holding SafeRent liable under § 4(10) therefore aligns with the provision's goal to provide "affordable, decent housing for those of low income" and the antidiscrimination goals of Mass. Gen. Laws ch. 151B more broadly. *Id.*

Furthermore, "statutory language, when clear and unambiguous, must be given its ordinary meaning." *Bronstein v. Prudential Ins. Co.*, 459 N.E.2d 772, 774 (Mass. 1984). In Massachusetts, a "credit services organization" is "(i) any consumer reporting agency as defined in 15 U.S.C. § 1681 et seq," which defines "consumer reporting agency" as an organization that "regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." Mass. Gen. Laws ch. 93, § 68(A); 15 U.S.C. § 1681a(f).

SafeRent is a consumer reporting agency: it uses "credit bureau data and scores" and "applicants' credit history [and] other credit-related information, including non-tenancy debts . . . in calculating SafeRent Scores" for housing providers. FAC ¶¶ 30-35. SafeRent is also included in the CFPB's *List of Consumer Reporting Agencies* under "Tenant Screening" and has been categorized as a consumer reporting agency by other courts. CFPB, *List of Consumer Reporting Agencies*, consumerfinance.gov https://www.consumerfinance.gov/consumer-tools/credit-reports-and-scores/consumer-reporting-companies/companies-list/ (last visited Dec. 15, 2022); *see, e.g., Oses v. CoreLogic SafeRent, LLC*, 171 F.Supp.3d 775, 780 (N.D. Ill. 2016) ("consumer reporting agencies such as defendant [CoreLogic SafeRent, LLC] . . ."). Therefore, SafeRent is a consumer reporting agency because it assembles consumer reports for third parties and is undeniably a credit services organization. Because SafeRent is a credit services organization involved in the provision of housing, it is liable for violations of § 4(10).

## III.   PLAINTIFFS HAVE STATED A CLAIM UNDER CH. 93A.

Mass. Gen. Laws ch. 93A "is a statute of broad impact." *Exxon Mobil Corp. v Att'y Gen.*, 94 N.E.3d 786, 791 (Mass. 2018) (citation omitted). The statute "was designed to encourage more equitable behavior in the marketplace and impose liability on persons seeking to profit from unfair practices." *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998) (quoting *Linkage Corp v. Trustees of Boston Univ.*, 679 N.E.2d 191, 208 (Mass. 1997)). As such, it prohibits all unfair or deceptive acts or practices.[16]

"[U]nfair or deceptive conduct is best discerned 'from the circumstances of each case.'"

---

[16] Although courts frequently merge the concepts of unfairness and deception, liability may be based solely on either unfairness *or* deception. *See Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 555-56 (Mass. 2008). Here Plaintiffs only assert their claims under the unfairness prong of ch. 93A § 9. Therefore, Defendant's argument that Plaintiffs failed to allege that SafeRent engaged in any deceptive conduct is irrelevant.

*Kattar v. Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000) (quoting *Commonwealth v. DeCotis*, 316 N.E.2d 748, 754 (Mass. 1974)); *see also Arthur D. Little, Inc.*, 147 F.3d at 55. When seeking to determine whether a particular set of circumstances constitute an unfair practice, Massachusetts courts rely upon the Federal Trade Commission's standard adopted by the Supreme Court in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244-45 n.5 (1972):

> (1) whether the practice, without necessarily having been prevously considered unlawul, offends public policy as it has been established by statutes, the common law or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;
>
> (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or]
>
> (3) whether it causes substantial injury to consumers.

*See PMP Assocs., Inc. v. Globe Newspaper Co.*, 321 N.E.2d 915, 917 (Mass. 1975); *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 309 (Mass. 2002).

Here, Plaintiffs' allegations satisfy all three criteria of "unfairness" to support their ch. 93A claims. Count 7 includes all voucher-holders who were denied housing because of their SafeRent Scores. *See* FAC ¶¶ 107, 166. Count 8 includes all Black and Hispanic voucher-holders who were denied housing because of their SafeRent Scores. *See id.* ¶¶ 108, 175. In each instance, SafeRent's practices offend public policy as established by, and incorporated within, the anti-discrimination provisions of ch. 151B, § 4(6) as well as in the FHA by relying on data that is biased against non-white applicants. *See id.* ¶¶ 50-61, 120-26, 142-49. The company's algorithms also discriminate against voucher-holders based on source of income by ignoring the benefits of vouchers and instead relying on credit scores and histories, which "especially fail in predicting if applicants who use housing vouchers would make quality tenants" contrary to the public policy encorporated in ch. 151B, § 4(10). FAC ¶¶ 61, 150-57. Furthermore, SafeRent's

alleged racially discriminatory practice "is conduct fairly described as immoral, unethical, or oppressive for the purposes of [ch.] 93A." *See Brooks v. Martha's Vineyard Transit Auth.*, 433 F.Supp.3d 65, 78 (D. Mass. 2020) (quoting *Ellis v. Safety Ins. Co.*, 672 N.E.2d 979, 986 (Mass. 1996)).

Finally, SafeRent's unfair practices have substantially injured the plaintiff consumers. Ms. Louis suffered monetary harm when she had to pay $200 more per month for less desirable housing due to her SafeRent Score. FAC ¶¶ 79-82. Ms. Douglas was forced to spend over three months in less desirable housing conditions because her score was too low for the apartment she wanted. *Id.* ¶¶ 83-92. The other members of the Voucher Class and Race Class were also injured when they "sought but were denied housing in Massachusetts because of their SafeRent Score. *Id.* ¶¶ 107-08. SafeRent's practices, in violation of applicable state and federal housing discrimination laws, thus placed plaintiff consumers "in a worse . . . position" than they would have been in had SafeRent complied with the law. *Hershenow v. Enter. Rent-A-Car of Boston, Inc.* 840 N.E.2d 526, 534 (Mass. 2006).

SafeRent's arguments are misdirected. Chapter 93A's safe harbor provisions simply do not apply here. The fact that SafeRent may be permitted to screen voucher-using rental applicants for credit history does not mean that SafeRent may engage in racially discriminatory practices by selectively relying upon data that is biased against non-white applicants or discriminate against voucher-holders by ignoring the benefits of housing choice vouchers in assessing applicants' rental qualifications. *See supra* at § I.B. Just because an act or practice may be authorized by statute or regulation does not mean that it "can never be an unfair or deceptive act or practice" as applied. *Schubach v. Household Fin. Corp.*, 376 N.E.2d 140, 142 (Mass. 1978). Nor was SafeRent's conduct "nothing more than good-faith or (at most) negligent

conduct" that is not actionable under ch. 93A. That merely is Defendant's characterization which is directly contradicted by Plaintiffs' allegations which must be assumed to be true at the motion to dismiss stage. Although the applicable FHA disparate impact and ch. 93A provisions do not require Plaintiffs to prove that SafeRent intended to harm them, there is no doubt that they have asserted that Defendant intentionally adopted and implemented the policies and practices that resulted in the alleged harm. Finally, Plaintiffs have not relied upon the violation of certain statutes, regulations or laws to assert per se violations of ch. 93A as the sole basis for their ch. 93A claims. To the contrary, as discussed above, Plaintiffs have adequately alleged that SafeRent's discriminatory practices, in and of themselves, are unfair because they offend fair housing policy, are oppressive and have caused material and substantial consumer harms to the class representatives and the putative classes they seek to represent.

IV.     **DEFENDANTS' STANDING ARGUMENTS ARE MERITLESS.**

A.     Ms. Louis Has Standing to Assert Claims Against Metropolitan.

Metropolitan incorrectly asserts that Ms. Louis lacks standing to pursue her individual claims. "Standing requires a showing that 1) plaintiff suffered an injury in fact 2) that is fairly traceable to the disputed conduct and 3) the relief sought will redress the injury sustained." *Dickey v. City of Boston*, 405 F.Supp.3d 195, 199 (D. Mass. 2019) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Ms. Louis has satisfied all three elements. First, she suffered a concrete injury when she was denied housing. *See Thurmond v. Bowman*, 211 F.Supp.3d 554, 560 (W.D.N.Y. 2016) (holding that denial of housing was injury in fact); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (finding injury where housing search was "thwarted by official action that is racially discriminatory"). Ms. Louis has also suffered economic injury because her "current rental costs [her] $200 *more* per month than if she had leased with

Metropolitan." FAC ¶ 79; *see Collins v. Yellen*, 141 S.Ct. 1761, 1779 (2021) (noting that

"pocketbook injury is a prototypical form of injury in fact"); *Czyzewski v. Jevic Holding Corp.*,

137 S.Ct. 973, 983 (2017) ("For standing purposes, a loss of even a small amount of money is

ordinarily an 'injury.'"). And she suffered emotional harm, FAC ¶ 81, which can be an injury

under the FHA, *see, e.g.*, *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 41 n.12 (2d Cir.

2015) (recognizing injury where plaintiffs alleged emotional harm from defendant's statements);

*Hill v. River Run Homeowners Ass'n*, 438 F.Supp.3d 1155, 1172 (D. Idaho 2020).[17]

Metropolitan dismisses these injuries as "general grievances shared by almost everyone

navigating the greater Boston area housing market." Metropolitan MTD at 16. But Ms. Louis's

alleged losses affect her "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1; *see*

*Gustavsen v. Alcon Lab'ys, Inc.*, 903 F.3d 1, 7 (1st Cir. 2018) (finding monetary loss

particularized "because it constitutes undisputed harm to the plaintiff specifically"). Those

personal losses are injuries in fact even if other renters have suffered similar harm. *See Laufer v.*

*Acheson Hotels, LLC*, 50 F.4th 259, 276 (1st Cir. 2022) (rejecting generalized-grievance

argument where plaintiff "personally suffered the denial of information the law entitles her").[18]

Second, Ms. Louis's injuries are traceable to Metropolitan's use of the SafeRent

screening—as Metropolitan's emails to Ms. Louis confirm. In response to her application,

Metropolitan stated: "[W]e regret to inform you that the third-party service we utilize to screen

---

[17] Unlike the plaintiff in *Beaudoin v. Baker*, 530 F.Supp.3d 169, 175 (D. Mass. 2021), Ms. Louis's feelings of disappointment, frustration, and worry do not stem from observations of other people's conduct; they are the direct result of the housing denial. *See* FAC ¶ 81.

[18] Metropolitan's argument also ignores the obvious difference between paying more for an apartment than one would prefer and being denied an apartment because of racial discrimination. The latter—which is what Ms. Louis alleges—is not the kind of generalized harm that is "shared in equal measure by all or a large class of citizens." *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 51 (1st Cir. 2000).

all prospective tenants has denied your tenancy. Unfortunately, the service's SafeRent tenancy score was lower than is permissible under our tenancy standards." FAC ¶ 76. The causal chain is clear: Metropolitan's use of the SafeRent Score caused the denial of housing—itself an injury— which in turn caused Ms. Louis's financial and emotional injuries.[19]

Finally, Ms. Louis's injuries are redressable. Damages would redress her financial injury. *See, e.g.*, *Gustavsen*, 903 F.3d at 9. As for injunctive relief, Ms. Louis "need only show that a favorable ruling could potentially lessen [her] injury; [she] need not definitively demonstrate that a victory would completely remedy the harm." *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 318 (1st Cir. 2012). Here, enjoining Metropolitan from using SafeRent Scores to reject applicants would allow Ms. Louis to reapply with a greater chance of success. That potential benefit suffices for standing purposes. *See id.* (finding redressability satisfied because plaintiff "stands to benefit if [challenged law] is nullified").[20]

B.    Both Individual Plaintiffs Can Assert Claims for Violations of 42 U.S.C. § 3604(b) and ch. 151B, § 4(6).

SafeRent asserts that Ms. Louis and Ms. Douglas lack standing to sue under § 3604(b) and § 4(6). Courts have not uniformly treated arguments about the scope of § 3604(b) as standing issues. *See, e.g.*, *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F.Supp.3d 555, 566-69 (D. Conn. 2015). In any event, SafeRent's argument is meritless.

Under § 3604(b), it is unlawful to "discriminate against any person in the terms,

---

[19] SafeRent also played a central role in denying Ms. Louis housing, but that does not deprive her of standing against Metropolitan. *See, e.g.*, *City of Wyoming v. Procter & Gamble Co.*, 210 F.Supp.3d 1137, 1151-52 (D. Minn. 2016) (collecting cases and explaining that "[a] plaintiff is not deprived of standing merely because he or she alleges a defendant's actions were a contributing cause instead of the lone cause of the plaintiff's injury").

[20] The FAC also requests "such other further relief as may be just and proper," FAC ¶ 193, which could include ordering Metropolitan to accept Ms. Louis, *contra* Metropolitan MTD at 18.

conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." SafeRent says Ms. Louis cannot assert a claim under this provision because she was never approved for housing. SafeRent MTD at 22. But discrimination during the application process can violate § 3604(b). *See, e.g.*, *United States v. Hylton*, 944 F.Supp.2d 176, 188 (D. Conn. 2013) (collecting cases involving pre-acquisition discrimination); 24 C.F.R. § 100.65(b)(3) (prohibiting "[f]ailing to process an offer for the sale or rental of a dwelling or to communicate an offer accurately"). There may be some uncertainty as to whether § 3604(b) applies to *post*-acquisition conduct, but there is no doubt it applies to *pre*-acquisition conduct. *See, e.g.*, *Davis v. City of New York*, 902 F.Supp.2d 405, 436 (S.D.N.Y. 2012) (holding that FHA "is best understood to prohibit post as well as pre-acquisition discrimination").

SafeRent's pre-acquisition conduct violates § 3604(b) in at least two ways. First, preventing a tenant from assuming residency is discrimination in the "privileges of sale or rental." *See Hylton*, 944 F.Supp.2d at 188 (concluding that defendant discriminated "in the privileges of a rental" by not allowing individual to rent property); *Williamsburg Fair Hous. Comm. v. N.Y.C. Hous. Auth.*, 493 F.Supp. 1225, 1248 (S.D.N.Y. 1980) (explaining that eligible non-white family denied apartment "would have been discriminated against in the privileges of a rental"). Ms. Louis and Ms. Douglas were denied housing—and the privileges of rental— because of the SafeRent screening. FAC ¶¶ 76, 85.

Second, SafeRent's tenant screening is a "service . . . in connection" with rentals. In ordinary parlance, tenant screening is undoubtedly a "service." That service is directly connected to the rental process and is a necessary hurdle for applicants to clear. FAC ¶¶ 38-41 (explaining how SafeRent Scores dictate whether applicants are approved); *cf. Ga. State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 633-34 (11th Cir. 2019) (holding that "service" under §

3604(b) means "a housing-related service that is directly connected to the sale or rental of a dwelling" and distinguishing services that are "not required in order to obtain housing").

SafeRent's interpretation of § 3604(b) is unduly narrow. For instance, SafeRent relies on *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180 (4th Cir. 1999), which held that "services" refers to "such things as garbage collection and other services of the kind usually provided by municipalities." *Id.* at 193 (quoting *Mackey v. Nationwide Ins. Cos.*, 724 F.2d 419, 424 (4th Cir. 1984)). But other courts have correctly criticized that reasoning. *See NAACP*, 978 F.2d at 299 ("[I]t is hard to understand § 3604 as restricted to garbage collection and like services."). And other courts have taken a more expansive view of the "services" covered by the FHA. *See, e.g.*, *Lindsey v. Allstate Ins. Co.*, 34 F.Supp.2d 636, 641 (W.D. Tenn. 1999) ("[T]he provision of property insurance can be reasonably interpreted as the 'provision of services or facilities in connection' with the sale or rental of a dwelling."). Those interpretations are more consistent with the broad reach of the FHA than is SafeRent's narrow construction.

SafeRent's practices fall under § 3604(b) as discrimination in the privileges of rental and as services connected to the rental process. Plaintiffs were injured by those practices when their applications were denied due to their SafeRent Scores, so they can sue under § 3604(b).[21]

---

[21] For the same reasons, SafeRent's screening practices fall under the "privileges" and "services" language of ch. 151B, § 4(6)(b). *Cf. Burbank*, 48 N.E.3d at 411 n.28 ("When interpreting . . . specific provisions of G.L. c. 151B . . . we consider Federal case law construing cognate provisions of the [FHA] unless we discern a reason to depart from those decisions." (omissions in original) (quoting *Andover Hous. Auth. v. Shkolnik*, 820 N.E.2d 815, 821 (Mass. 2005))). Alternatively, Plaintiffs can sue under § 4(6)(a), which makes it unlawful "to deny to or withhold from any person or group of persons such accommodations because of . . . race." That claim can proceed even if the FAC referenced § 4(6)(b) rather than § 4(6)(a). FAC ¶ 140; *see, e.g.*, *Snyder v. Collura*, 812 F.3d 46, 50 (1st Cir. 2016) (noting that "a complaint need plead facts and not necessarily the specific names of the legal theories and causes of action fairly raised by these facts").

C.     CAAS Has Organizational Standing to Assert Claims Under the FHA and Mass.
       Gen. Laws ch. 151B.

SafeRent also challenges CAAS's standing. An organization has standing "if it can show

that the defendant's actions cause a 'concrete and demonstrable injury to the organization's

activities' that is 'more than simply a setback to the organization's abstract social interests.'"

*Nat'l Ass'n of Consumer Advocs. v. Uejio*, 521 F.Supp.3d 130, 142 (D. Mass. 2021) (quoting

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "This is not a demanding standard,

since 'only a perceptible impairment of an organization's activities is necessary for there to be an

injury in fact.'" *Id.* (quoting *Nat. Res. Def. Council v. Dep't of Interior*, 410 F.Supp.3d 582, 593

(S.D.N.Y. 2019)).

    *Havens* set out the requirements for organizational standing. There, a housing

organization alleged that the defendants' steering practices had frustrated "its efforts to assist

equal access to housing through counseling and other referral services." *Havens*, 455 U.S. at 379

(citation omitted). The organization also alleged that it had to "devote significant resources to

identify and counteract" those practices. *Id.* (citation omitted). The Court held that those

allegations of a "concrete and demonstrable injury to the organization's activities" sufficed at the

pleading stage. *Id.* Following *Havens*, several circuits have found standing where organizations

alleged that they diverted resources to counter discriminatory housing practices. *See, e.g.*, *Fair

Hous. of Marin v. Combs*, 285 F.3d 899, 904-05 (9th Cir. 2002) (collecting cases); *Cent. Ala.

Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 642 (11th Cir. 2000) (explaining that

organization suffers injury where it "expends resources as a proximate result of the defendant's

discriminatory conduct, and those resources would have been devoted to other activities

consonant with its mission were it not for the offending conduct").

    CAAS has alleged the same kind of injury. The organization faces time constraints in

securing housing for voucher-holders, so clients cannot spend time applying to places where they are likely to be denied based on credit history. FAC ¶¶ 95, 99. Since CAAS cannot encourage those clients to apply to some of the largest property management companies—which are most likely to use SafeRent or similar vendors—it must expend more resources to help them find housing. *Id.* ¶¶ 97-101. That diversion of resources to offset SafeRent's discriminatory practices qualifies as an injury in fact. *See, e.g.*, *Fortune Soc'y*, 388 F.Supp.3d at 163-64 (finding standing where organization expended time and resources finding alternative housing for clients because defendant prohibited tenants with certain criminal convictions); *Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F.Supp.2d 46, 53 (D.D.C. 2002) (finding standing where organizations diverted resources "to identify and counteract the [defendant's] discriminatory policies and practices").

*Equal Means Equal v. Ferriero*, 3 F.4th 24 (1st Cir. 2021), illustrates the distinction between injuries that establish organizational standing and those that do not. The mission of the plaintiff organizations was to advocate women's equality and ratification of the Equal Rights Amendment ("ERA"). *Id.* at 26. They alleged that the Archivist of the United States's failure to publish and certify the ERA had forced them to expend resources "to educate and inform [their] members, supporters and the general public about why the ERA is duly ratified despite the Archivist's actions." *Id.* at 30. The court found those allegations distinguishable from *Havens*, which "did not purport to find standing based merely on the expenses that the plaintiff would have had to incur to engage in additional issue advocacy in favor of fair housing." *Id.*

The allegations here are much closer to those in *Havens*. CAAS is not arguing that it "educates and informs" the public about SafeRent's conduct or that it incurs expenses related to "issue advocacy." Instead, the organization has alleged that certain clients are unlikely to pass

SafeRent's screening, so CAAS must spend more time and resources helping those clients find

housing. FAC ¶¶ 96-99. At the pleading stage, those allegations suffice to show injury in fact.

*See Havens*, 455 U.S. at 379; *see also Equal Means Equal*, 3 F.4th at 31 & n.5 (noting that some

of organizations' cited cases "involve allegations by plaintiff organizations that are much more

like those in *Havens* than those before us here").

      SafeRent's arguments to the contrary overstate CAAS's burden. For instance, CAAS did

not need to allege that it worked with clients whose applications were screened by SafeRent. *See*

SafeRent MTD at 24. CAAS's activities have been "perceptibly impaired," *Havens*, 455 U.S. at

379, by the need to *avoid* housing providers that use SafeRent's services. As the FAC makes

clear, CAAS cannot encourage clients with credit history likely to result in a low SafeRent Score

to waste time considering such locations. FAC ¶¶ 96-99. The use of additional resources to help

those clients find other housing qualifies as an injury in fact. *See Spann v. Colonial Vill., Inc.*,

899 F.2d 24, 28 (D.C. Cir. 1990) (finding standing where advertising practices "discouraged

black home buyers and renters from considering defendants' housing and required the

organizations to expend additional resources to identify and dispel this discouragement").

      Nor was CAAS required "to show that applicants that were never screened by SafeRent

would have been denied if they were submitted and screened." SafeRent MTD at 24. CAAS met

its burden to allege a "concrete and demonstrable injury to the organization's activities," *Havens*,

455 U.S. at 379, by asserting that it must spend more time and resources to help clients find

housing. That injury is traceable to SafeRent's consideration of credit history in its screening

services. *Cf. Equal Rts. Ctr. v. Equity Residential*, 798 F.Supp.2d 707, 726 (D. Md. 2011)

(explaining that once organization discovered defendant's violation, "every subsequent expense

associated with the [organization's] investigation of [defendant] and counteraction of its alleged

violations is traceable to those violations"). And it is redressable because CAAS could encourage

its clients to apply to more housing providers if SafeRent halted its discriminatory practices.

Whether those clients would ultimately be accepted or denied is not relevant. *See Fortune Soc'y*,

388 F.Supp.3d at 165 n.16 ("Plaintiff is not required for the purposes of standing to show that its

members ultimately would have been selected as tenants.").[22]

   CAAS has satisfied the pleading requirements for organizational standing.

## CONCLUSION

For the foregoing reasons, both Defendants' motions to dismiss should be denied.

---

[22] SafeRent also relies on *Lowell v. Lyft, Inc.*, 352 F.Supp.3d 248 (S.D.N.Y. 2018), but that case is inapposite because the organization failed to allege that "Defendant's conduct caused it to expend any resources separate from this litigation or that it was otherwise impeded in its ability to pursue its mission." *Id.* at 259. By contrast, CAAS has alleged an injury based on expenditures distinct from this litigation. FAC ¶¶ 93-102; *see, e.g.*, *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (finding standing where defendant's conduct "caused the [organizations] to divert resources independent of litigation costs and frustrated their central mission").

December 19, 2022                          Respectfully submitted,

                                          */s/ Christine E. Webber*
                                          Todd S. Kaplan (Bar No. 634710)
                                          Nadine Cohen (Bar No. 090040)
                                          GREATER BOSTON LEGAL SERVICES
                                          197 Friend Street
                                          Boston, MA, 02114
                                          Tel.: (617) 371-1234
                                          tkaplan@gbls.org
                                          ncohen@gbls.org

                                          Christine E. Webber (*pro hac vice*)
                                          Samantha N. Gerleman (*pro hac vice*)
                                          COHEN MILSTEIN SELLERS & TOLL PLLC
                                          1100 New York Ave., N.W.
                                          Suite 500
                                          Washington, D.C., 20005
                                          Tel.: (202) 408-4600
                                          cwebber@cohenmilstein.com
                                          sgerleman@cohenmilstein.com

                                          Stuart T. Rossman (Bar No. 430640)
                                          Ariel C. Nelson (Bar No. 705704)
                                          NATIONAL CONSUMER LAW CENTER
                                          7 Winthrop Square, Boston, MA, 02110
                                          Tel.: (617) 542-8010

                                          *Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the NEF (NEF) and paper copies will

be sent to those indicated as non-registered participants on December 19, 2022.


Dated:  December 19, 2022              */s/Christine E. Webber*
                                       Christine E. Webber