# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

MARY LOUIS AND MONICA DOUGLAS, on behalf of themselves and all others similarly situated, and COMMUNITY ACTION AGENCY OF SOMERVILLE, INC.,

Plaintiffs,

v.

SAFERENT SOLUTIONS, LLC, and METROPOLITAN MANAGEMENT GROUP, LLC,

Defendants.

Civil Case No. 1:22-cv-10800-AK

# MEMORANDUM IN SUPPORT OF
# DEFENDANT SAFERENT SOLUTIONS, LLC'S MOTION TO DISMISS
# PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF CONTENTS

STATEMENT OF INTEREST ........................................................................................ 1

SUMMARY OF THE ARGUMENT ............................................................................ 2

ARGUMENT ................................................................................................................ 4

I.    Tenant Screening and Credit History Data Play an Important Role in Managing Risk and Ensuring Compliance with Applicable Law. ............................................. 4

II.    CRAs Provide Information Used by Housing Providers to Make Decisions. ............. 10

III.    Plaintiffs' Challenge to the Use of Credit History Information in Rental Screening is Contrary to Existing Law. ................................................................. 13

CONCLUSION ............................................................................................................ 19

CERTIFICATE OF SERVICE .................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Austin Apartment Ass'n v. City of Austin*, 89 F.Supp.3d 886 (W.D. Tex. 2015) .......................... 18

*Connecticut Fair Hous. Ctr. v. CoreLogic Rental Property Solutions, LLC,* 2015 WL 5521769
    (S.D. N. Y. 2915 .............................................................................................................16, 17

*Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n,
Inc.,* 141 F. Supp. 3d 1321, 1327 (S.D. Fla. 2015) .................................................................14

*Franklin Tower One, L.L.C. v. N.M.*, 157 N.J. 602 A.2d 1104 (1999).........................................18

*Frederick v. Cap. One Bank (USA), N.A,* 2018 WL 1583289 (S.D.N.Y. 2018)...........................16

*Karim-Panahi v. 4000 Massachusetts Apartments*, 302 F. Supp. 3d 330 (D.D.C. 2018) ........... 17

*Pasquince v. Brighton Arms Apartments*, 378 N.J. Super. 588 A.2d 834 (App. Div.
    2005) ................................................................................................................. 17, 18, 20

*Steptoe v. Beverly Area Plan. Ass'n*, 674 F. Supp. 1313 (N.D. Ill. 1987) .................................... 15

**Statutes**

15 U.S.C. § 1681g.......................................................................................................... 6, 9

15 U.S.C. § 1681k.............................................................................................................. 13

15 U.S.C. § 1681m .................................................................................................... 3, 12, 13

15 U.S.C. §§ 1681 *et seq.* ................................................................................................. 1, 3, 5

15 U.S.C. §1681a............................................................................................................... 12

24 C.F.R. § 982.307 ........................................................................................................... 19

42 U.S.C. § 3605 ............................................................................................................... 16

42 U.S.C. § 3610 ................................................................................................................. 3

42 U.S.C. §§ 3601 *et seq.*..................................................................................................... 2

42 U.S.C.A. § 1437f............................................................................................................ 19

FHA § 3605................................................................................................................... 15, 16

## Other Authorities

Alison Pepper, *The Credit Reporting Process In a Nutshell,* 11 No. 4 Elec. Banking L. & Com. Rep. 9 (May 2006) ........................................................................................... 8

Bd. of Governors of the Fed. Reserve Sys., *Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit* S1-S2 (2007) ...................... 3, 4, 7, 8, 12

Experian, *Risk versus Reward: Identifying the Highest Quality Resident Using Rental Payment History*, 4 (2013) ...................................................................................... 7

Fed. Trade Comm'n, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations*, 2011 WL 3020575, at 1 (July 2011) .............. 5

Federal Trade Commission, *What Landlords Need to Know* ....................................... 13

Harry J. Holzer *et al.*, *Perceived Criminality, Criminal Background Checks and the Racial Hiring Practices of Employers*, 49 J. Law & Econ. 451 (2006) ................................ 9

https://innago.com/tenant-scoring-system/#:~:text=Tenant%20scoring%20systems%20allow%20you,need%20to%20choose%20only%20on ..................................................................................... 10

https://www.nolo.com/legal-encyclopedia/choosing-tenants-avoid-fair-housing-29816.htm ...... 10

https://www.nolo.com/legal-encyclopedia/how-screen-select-tenants-faq.html#answer-1739503 ...................................................................................................... 10

HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Providers (Nov. 2013) ................................................................................... 3, 10, 15

*Prepared Statement of the Federal Trade Commission on the Fair Credit Reporting Act Before the House Committee on Financial Services*, July 9, 2003 ............................ 8

Treasury Secretary John W. Snow Testimony on Strengthening Consumer Interests of the Fair Credit Reporting Act Before the Committee on Banking, Housing, and Urban Affairs ... 6

## Rules

Federal Rule of Appellate Procedure 29 ...................................................................... 1

The Consumer Data Industry Association ("*amicus*"), respectfully submits this brief in support of Defendant SafeRent Solutions, LLC's ("SafeRent") Motion to Dismiss.[1]

## STATEMENT OF INTEREST

The Consumer Data Industry Association ("CDIA") is a trade association representing consumer reporting agencies ("CRAs"), including the nationwide credit bureaus, regional and specialized credit bureaus, and background check and residential screening companies. Founded in 1906, CDIA promotes the responsible use of consumer data to help consumers achieve their financial goals and to help businesses, governments, and volunteer organizations avoid fraud and manage risk. Through data and analytics, CDIA members empower economic opportunity, thereby helping to ensure fair and safe transactions for consumers and facilitating competition, expanding consumers' access to financial and other products suited to their unique needs.

In essence, the theory pursued by Plaintiffs in this case, and as supported by the U.S. Department of Justice, as *amicus*, is a novel theory that challenges the long-established role that CRAs play in tenant screening. CRAs provide data to end users, including property managers, lenders, and employers, who use the information provided to make decisions about their business – whether to rent a property to an applicant, or to make a loan, or to hire an individual. CRAs' consumer reports are thoroughly regulated by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"), which imposes specific duties on those users who receive and *use* the reports to make decisions. Allowing this case to proceed on this novel theory – that an information provider like a CRA is a person who made housing "unavailable" – would in turn wreak havoc on countless

---

[1] Consistent with what would be required by Federal Rule of Appellate Procedure 29(a)(2), *amicus* represents that no party or party's counsel has authored this brief, in whole or in part, or contributed money intended to fund the preparation or submission of this brief. Further, no person other than *amicus* and its non-party members contributed money that was intended to fund the preparation or submission of this brief.

industries that rely on consumer reports, including the national banking system that relies on accurate and timely consumer report information in order to extend credit to consumers. Given the role that its members play, *amicus* is uniquely qualified to assist this Court in understanding the law as applied to CRAs, such as Defendant, and the impact an adverse ruling on the Motion to Dismiss could have well beyond this single Defendant. *Amicus* respectfully requests that this Court grant Defendant SafeRent's Motion to Dismiss.

## SUMMARY OF THE ARGUMENT

At its core, Plaintiffs' principal argument is that credit history information should not be used in rental screening – a question of housing policy best left to Congress to determine. Notwithstanding the fact that consumer reports, and credit scores, have been used for over 50 years, and often heralded for avoiding discrimination based on subjective determinations, which may be based on known and unknown biases, Plaintiffs allege a novel theory that the Fair Housing Act[2] prohibits their use. And who is it that may or may not use the information? The user of consumer report information is, and has always been, the recipient of the report – the creditor or the property owner itself. Here, Plaintiffs allege that Defendant SafeRent *effectively* makes the housing decisions because the property managers have made their own business decision not to deviate from the application of their own housing criteria standards.

Plaintiffs' theory cannot be correct, as consumer reporting agencies do not make eligibility decisions regarding a consumer's eligibility for any purpose permitted under the law, including the FCRA.[3] Federal law, and various regulators charged with enforcement thereof, recognize that CRAs do not make eligibility determinations when they provide consumer reports, including credit

---

[2] 42 U.S.C. §§ 3601 *et seq.* ("FHA").
[3] 15 U.S.C. §§ 1681 *et seq*. ("FCRA").

scores, to their end user customers – and require end users to tell consumers that is the case.[4] Instead, the decision is made by the recipient of the report, who considers the information provided in order to evaluate the consumer's application.  This practice in the tenant screening space is entirely consistent with the practice across our national credit system.  A ruling to the contrary would have devastating effects not only on the tenant screening industry, but also the credit industry.

Finally, the argument that credit history information is irrelevant to property owners and managers who evaluate applications for housing, or at least is irrelevant where the applicant is entitled to a housing subsidy from the government, must fail for a number of reasons.  First, the United States Department of Housing and Urban Development ("HUD"), the department charged with administering and enforcing the FHA,[5] not only *tacitly* permits the consideration of credit history information in screening applicants who are entitled to assistance, but expressly recognizes the very reason why owners would want to consider an applicant's credit history information: "A credit check can help demonstrate whether an applicant has the ability to pay rent on time."[6]  A disparate impact claim cannot stand for a practice the law expressly permits, and the enforcer encourages.  Moreover, credit history information, and in particular credit scores, are known to provide objective measurements of risk, and can serve as an important tool to avoid violations of fair lending and fair housing laws.[7]  In the same way, tenant screening scores built off of a consumer's credit history can provide these same benefits.

---

[4]  15 U.S.C. § 1681m(a).

[5]  42 U.S.C. §§ 3610-3612.

[6]   HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Providers (Nov. 2013) (the "Handbook").

[7]  *See gen.*, Bd. of Governors of the Fed. Reserve Sys., *Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit* S1-S2 (2007) (noting that credit scores act as predictors of default and not as proxies for race) ("FRB Study").

This Court should not turn the consumer reporting industry on its head by permitting the claim against Defendant SafeRent to proceed, and should grant Defendant SafeRent's Motion.

## ARGUMENT

Consumer reporting agencies, including those providing tenant screening reports, serve an important public interest by providing accurate and timely information to property owners and managers who use that information to provide their existing residents safe places to live, to protect their property, and to manage their financial risk.  A robust consumer reporting system expedites the application process for applicants, which allows consumers to expedite their shopping behavior, which is a material benefit to consumers. [8]  Consumer reports provided by CRAs provide objective information on consumers that removes from the applicant screening process the need for individuals to make subjective determinations based on incomplete information.  HUD and others in the field encourage housing providers to establish criteria for approval at each property, to conduct credit checks on applicants, and to treat all applicants the same.  In light of the foregoing, it is clear that Plaintiffs' novel liability theory must fail.

**I.      Tenant Screening and Credit History Data Play an Important Role in Managing Risk and Ensuring Compliance with Applicable Law.**

Defendant SafeRent does not provide its tenant screening services in a vacuum.  Instead, it is merely one player within a robust and diverse ecosystem comprised of data collectors, CRAs, property managers, landlords, and consumers, all of whom rely on consumer reports to assist

---

[8] "An advantage of credit scoring is that it allows a quicker decision than manual, or judgmental, underwriting.  Increased speed benefits consumers.  First, faster credit decisions allow consumers to purchase, and thus benefit from, products or services more quickly. Second, faster decisions more quickly give consumers the feedback they need for credit shopping. Receiving such feedback informs consumers about their circumstances; the more quickly they get it, the more efficient will be their credit shopping and decision-making. Increasing the efficiency of credit shopping may increase the competitiveness of loan markets." FRB Study, pp. 35-36.

properties with providing clean and safe housing for all residents, employees, and their guests. CRAs provide tenant screening reports and scores for use in housing decisions that are specifically designed to minimize the risk of discrimination under the FHA and other applicable law.  If Plaintiffs were allowed to proceed on their theory that a *property manager's* use of credit history information in evaluating applications creates liability *on the part of the consumer reporting agency* that delivered the information, such a ruling would have disastrous impacts across the entire tenant screening ecosystem, and well beyond, into the national banking system.

*Amicus* members provide residential screening reports pursuant to the FCRA.[9]  Enacted in 1970, the FCRA governs the collection, assembly, and use of consumer report information and provides the framework for our nation's credit reporting system.  In enacting the FCRA, Congress recognized the consumer reporting industry to be valuable to the nation's economy, finding that CRAs "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers."[10]  Its purposes are twofold: (1) to protect consumers by preventing the misuse of their sensitive personal information and improving the accuracy of consumer report information; and (2) to promote the efficiency of the nation's banking and consumer credit systems.[11]  All CRAs must adhere to the FCRA, regardless of size or location.

The FCRA regulates the practices of the three principal groups involved in this ecosystem: (1) CRAs, often referred to as "credit bureaus"; (2) furnishers of consumer report information to the CRAs (such as lenders that have accounts with consumers); and (3) users of consumer reports

---

[9]  15 U.S.C. §§ 1681 *et seq.*
[10]  15 U.S.C. § 1681(a)(3).
[11]  *See* Fed. Trade Comm'n, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations*, 2011 WL 3020575, at 1 (July 2011), https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf ("40 Years Report").

(such as property managers and owners, creditors, insurance companies, and employers, all of whom make *eligibility decisions* about consumers).   In 2003, the Secretary of the Treasury explained that the FCRA's national consumer reporting standards makes consumers' "reputation as a borrower portable, so that you don't have to establish your good name from scratch in every city you visit, or every store where you shop."[12]  Explaining that "[t]his democratization of credit has especially benefited minority and lower income families," the Secretary noted the increase in the number of minorities holding mortgages between 1995 and 2001, and further, that a greater percentage of African-American households had credit cards in 2001 than in 1995.[13]

A CRA may include various race-neutral data about prospective tenants in a tenant screening report: (1) financial information, including a credit score,[14] a tenant screening score, or both, together with the underlying detailed credit report data, which may include rent payment history; (2) eviction information, consisting of unlawful detainer records and judgments related thereto; and, if requested, (3) criminal background information on cases that involve harm to persons and property.   Each of these categories provides the housing provider with reliable predictors regarding the tenant's suitability for a particular property.   Owners looking to maintain viable properties properly seek to avoid these costs, and the services provided by *amicus's* members help them do so.[15]

---

[12] Treasury Secretary John W. Snow Testimony on Strengthening Consumer Interests of the Fair Credit Reporting Act Before the Committee on Banking, Housing, and Urban Affairs, found at: https://home.treasury.gov/news/press-releases/js620 (last visited February 16, 2023).
[13] *Id.*
[14]  Credit scores are a form of consumer report, and are governed by the FCRA. Under the FCRA, a credit score is a "numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default (and the numerical value or the categorization derived from such analysis may also be referred to as a "risk predictor" or "risk score"). 15 U.S.C. § 1681g(f)(2).
[15] For example, a statistically validated study revealed that rental applicants with a Vantage credit score between 501 and 699 were seven times more likely to default on a lease than applicants with

Historically, like credit decisions, tenant screenings were often conducted using manual judgmental systems by a property manager or owner, but the use of credit and tenant screening scores has grown given the advantages scores provide. "Before the advent of credit scoring, individual credit analysts, or underwriters, manually reviewed applications and evaluated them on the basis of their own experience, sometimes in conjunction with specific rules or other non-empirically derived credit guides established by the creditor."[16]  These judgmental systems were viewed as "subject to inconsistency because different underwriters may weigh individual factors differently," thus creating risk of disparate treatment or disparate impact under the FHA.[17]  In contrast, credit scoring systems were often viewed as "potentially [improving] the accuracy of credit decisions and may reduce the potential for prohibited forms of discrimination to the extent it removes subjectivity from credit decisions."[18]  "The automated process of using credit risk scores is essentially the same process a lender uses to manually review credit applications. ….  However, the process of using automatically generated credit risk scores has several advantages for consumers.  Unlike manually reviewed credit applications, computer-generated credit scores are objective and precise; they eliminate individual bias from the credit-granting decision. Computer generated scores also result in faster, more accurate credit decisions, reducing the cost of credit by allowing lenders to make better, more efficient decisions."[19]  In large part, the minimization of the

---

a 700 or greater Vantage score. Experian, *Risk versus Reward: Identifying the Highest Quality Resident Using Rental Payment History*, 4 (2013) https://www.experian.com/assets/rentbureau/white-papers/experian-rentbureau-rental-history-analysis.pdf. Moreover, individuals who have not skipped or been late in rent payments were found to have a roughly six percent rate of default; prospects with a rental debt default at a rate of nearly one in four.  *Id.*

[16]  FRB Study, p. 3.

[17]  *Id.*

[18]  *Id.*

[19]  Alison Pepper, *The Credit Reporting Process In a Nutshell,* 11 No. 4 Elec. Banking L. & Com. Rep. 9 (May 2006).

risk of discrimination depends on creditors not deviating from their pre-determined credit score thresholds or other approval criteria on a case-by-case basis.[20]

The expansion of access to credit data, and the development of credit scoring models, has greatly benefitted American consumers.  In hearings on the Fair and Accurate Credit Transactions Act of 2003, FTC Chairman Muris stated, the "miracle of instant credit created by our national credit reporting system has given American consumers a level of access to financial services and products that is unrivaled anywhere in the world."[21]

As Representative Spencer Bachus explained:

What we are dealing with here is a national delivery system, and that is our national credit reporting system. And like our national interstate highway system, like our national power grid, like our national communications system, they deliver an incredible amount of value and are very important to the economy. Consumers today are able to move from state to state, they are able to finance loans, get mortgages at low rates. And part of the reason is what they never see, and that is the national uniform credit reporting system. As much as anything, and I think Secretary Snow pointed this out in a press conference last week, we have seen the democratization of credit, where low and middle income families enjoy incredible access to credit today at unparalleled levels.[22]

Indeed, evidence exists that the use of credit scores, and background screening reports, may actually *reduce* the incidence of racial discrimination by shattering subconscious stereotypes.[23]

Consumer reports are prepared by CRAs and delivered to persons who use them to make an eligibility determination – i.e., an "end user" as contemplated by the FCRA.  Similar to a

---

[20] FRB Study at 52 ("Of course, discrimination could arise if lenders fail to apply credit scores evenhandedly, ignore the scores, or exercise overrides for some populations or in some circumstances.").

[21] *Prepared Statement of the Federal Trade Commission on the Fair Credit Reporting Act Before the House Committee on Financial Services*, July 9, 2003 (https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fair-credit-reporting-act/fcratest.pdf (last visited on 2/16/2023).

[22] *H.R. 2622-Fair And Accurate Credit Transactions Act of 2003: Hearing Before the Committee on Financial Services*, 108 H.R. 5-6 (2003) (Rep. Spencer Bachus).

[23] *See* Harry J. Holzer *et al.*, *Perceived Criminality, Criminal Background Checks and the Racial Hiring Practices of Employers*, 49 J. Law & Econ. 451, 452 (2006).

traditional credit score, which is a mathematical representation of the information contained in a consumer's credit file that is risk-ranked to predict some likelihood of default,[24] a tenant screening score is a mathematical representation of the information in a consumer's credit file, among other factors, and is designed to predict the likelihood that the consumer will satisfy the terms of a potential lease.  As discussed below, CRAs do not use the score that is provided – it is the end user (recipient) that makes a decision on the consumer's application using that report or score, which Plaintiffs concede in their brief: "[h]ousing providers use these scores as authoritative decisions."[25]

## II.    CRAs Provide Information Used by Housing Providers to Make Decisions.

*Amicus'* member CRAs provide the information that housing providers need to evaluate consumer applications for housing.  HUD and landlord-tenant experts alike recommend that properties establish their own written approval criteria by which housing applications will be evaluated, and encourage providers to apply their criteria consistently across all applicants.[26]  Such uniformity is often touted as a best practice on how to avoid fair housing liability:

> Consistency is crucial when dealing with prospective tenants. If you don't treat all tenants more or less equally—for example, if you arbitrarily set tougher standards when renting to members of a racial minority—you are violating federal laws and opening yourself up to lawsuits. And if you give one person a break (such as lowering the security deposit for a single mother but not for other tenants), you'll likewise risk a charge of discrimination from other tenants.[27]

And further:

> Landlords are legally free to choose among prospective tenants as long as their decisions comply with these laws and are based on legitimate business criteria. For example, a landlord is entitled to reject someone with a poor credit history, insufficient income to pay the rent, or past behavior—such as damaging property—

---

[24]  15 U.S.C. § 1681g(f)(2).
[25]  Plaintiffs' Opposition Brief [Dkt. 36] p. 17.
[26]  Handbook, p. 4-23 § 4-7 ("All screening criteria adopted by the owner must be described in the tenant selection plan and consistently applied to all applicants.")
[27]  Janet Portman, *Choosing Tenants: Avoid Fair Housing Complaints and Lawsuit* https://www.nolo.com/legal-encyclopedia/choosing-tenants-avoid-fair-housing-29816.html.

that makes the person a bad risk. . . Landlords must apply selection standards, such as requiring a minimum income and a good credit report, equally to all tenants.[28]

Thus, it is not surprising that a property manager will establish strict screening criteria and not deviate from it, with the goal of *avoiding, not facilitating,* discrimination in housing.[29]  The decision to adopt housing criteria, and how to apply the information received to the housing criteria, is the exclusive right and decision of the housing provider.

Having established objective, lawful approval criteria in advance for a property, when a consumer applies for housing, the housing provider submits a request (an "inquiry") to the CRA for a consumer report.  The CRA searches records available to it and prepares a consumer report including credit history information, and as requested, one or more risk scores, and delivers it to the property.  The property then uses the information provided, and any other information the landlord deems relevant, to determine whether to approve or decline the consumer.

---

[28]  Beth Dillman, *How to Screen and Select Tenants FAQ,* https://www.nolo.com/legal-encyclopedia/how-screen-select-tenants-faq.html#answer-1739503.  "If you create standardized scoring criteria based on this information and apply the same criteria equally to all applicants, you should be in compliance with Fair Housing laws." *How to Create a Tenant Screening System* https://innago.com/tenant-scoring-system/#:~:text=Tenant%20scoring%20systems%20allow%20you,need%20to%20choose%20only%20on.

[29]  Given the plethora of advisors making best practice recommendations to property owners to establish, and not deviate from, the property's own approval criteria, it is not surprising that certain customers of Defendant SafeRent allegedly refused to deviate from their pre-set score or other thresholds, as set reflected on the summary page of the consumer report. Compl. ¶¶ 38-39. While unartfully described, it is clear that each property sets a score threshold representing the property's approval or decline tolerances, just like a credit score threshold set by a lender. *Id.* CRAs often provide a summary tool to assist their property owner customers with the review of the consumer report information they provide, including the score. Such tools highlight or otherwise flag information in the report that correlates to the property's own stated criteria. For example, if the property's criteria provides that an applicant may not have bankruptcy within the prior two years, the CRA may flag the existence of a recent bankruptcy as a potentially "disqualifying" record in light of the property's stated criteria.  Once the information is received by the property, it is the property owner's decision to choose to approve or decline the applicant based on the consumer report.  If the property owner adopts a business policy not to deviate from its pre-determined approval criteria, including a score threshold, that is its prerogative, and its sole risk to bear.

Plaintiffs' theory in this case is that a CRA, by providing the report and certain scores that the *property owner chooses to use however it sees fit* (whether or not that use is consistent with the property owner's obligations under the law or contract), is *effectively* taking an action that "makes housing unavailable" to certain consumers who are members of a protected class.  This theory turns the entire national consumer reporting industry on its head.

Congress, in drafting the FCRA, explicitly recognizes the different responsibilities that CRAs and end users, like property owners, have in the preparation and use of consumer reports. CRAs and users alike have all built processes and systems in reliance on, and to assure compliance with, the responsibilities outlined under the FCRA.  Recognizing the limited role of a CRA with respect to transactions initiated by consumers, Congress took steps to assure that it is absolutely clear to consumers that a CRA is <u>not</u> the decision-maker with regard to a consumer's application for housing or credit in providing reports that its users rely on.

The FCRA requires a user of a consumer report to provide the consumer with notice of adverse action when the user takes adverse action "that is based in whole or in part on any information contained in a consumer report."[30]  A decision constitutes adverse action, in the rental housing space, if an "action is taken or a determination [is made] in connection with an application that was made by, or a transaction that was initiated by, any consumer…and [is] adverse to the interests of the consumer."[31] Thus, where a consumer's application for housing is denied, or the consumer is required to pay an additional deposit, or obtain a guarantor in order to obtain the lease, the consumer has experienced adverse action.

---

[30] 15 U.S.C. § 1681m(a).
[31] 15 U.S.C. §1681a(k)(1)(B)(iv).

Given that it is the <u>end user</u> that takes adverse action, or makes an adverse determination, the FCRA not only requires end users to provide a notice to consumer, but the adverse action notice must expressly state that "**the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken**."[32]  The consumer must also be provided with the CRA's name, address, and telephone number, along with notice that the consumer has a right under the FCRA to obtain a free copy of their report, and to dispute any information that the consumer believes to be in accurate.[33]  Thus, the consumer is told – by the person making the decision – that the decision was only based on information from the CRA, and was not a decision made by the CRA.

Consistent with the above, as part of the comprehensive study of credit scoring systems pursuant to the FACT Act, the Federal Reserve Board acknowledged the bounds of the role that CRAs play in the credit lifecycle: "These firms, known today as credit reporting agencies, **do not make credit decisions**; rather, they collect, standardize, and disseminate to their subscribers information on a wide range of consumer activity by individuals over time."[34]  The Federal Trade Commission's guidance to landlords on compliance with the FCRA also explains that "[w]hen you use consumer reports to make tenant decisions, you must comply with the Fair Credit Reporting Act (FCRA)" and "[a]n adverse action is any action by a landlord that is unfavorable to the interests of a rental applicant or tenant."[35]

A CRA cannot "make housing unavailable" when it has no authority to make the decision. Plaintiffs admit that "housing providers make the decision" based on information from the CRA.

---

[32] 15 U.S.C. § 1681k(a)(3) (emphasis added).

[33] 15 U.S.C. § 1681m(4).

[34] FRB Study, p. 13 (emphasis added).

[35]  Federal Trade Commission, *What Landlords Need to Know*. https://www.ftc.gov/business-guidance/resources/using-consumer-reports-what-landlords-need-know (last visited 02/14/2023).

But the CRA cannot dictate to the housing provider what the decision could be.  No liability should attach where no authority exists.[36]

## III.   Plaintiffs' Challenge to the Use of Credit History Information in Rental Screening is Contrary to Existing Law.

In summary, Plaintiffs' claim is essentially that the use of a consumer's credit history information in tenant screening is unlawful because it may allegedly cause a disparate impact under the FHA because Blacks and Hispanics, as a demographic, are reported as having lower credit scores.  However, where, as is the case here, the challenged data has been studied and found not to correlate to race, and where the activity complained of has not only been implicitly approved by the agency charged with enforcement of the law (by virtue of not banning the activity), but instead explains the value and the considerations with which the information may be used, no claim may lie for its use.

HUD has not treaded lightly regarding its approval to use credit history in formation in tenant screening.  HUD's Occupancy Requirements of Subsidized Federal Housing Programs 4350.3 provides the following as "**Permitted Screening Criteria Commonly Used by Owners**":

> Examining an applicant's credit history is one of the most common screening activities. **The purpose of reviewing an applicant's credit history is to determine how well applicants meet their financial obligations. A credit check can help demonstrate whether an applicant has the ability to pay rent on time.**
>
> a. Owners may reject an applicant for a poor credit history, but a lack of credit history is not sufficient grounds to reject an applicant.
>
> b. As part of their written screening criteria, and in order to ensure that all applicants are treated fairly, owners should describe the general criteria they will use for distinguishing between an acceptable and unacceptable credit rating. Owners are most often interested in an applicant's credit history related to rent and utility

---

[36] *See Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n, Inc., 141 F. Supp. 3d 1321, 1327 (S.D. Fla. 2015)* (finding that there was no FHA liability because neither the individual property manager nor the property management company had authority over the HOA's decision to deny housing).

payments. A requirement for applicants to have a perfect credit rating is generally too strict a standard.

c. Owners may determine how far back to consider an applicant's credit history. Owners generally focus on credit activity for the past three to five years. It is a good management practice to give priority to current activity over older activity.

d. Owners may have to justify the basis for a determination to deny tenancy because of the applicant's credit rating, so there should be a sound basis for the rejection.[37]

Thus, HUD recognizes not only that there is a practice of using credit history information to evaluate prospective tenants (which practice it has not by rule or other enforcement tool prohibited), but it advises property owners on how to use the information in the screening decision. Taking the full text of section 4-7(F)(2) above, together with the FAQs and other general statements of policy cited by Plaintiffs in their brief, it is clear that HUD allows property owners to use credit history information as part of its regular screening process, including denying applications as a result of the same.

The Plaintiffs rely on *Steptoe v. Beverly Area Plan. Ass'n*, for the proposition that certain third parties can be liable under FHA, including real estate appraisers and multiple listing services in connection with real estate transactions.[38] Notably, however, after *Steptoe* was decided, Congress amended the FHA in 1998 and regulated residential real estate-related transactions specifically, further defining the scope of persons subject to the FHA's reach.[39] FHA § 3605

---

[37] Handbook at 4-23 p. 4-23 §4-7(F)(2) (emphasis added). Note that HUD also expressly permits housing providers to consider an applicant's prior tenant history information, which would include evictions: "In addition to determining whether applicants are likely to meet their financial obligations as tenants and pay rent on time, owners are also interested in whether applicants have the ability to meet the requirements of tenancy. (a) Owners must not reject an applicant for lack of a rental history but may reject an applicant for a poor rental history." *Id.* at § 4-7(F)(4).

[38] 674 F. Supp. 1313, 1320 (N.D. Ill. 1987).

[39] "As used in this section, the term "residential real estate-related transaction" means any of the following: (1) The making or purchasing of loans or providing other financial assistance--(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or (B) secured by residential real estate. (2) The selling, brokering, or appraising of residential real property." 42 U.S.C. § 3605.

prohibits discrimination in connection with "residential real estate transactions," which Congress defined to mean any of the following:

> (1) The making or purchasing of loans or providing other financial assistance--
> (A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or
> (B) secured by residential real estate.
> (2) The selling, brokering, or appraising of residential real property.[40]

It is telling that Congress chose to expressly subject a handful of third parties whose services might be used in connection with real estate transactions to FHA's anti-discrimination law, but not <u>all</u> third parties that provide related services. Notably absent from this list are CRAs who provide credit reports to brokers and lenders who use these services in connection with the extension of credit used to finance the purchase of residential real property. Thus, implicitly, even knowing that CRAs provide the data that lenders use to evaluate consumer credit applications, the CRAs were not swept into the reach of FHA §3605.

The case law on the applicability of FHA is far from well developed, but two cases have examined FHA's applicability to CRAs: *Frederick v. Cap. One Bank (USA), N.A.,* and *Connecticut Fair Hous. Ctr. v. CoreLogic Rental Property Solutions, LLC.*[41] In *Frederick,* the plaintiff alleged an FHA violation against the CRA where the lender relied on information in a consumer report to deny plaintiff's application because the plaintiff challenged the information in the report.[42] Finding that to be too far removed from conduct that made housing "unavailable, and noting that other federal laws regulate the CRA's conduct, including the FCRA, the court dismissed the CRA from the case.[43] The *Connecticut Fair Housing* case is not on point given that the issues involved

---

[40] 42 U.S.C. § 3605.
[41] 2018 WL 1583289 (S.D.N.Y. 2018); 2015 WL 5521769 (S.D. N. Y. 2015).
[42] *Id.* at *2.
[43] *Id.* at *3.

in that case relate to the sharing of arrest record data in light of the guidance HUD issued to landlords regarding its use, which raised a quest of the CRA's actual intent.[44]   Further, the *Connecticut Fair Housing* case is not instructive because the theory was essentially founded upon the existence of an agency relationship between the CRA and the housing provider, with regard to the ultimate screening decision.[45]   In contrast, here, Plaintiffs admit that it is the housing providers who make decisions, albeit using the CRA's data.[46] Again, their business decision to rely on the information provided is solely within their discretion.

Several courts to have considered the question of whether a housing provider has violated federal fair housing law by screening applicants for creditworthiness have answered in the negative.[47]   In *Karim*, a motion to dismiss was granted when plaintiff's claim was based on allegations that the housing providers violated fair housing laws by reviewing the applicant's credit report and denied his application based on the credit history reflected in the report.[48]   Explaining that even when a consumer is entitled to housing benefits, the court said, "Federal law does not require landlords to accept housing vouchers, and landlords who do accept vouchers are not required to approve tenants merely because they are voucher holders."[49]   Further, the court explained that "landlords who [choose to] participate in the Program may screen prospective

---

[44] 369 F. Supp. 3d 362 (D. Conn. 2019).
[45] *Id.* at 372-374.
[46] Plaintiffs' Opposition [Dkt. 36], p. 17.
[47]   *Karim-Panahi v. 4000 Massachusetts Apartments*, 302 F. Supp. 3d 330, 337 (D.D.C. 2018), *aff'd*, No. 18-7054, 2018 WL 6167393 (D.C. Cir. Nov. 1, 2018). *Pasquince v. Brighton Arms Apartments*, 378 N.J. Super. 588, 595, 876 A.2d 834, 838 - 840 (App. Div. 2005).
[48] *Id.*
[49] *Id.*

tenants and reject them if screening reveals red flags in terms of paying rent and utility bills, caring for rental housing, respecting neighbors, criminal activity, and the like."[50]

In *Pasquince,* the plaintiff pursued the very same theories as Plaintiffs in this case; namely, that it is unlawful for a housing provider to consider credit history information in connection with an application for housing, particularly when the applicant has a housing subsidy that would cover the majority of the stated rental amount.[51]  Notwithstanding the fact that New Jersey law expressly permitted such screening, the *Pasquince* court looked to federal law for guidance, and recognized that the right to screen a prospective housing tenant exists under federal law as well – even in the context of subsidized housing recipients – finding that "it is well established that creditworthiness is a legitimate, non-discriminatory criteria which landlords are permitted to consider when evaluating prospective tenants, including recipients of Section 8 housing assistance" and noting as "significant" that HUD "consider[s] that landlords may take into account the creditworthiness of Section 8 applicants").[52]  The court explained the common-sense rationale behind the consideration of a consumer's credit history:

> The prospective tenant is still responsible for the payment of some portion of the rent, and, if the applicant has a history of not paying his or her financial obligations, it is logical and reasonable for a landlord to conclude that the applicant might avoid the rent obligation, no matter how small the amount. Moreover, the rent subsidy could be terminated, in which case the tenant would be responsible for the entire rent obligation.[53]

---

[50] *Id. citing Austin Apartment Ass'n v. City of Austin*, 89 F.Supp.3d 886, 890 (W.D. Tex. 2015).

[51] *Pasquince*, 378 N.J. Super. 588 at 595, 876 A.2d 834 at 838-840.

[52] *Id.*

[53] *Id. citing Franklin Tower One, L.L.C. v. N.M.*, 157 N.J. 602, 622, 725 A.2d 1104, 1114 (1999) (where the New Jersey Supreme Court noted "[s]imilarly, although the issue is not before us, we acknowledge that a landlord approached by a prospective tenant eligible for Section 8 assistance has the full right to screen and review the tenant's references, background, employment and rental history to verify that the tenant is otherwise qualified to reside in the landlord's building. *See* 42 U.S.C.A. § 1437f(d)(1)(A); 24 C.F.R. § 982.307.").

Finally, Plaintiffs argue in their Opposition Brief that they are not challenging the use of credit history information generally, but the specific allegations in Count I say otherwise. In relevant part, the allegations are that SafeRent's score is comprised of "an applicant's credit and other non-tenancy debt histories,"[54] and, given that "Black and Hispanic consumers have disproportionately lower credit scores and worse non-tenancy debt histories than white consumers,"[55] "SafeRent's scoring system has had and will continue to have an adverse impact on Black and Hispanic renters."[56] Plaintiffs further allege that because the putative plaintiffs "all use federal housing choice vouchers" the applicant's prior credit histories "do not reflect [their] current lease performance risk"[57] and therefore the use of the credit history information caused SafeRent to "[make] housing unavailable on the basis of race and national origin"[58] and/or on "different terms and conditions and discriminating in the provision of services in connection with housing on the basis of race and national origin."[59] Plaintiffs' requested relief includes an order "enjoining Defendants, Defendants' agents, employees and successors, and all other persons in active concert or participation from: a. Creating tenant screening reports or compiling information for dissemination to housing providers that includes derogatory non-tenant related debt – i.e., credit history information."[60]

Respectfully, from a policy perspective, the argument that the use of credit history information is unnecessary in the tenant screening space, either as a general proposition, or even when coupled with the fact that a particular applicant may receive some amount of housing

---

[54] Compl. ¶ 122.
[55] Compl. ¶ 123.
[56] *Id.*
[57] Compl. ¶ 124.
[58] Compl. ¶ 126.
[59] Compl. ¶¶ 124 and 126, respectively.
[60] Compl. ¶ 186.

assistance, defies common sense.   As the court in *Pasquince* noted, the consumer is often responsible for some portion of their housing expenses[61] – which go beyond the stated lease amount to include costs associated with the property's upkeep and the resident's comfort within the property, such as electricity, water, gas, and insurance, as well as other life necessities the applicant must be able to cover simply to live, including food, health care, transportation costs, among others.

In any event, it is undisputed that using credit history information has been a common practice, and approved by regulators, for decades.  If a policy change regarding its use by housing providers is warranted, that policy decision is one for Congress, or its delegate, to make.   In the same vein, a rule that would make every CRA across the United States a decision-maker with regard to every housing decision made (and, by extension, credit decisions) *because its customers choose to rely on the information presented without review or oversight*, throws industry practice, and applicable law, out the window.

<u>**CONCLUSION**</u>

For the foregoing reasons, *amicus* Consumer Data Industry Association prays that this Court grant Defendant SafeRent Solutions, LLC's Motion to Dismiss.

Dated: February 16, 2023                    Respectfully submitted,


<u>/s/ Ryan P. Dumais</u>
Ryan P. Dumais
Eaton Peabody
77 Sewall Street #3000
Augusta, ME 04330
Phone: (207) 729-1144 ext. 3810
Fax: (207) 729-1140
rdumais@eatonpeabody.com

---

[61] *Pasquince*, 378 N.J. Super. 588 at 595, 876 A.2d 834 at 838-840.

*Attorneys for Amicus Curiae*
*The Consumer Data Industry Association*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of February 2023, I electronically filed the foregoing Brief of Amicus Curiae the Consumer Data Industry Association In Support of Defendants' Motion to Dismiss with the clerk of this Court using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

Dated: February 16, 2023 HUDSON COOK, LLP

By  /s/ Ryan P. Dumais
    Ryan P. Dumais
    Eaton Peabody
    77 Sewall Street #3000
    Augusta, ME 04330
    Phone: (207) 729-1144 ext. 3810
    Fax: (207) 729-1140
    rdumais@eatonpeabody.com

    *Attorney for Amicus Curiae*
    *The Consumer Data Industry Association*