UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY LOUIS AND MONICA DOUGLAS, ON BEHALF OF THEMSELVES AND SIMILARLY SITUATED PERSONS, AND COMMUNITY ACTION AGENCY OF SOMERVILLE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SAFERENT SOLUTIONS, LLC AND METROPOLITAN MANAGEMENT GROUP, LLC, <br><br> Defendants. | Civil Action No. 1:22-CV-10800-AK |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR UNOPPOSED MOTION
FOR CERTIFICATION OF THE SETTLEMENT CLASSES AND
FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...........................................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...................................................2
      A.    History of the Litigation ...................................................................................2
      B.    Settlement Negotiations ....................................................................................3
      C.    Preliminary Approval .......................................................................................3

III.  SUMMARY OF THE PROPOSED SETTLEMENT ...................................................4
      A.    The Settlement Classes .....................................................................................4
      B.    Injunctive Relief Provided by the Proposed Settlement ...................................4
      C.    Monetary Relief Provided by the Proposed Settlement ....................................6
      D.    Attorneys' Fees and Costs ................................................................................6
      E.    Releases ............................................................................................................7

IV.   NOTICE AND CLAIMS PROCESS ...........................................................................7
      A.    CAFA Notice ....................................................................................................8
      B.    Class Notice ......................................................................................................8
      C.    Opt-Outs and Objections ..................................................................................9
      D.    Claims Processing and Verification ................................................................10
      E.    Estimated Awards ...........................................................................................12

V.    ARGUMENT ..............................................................................................................13
      A.    Notice Was Adequate .....................................................................................13
      B.    The Settlement Classes Should be Certified for Settlement Purposes .............14
            (i)     Plaintiffs Satisfy the Requirements of Rule 23(a) .................................14
            (ii)    Plaintiffs Satisfy the Requirements of Rule 23(b)(2). ...........................16
            (iii)   Plaintiffs Satisfy the Requirements of Rule 23(b)(3). ...........................16
      C.    The Settlement Agreement Is Fair, Reasonable, and Adequate. ....................17
            (i)     The Settlement Classes Are Adequately Represented .............................18
            (ii)    The Settlement Was the Product of Arm's-Length Negotiations. ...........18
            (iii)   The Settlement Provides More Than Adequate Relief to the
                    Classes. ................................................................................................19
            (iv)    The Proposed Settlement Treats Class Members Equitably. ...................20

VI.   CONCLUSION ...........................................................................................................20

# TABLE OF AUTHORITIES

Page

**CASES**

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997). ...............................................................16

*Bacchi v. Mass. Mut. Life Ins. Co*., No. 12-11280, 2017 WL 5177610 (D. Mass. Nov. 8, 2017) 19

*Bezdek v. Vibram USA Inc*., 79 F. Supp. 3d 324 (D. Mass. 2015) ................................... 13, 14, 19

*Connor B. v. Patrick*, 272 F.R.D. 288 (D. Mass. 2011)...............................................................18

*Express Freight Int'l v. Hino Motors*, Case No. 1:22-cv-22483 (S.D. Fla. April 1, 2024) ..........12

*George v. TRS Staffing Sols., Inc.*, 2010 WL 11519346 (C.D. Cal. Sept. 13, 2010)....................21

*Hawkins ex rel. Hawkins v. Comm'r of N.H. Dep't of Health & Human Servs.*, No. 99-143, 2004
    WL 166722 (D.N.H. Jan. 23, 2004) ......................................................................................16

*Hill v. State St. Corp.*, 2015 WL 127728 (D. Mass. Jan. 8, 2015)...............................................20

*In re Credit Suisse-AOL Sec. Litig*., 253 F.R.D. 17 (D. Mass. 2008)..........................................15

*Jean-Pierre v. J&L Cable TV Servs., Inc*., 538 F.Supp.3d 208 (D. Mass. 2021)........................15

*Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters' Health Benefits Fund,* 582 F.3d 30
    (1st Cir. 2009) ......................................................................................................................17

*Nat'l Ass'n of Deaf v. MIT*, No. 15-CV-30024, 2020 WL 1495903 (D. Mass. Mar. 27, 2020)....18

*New Eng. Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-CV-11148, 2009 WL
    10703302 (D. Mass. Mar. 30, 2009) .....................................................................................15

*New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc.*, 602 F.Supp.2d 277 (D.
    Mass. 2009).........................................................................................................................20

*Reid v. Donelan*, 297 F.R.D. 185 (D. Mass. 2014)....................................................................18

*Reppert v. Marvin Lumber & Cedar Co*., 359 F.3d 53 (1st Cir.2004)........................................13

*Robinson v. Nat'l Student Clearinghouse*, 14 F.4th 56 (1st Cir. 2021) ................................19, 20

*See Andrews v. Bechtel Power Corp*., 780 F.2d 124 (1st Cir. 1985)...........................................18

*Sparks v. Mills*, 626 F.Supp.3d 131 (D. Maine 2022)................................................................20

# TABLE OF AUTHORITIES

Page

**STATUTES**

Fair Housing Act ("FHA"), 42 U.S.C. § 3604 *et seq*...............................................................2

Massachusetts General Laws ch. 151B §§ 4(6), 4(10) ("Massachusetts Discrimination Law").....2

Massachusetts General Laws ch. 93A § 9 .................................................................................2

**RULES**

Fed. R. Civ. P. 23(b) .........................................................................................16, 17

Fed.R.Civ.P. 23(c)................................................................................................14

Fed. R. Civ. P. 23(e)..................................................................................... 17, 19, 20

Fed. R. Civ. P. 23(g). .............................................................................................18

## I.    INTRODUCTION

Plaintiffs Mary Louis and Monica Douglas (collectively "Plaintiffs"), on behalf of themselves and the Settlement Classes as defined in the Court's April 25 Order (ECF No. 122), submit this Memorandum in Support of Their Unopposed Motion for Certification of the Settlement Classes and Final Approval of the Class Action Settlement. Plaintiffs seek final approval of the previously filed Class Action Settlement Agreement and Release ("Agreement"),[1] attached as Exhibit 1, that has been entered into by and between Plaintiffs and SafeRent Solutions, LLC ("SafeRent" or "Defendant").[2] SafeRent does not oppose Plaintiffs' Motion.

On April 25, 2024, the Court conditionally certified the Settlement Classes and directed the distribution of Notice. Doc. No. 122 at 2–3 ("Prelim. Approval Order"). Notice was provided to the Settlement Classes in accordance with the Court's Order and the terms of the Agreement. The response of the Settlement Classes to the Settlement has been overwhelmingly positive: no Settlement Class Members filed objections,[3] and only eight requests for exclusion were received. For the same reasons the Court found that it would "likely be able to approve the proposed Settlement" as "fair, reasonable, and adequate" under Fed. R. Civ. P. 23(e)(2), *see id.* at 2, and for the reasons detailed herein, Plaintiffs respectfully request that the Court grant their Motion and enter the Final Approval Order, attached as Exhibit 2, and Final Judgment, attached as Exhibit 3.

---

[1] Capitalized terms not otherwise defined herein have the meanings set forth in the Agreement.

[2] SafeRent has agreed to a separately negotiated settlement with organizational plaintiff Community Action Agency of Somerville, Inc. ("CAAS") to settle on an individual basis CAAS's non-class claims. *See* Doc No. 117. Plaintiff Mary Louis has also separately negotiated a settlement of her individual claim with Defendant Metropolitan Management Group, LLC. *See* Doc No. 125. Both the CAAS settlement and Metropolitan settlement will only become final if the class settlement is approved. The payments to CAAS and Ms. Louis for their individual claims do not come from the Settlement Fund, and no portion of these payments will be paid to Settlement Class Counsel. Nor will CAAS's attorneys' fees be paid from the fee award in the proposed class settlement. If approved, the class settlement, the CAAS settlement, and the Metropolitan settlement will resolve all claims in this litigation.

[3] The only objection received was from a non-class member, whose concerns have been adequately addressed by the claims process, as described in Section IV.D, *infra*.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    History of the Litigation

On May 25, 2022, Plaintiffs filed this putative class action against Defendant SafeRent, challenging its proprietary "SafeRent Score" product, a tenant-screening service sold by Defendant and purchased by rental housing providers to make leasing decisions. Plaintiffs filed their operative Amended Complaint on August 26, 2022. Doc. No. 15. The Amended Complaint alleges that the SafeRent Score is calculated using a formula that results in the disproportionate denial of rental housing for rental housing applicants who use housing choice vouchers, with a further disparate impact on Black and Hispanic applicants who use vouchers, because the formula relies heavily on non-tenancy debt, which Plaintiffs allege is not predictive of the ability to pay rent. Doc. No. 15 ¶¶ 1–10, 45–61. Plaintiffs further allege that this disparate impact cannot be justified by any business necessity because a tenant's housing voucher uniquely protects the housing provider's receipt of monthly rent. Doc. No. 15 ¶¶ 62–73. On behalf of the putative classes, Plaintiffs brought disparate impact fair housing claims against SafeRent under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604 *et seq.* and Massachusetts General Laws ch. 151B §§ 4(6), 4(10) ("Massachusetts Discrimination Law"), and claims of unfair and deceptive business practices under Massachusetts General Laws ch. 93A § 9. Doc. No. 15 ¶¶ 120–126, 134–141, 150–157, 165–183.

SafeRent filed a motion to dismiss Plaintiffs' Amended Complaint on October 27, 2022, arguing, among other things, that the prohibition on disparate impact discrimination in housing under the FHA and the Massachusetts Discrimination Law does not extend to tenant screening companies such as SafeRent. *See* Doc. No. 32. On July 26, 2023, the Court denied SafeRent's motion to dismiss the housing discrimination claims, finding Plaintiffs had sufficiently alleged that the SafeRent Score "has a disproportionate impact on Black and Hispanic applicants and voucher holders," directly resulting "in a disproportionate rate of housing denials for these protected groups." *Louis v. SafeRent Sols. LLC*, No. 22-CV-10800, 2023 WL 4766192, at *12 (July 26, 2023). The Court granted SafeRent's motion to dismiss Plaintiffs' unfair and deceptive business practices claim under G.L. Ch. 93A. *See id.* at *15.

B.  Settlement Negotiations

Following the Court's decision on the motion to dismiss, Plaintiffs began to prepare for discovery. However, before embarking on a costly and lengthy discovery process, the Parties agreed to explore settlement. They identified a highly skilled and reputable mediator, the Honorable Diane M. Welsh (Ret.), and promptly scheduled a mediation session, which took place on November 6, 2023.[4] In advance of the mediation, the Parties exchanged detailed mediation statements, setting forth the strengths and weaknesses of their respective positions and, after the Court entered a Protective Order on October 26, 2023 (Doc. No. 96), SafeRent provided a set of confidential, attorneys-eyes-only documents in response to Plaintiffs' pre-mediation discovery requests. This information included documents relating to the named Plaintiffs' applications for housing and SafeRent's analysis of those applications, information explaining the function of each of the different tenant-screening models SafeRent sells to Massachusetts housing providers, including its "Affordable Model," "Market Model," and "No-Credit Model," and other information about the SafeRent Score and how it is calculated.

On November 6, 2023, the Parties had a productive mediation session during which SafeRent agreed in principle to significant injunctive relief, though it took considerable time after the mediation to reach an agreement setting forth the exact parameters of such changes in writing. Following the mediation, SafeRent provided pertinent information and documents on a confidential, attorneys-eyes-only basis, so that the Parties could come to an agreement on a fair monetary settlement amount. With the assistance of Judge Welsh, the Parties continued to engage in comprehensive settlement discussions, and on December 22, 2023, executed a Memorandum of Settlement, resulting in an agreement to resolve the case as set forth in the proposed Settlement.

C.  Preliminary Approval

On March 28, 2024, Plaintiffs filed their Unopposed Motion to Certify the Classes for Settlement Purposes and Direct Notice of Settlement to the Classes. Doc. No. 113 ("Prelim.

---

[4] Judge Welsh submitted a declaration in support of the proposed Settlement and Plaintiffs' Motion for Attorneys' Fees. *See* Motion for Prelim. Approval, Ex. 2.

Approval Motion"). On April 25, 2024, the Court granted the Motion and entered an order: (1) conditionally certifying the Settlement Classes, (2) directing notice of the settlement to the Settlement Classes, (3) appointing Epiq as Settlement Administrator, (4) appointing Plaintiffs Louis and Douglas as the Settlement Class Representatives, (5) appointing Cohen Milstein Sellers & Toll PLLC, Greater Boston Legal Services, and the National Consumer Law Center as Settlement Class Counsel, and (6) scheduling a Final Approval Hearing for November 18, 2024. *See* Prelim. Approval Order.

### III.    SUMMARY OF THE PROPOSED SETTLEMENT

Plaintiffs brought this action to ensure that individuals who use housing vouchers are not denied housing based on their SafeRent Score—a product Plaintiffs allege has not been proven to effectively and fairly screen tenants who pay most, or all, of their rent with housing vouchers. This lawsuit also was filed to secure compensation for Plaintiffs and putative Class Members who Plaintiffs allege were unfairly denied housing based on their SafeRent Score. The relief afforded by the proposed Settlement achieves both goals. A description of the key provisions follows.

### A.    The Settlement Classes

The proposed Settlement provides relief for the following two Settlement Classes:

All rental applicants who used publicly funded housing vouchers and sought but were denied housing in Massachusetts because of their SafeRent Score at any property using SafeRent's tenant screening services between May 25, 2021 and the date of the entry of the Preliminary Approval Order (the "Massachusetts Income-Based Settlement Class");

All Black and Hispanic rental applicants who used publicly funded housing vouchers and sought but were denied housing in Massachusetts because of their SafeRent Score at any property using SafeRent's tenant screening services between May 25, 2020 and the date of the entry of the Preliminary Approval Order (the "Massachusetts Race-Based Settlement Class").

Ex. 1 §§ 1.17, 1.18.

### B.    Injunctive Relief Provided by the Proposed Settlement

The proposed Settlement achieves substantial injunctive relief that requires SafeRent to comply with a number of practice changes that are of the kind and scope that Plaintiffs sought by filing this litigation. SafeRent will implement these business practice changes by doing the

following, which will be fully effective no later than twelve months from the date the Agreement was executed. *See* Ex. 1 § 3.5.1.

First, SafeRent will cease including a SafeRent Score or an accept/decline recommendation based on a tenant screening score in any of its score reports generated for housing providers who subscribe to or purchase SafeRent's "Affordable Model," the SafeRent Score model many housing providers use when submitting information for applicants using vouchers. Ex. 1 § 3.5.2. SafeRent will also be barred from including any other tenant screening score (either from a third party or its own revised model) in its Affordable Model score reports, unless that tenant screening score has been validated for its use for applicants with housing vouchers by the National Fair Housing Alliance or any similar organization agreed to by the Parties. Ex. 1 § 3.5.5(ii)(1). To ensure housing providers have some information about housing voucher applicants to make an informed decision on an application, SafeRent will still provide a report containing the underlying applicant information. Ex. 1 § 3.5.2.

Second, under the proposed Settlement, SafeRent will require housing providers who subscribe to or purchase the "Market Model" or "No-Credit Model"—SafeRent's two other types of tenant-screening scoring models—to affirmatively certify that the rental applicant for whom they are requesting a SafeRent Score is not currently a recipient of any publicly funded federal or state housing voucher. Ex. 1 § 3.5.3. If the housing provider does not make this certification, SafeRent, as with the Affordable Model, will provide a report with the underlying applicant information but will not include a SafeRent Score or accept/decline recommendation based on a tenant screening score. Ex. 1 § 3.5.3. As with the terms applicable to the Affordable Model customers, SafeRent will not be allowed to provide non-certifying "Market Model" and "No-Credit Model" customers with any other tenant screening score unless that score has been independently validated. Ex. 1 § 3.5.5(ii)(1).

Third, the proposed Settlement requires SafeRent to provide training or instruction to housing providers explaining the differences between the Market Model, No-Credit Model, and Affordable Model, and explaining the changes to the SafeRent products and services that are

encompassed in the proposed Settlement. Ex. 1 § 3.5.4. This training and instruction will inform and explain to housing providers why they will not receive a SafeRent Score when processing rental application for housing voucher recipients to avoid confusion.

### C. Monetary Relief Provided by the Proposed Settlement

The proposed Settlement provides meaningful monetary relief to members of the Settlement Classes. Under the terms of the Agreement, SafeRent will pay a sum of $1,175,000 into a Settlement Fund within thirty days of the Effective Date. Ex. 1 §§ 1.40, 3.2.1. The Settlement Fund will be used to make payments to members of the Settlement Classes who submit valid claims, payments to Epiq for costs associated with notice and administration,[5] and, subject to Court approval, service award payments of up to $20,000 total to the Class Representatives.[6] Ex. 1 §§ 3.2.2, 3.3. Payments to members of the Settlement Classes will be distributed to individuals who have submitted valid and timely claim forms, as defined by the terms of the proposed Settlement. *See* Ex. 1 § 4.3.[7]  In the event the Settlement Fund is not fully exhausted, the remaining amount will be distributed in a manner agreed upon by the Parties, subject to Court approval.  *Id.* §§ 3.2.2, 4.7.3.  No portion of the Settlement fund will revert to SafeRent.  *Id.* § 4.7.3.

### D. Attorneys' Fees and Costs

The proposed Settlement permits Plaintiffs to apply for an award of attorneys' fees and costs, not to exceed $1,100,000. Ex. 1 § 3.4.1. This term was negotiated after the relief was substantially agreed upon for Plaintiffs and the Classes, and payment will not be made from the

---

[5] With their Preliminary Approval Motion, Plaintiffs submitted a proposal from Epiq stating that the projected costs of the notice and claims process would be between $110,000 and $135,000. *See* Prelim. Approval Mot. Ex. 5 § 34. For the reasons explained in Section IV.B, *infra* Epiq's costs have exceeded this amount due to an unexpected increase in the number of notices that needed to be distributed. The total charges from Epiq to date are $249,301 and Epiq estimates that its costs for the entire process will total $312,406. Class Counsel have attempted to defray Epiq's costs by taking on much of the work required to verify claims described in Section IV.D, *infra*.

[6] Plaintiffs requested service awards for the Class Representatives in their Motion for Attorneys Fees, Costs, and Service Awards, Doc No. 115.

[7] Estimated ranges of payment amounts that will likely be distributed Settlement Class Members are provided in Section IV.E, *infra*.

Settlement Fund. The Settlement is not conditioned on the Court's approval of Plaintiffs' attorneys' fees request, and if the Court does not award the full amount, any money remaining from the $1,100,000 will be added to the amount paid into the Settlement Fund. Ex. 1 § 3.4.5.

On March 28, 2024, Plaintiffs filed a Motion for Attorneys' Fees, Costs, and Service Awards (Doc No. 115), detailing Plaintiffs' fees and costs incurred in the litigation of this action, which totaled more than the $1,100,000 cap on Plaintiffs' petition. In the seven months since filing their Motion, Plaintiffs have incurred an additional $191,592.20 in fees and $1,353.44 in costs as a result of Class Counsel's work during the notice and claims process. *See* Declaration of Christine E. Webber ("Webber Decl."), attached as Exhibit 4, ¶¶ 15, 17. Thus, Plaintiffs' current total lodestar of $1,525,744.40, plus $23,805.76 in total costs, is well above the $1,100,000 cap and will only continue to increase throughout the remainder of the settlement administration process.

    E.  Releases

In consideration for the business practice changes and monetary relief provided to Plaintiffs and the Classes, the proposed Settlement provides SafeRent with releases of claims. The releases are appropriately tailored to the facts and claims Plaintiffs raised in this case by releasing and forever discharging SafeRent from any and all claims arising out of conduct that occurred as of the date of the execution of the Agreement relating to (a) violations of the FHA, Massachusetts Discrimination Law, and Massachusetts Consumer Protection Law alleged in this case; (b) any and all claims asserted in the Litigation, or based on allegations identified in the Complaint or Amended Complaint; and (c) any and all claims made by voucher-holders for discrimination attributable to SafeRent Scores. Ex. 1 §§ 1.28, 3.6. The Named Plaintiffs also separately agree to generally release SafeRent from any claims arising out of or relating to any conduct that occurred as of the date the Agreement was executed. Ex. 1 § 3.6.2.

## IV.   NOTICE AND CLAIMS PROCESS

The Parties and Settlement Administrator Epiq have complied with the Court's Preliminary Approval Order directing notice to be distributed pursuant to the terms of the Settlement Agreement. *See* Prelim. Approval Order at 3. The period for Settlement Class Members to submit

claims, objections, and requests for exclusion ended on September 3, 2024, and the reaction of the Settlement Classes has been overwhelmingly positive, with only one objection (from a non-class member) and eight valid requests for exclusion. Epiq received a total of 821 timely claims and has been working diligently with Class Counsel to verify that each claimant held a housing voucher during the relevant time period. As a result, Plaintiffs anticipate that each Class Member whose claim has been verified will receive meaningful relief under the Settlement.

A. CAFA Notice

On April 5, 2024, Epiq sent CAFA Notice Packages to 57 federal and state officials (the U.S. Attorney General and the Attorneys General of the 50 states, the District of Columbia, and the U.S. Territories). *See* Azari Declaration, attached as Exhibit 5, at Attachment 1 (Bingham Declaration on Implementation of CAFA Notice). The ninety-day CAFA notice period has concluded and no federal or state authorities commented on or objected to the proposed Settlement.

B. Class Notice

On May 6, 2024, SafeRent provided to Epiq the list of individuals who applied for rental housing in Massachusetts during the relevant period and received a SafeRent Score below the score required for an "accept" recommendation, as well as reasonably available Social Security numbers and last known addresses, emails, and telephone numbers. Ex. 1 § 4.2.1. SafeRent did not know which of these individuals held housing vouchers at the time they received a SafeRent Score, or the race of the individuals. The Parties believed that by sending notice to all individuals for whom SafeRent generated a "decline" or "accept with conditions" Score report, notice would be sent to all Settlement Class Members, in addition to several thousand non-class members.

While SafeRent had initially estimated that its list of potential Settlement Class Members would contain more than 18,000 names (*see* Prelim. Approval Mot. at 7), the list SafeRent produced to Epiq in May 2024 identified 30,065 potential Settlement Class Members. *See* Azari Decl. ¶ 11. On June 5, 2024, thirty days after SafeRent provided Epiq with the list of potential Settlement Class Members, Epiq mailed 30,065 hardcopy Notices and Claim Forms and sent

18,537 email Notices and 15,408 text messages with links to the Settlement Website.[8] *Id.* ¶¶ 13, 15, 19. Epiq was able to successfully deliver Notice to 28,348 out of 30,065, or 94.2%, of potential Settlement Class Members. *Id.* ¶ 20.

The Notice informed Settlement Class Members that they could exclude themselves from the Settlement by mailing a written request to Epiq, postmarked no later than September 3, 2024. *See* Azari Decl., Attachment 3 (Notice) at 7. The Notice also informed Settlement Class Members that if they did not request exclusion, they had the right to object to the proposed Settlement by filing or sending a written objection to the Court, postmarked or filed no later than September 3, 2024. *Id.* The date, time, and place of the Final Approval Hearing was included in the Notice as required by the Court. *See id.* at 4; Prelim. Approval Order at 4.

C. <u>Opt-Outs and Objections</u>

Epiq received eight requests to opt out of the Settlement that were postmarked on or before the Exclusion/Objection Deadline of September 3, 2024.[9] Azari Decl. ¶ 24. There has also been one objection to the Settlement from a non-class member[10] who expressed concern that the Settlement may include individuals who did not hold housing vouchers. *See* Doc No. 126 at 1. Both of the Settlement Classes are defined in part by voucher status. Plaintiffs are moreover confident that the objector's concerns are addressed by the Settlement claims process, which requires verification that each claimant held a housing voucher during the relevant time. *See* Section IV.D, *infra*; Ex. 1 § 1.5.

---

[8] Pursuant to the terms of the Settlement Agreement, Epiq set up a Settlement Website containing a downloadable Notice and downloadable Claim Form, contact information, and relevant case documents, and established a toll-free phone number to field potential Class Member questions and to assist claimants with completing their claim forms. Azari Decl. ¶ 21; https://matenantscreeningsettlement.com/.

[9] It is not clear whether all eight requests were filed by Settlement Class Members, given that the Notice was distributed to a group that also included non-class members. Plaintiffs submit that the Settlement should be finally approved even if all the opt outs are from Settlement Class Members.

[10] The content of the objection makes clear that the objector is not a Settlement Class Member because she states that she did not hold a housing voucher. *See* Doc No. 126 at 1.

D.  Claims Processing and Verification

Epiq mailed and/or emailed the Claim Form to those individuals who were sent Notice, with pre-paid return postage and an envelope to submit a hardcopy Claim Form or, for email notice, a link to the Settlement Website. *See* Azari Decl., Attachment 4 (Claim Form). The Claim Form was available on the Settlement Website and could also be filled out and signed electronically. Ex. 1 § 4.3.1; Azari Decl. ¶ 21. To be valid, the Claim Form must have been completed and signed (either by physical or electronic signature or by affirmation) and either submitted online at the Settlement Website or submitted by mail and postmarked no later than September 3, 2024 (ninety days after Epiq first disseminated Notice). Ex. 1 § 4.3.2. Epiq received a total of 821 timely claims and 36 late claims (excluding duplicate submissions). Azari Decl. ¶ 26.

The Claim Form required Settlement Class Members to provide their name and contact and information and either: (a) documentation sufficient to show that the individual held a housing voucher during the Relevant Period, and/or (b) a statement signed under penalty of perjury attesting that the individual held a voucher during the Relevant Period and authorizing Epiq to verify the claimant's voucher by contacting the relevant Public Housing Authority ("PHA"), the Department of Housing and Urban Development ("HUD"), and/or the Massachusetts Executive Office of Housing and Livable Communities ("EOHLC"). Ex. 1 § 1.5. To qualify as a member of the Race-Based Settlement Class, the Class Member was required to declare on the Claim Form under penalty of perjury that the claimant identifies as Black or Hispanic. Ex. 1 § 1.5.

Claimants were given the option to submit documentation (either electronically or by mail) along with their Claim Forms. Epiq processed the Claim Forms and shared any supporting documentation with Class Counsel, who then reviewed each document to determine whether it was sufficient to show that the claimant held a housing voucher during the relevant period. Azari Decl. ¶ 27; Webber Decl. ¶ 5.  Epiq also sent out mass emails and text messages on September 28, 2024, and October 31, 2024, to claimants whose voucher status had not yet been verified, requesting supporting documentation. Azari Decl. ¶ 27. Class Counsel was able to verify that 123 claimants held housing vouchers during the relevant period based on the documentation they

submitted. Webber Decl. ¶ 5.

Class Counsel also attempted to verify each claimant's housing voucher with HUD, EOHCL, and/or the PHA that the claimant identified on their claim form (if any). *Id.* ¶ 6. On August 15, 2024, Class Counsel sent HUD a list of claimants who had submitted a claim form with their Social Security number. *Id.* ¶ 7. On October 22, 2024, Class Counsel sent HUD a new list of additional claimants who had either submitted new claim forms or cured their claim forms since August 15. *Id.* In total, HUD confirmed that 311 claimants held housing vouchers during the relevant time. *Id.* Class Counsel also contacted EOHLC, which ran claimants' information through its (incomplete) database and confirmed that an additional 29 eligible claimants held vouchers during the relevant time period. *Id.*

During this time, Class Counsel also sent letters via email and/or first-class mail (to the extent contact information could be obtained) to 87 local PHAs that claimants identified in their claim forms, requesting that the PHA verify whether the associated claimants held housing vouchers. *Id.* ¶ 8. Class Counsel has worked diligently to monitor responses and follow up with non-responsive PHAs to verify as many claimants' vouchers as possible. *Id.* To date, 67 PHAs have checked their databases for housing voucher records pertaining to the claimants who identified that PHA. *Id.* These PHAs have been able to verify that 107 eligible claimants held housing vouchers during the relevant time. *Id.*

To date, through all of the methods described above, Class Counsel and Epiq have confirmed that 421 total claimants held housing vouchers during the relevant time period and are thus Settlement Class Members who will receive payment.[11] *Id.* ¶ 9. Class Counsel also confirmed that 84 claimants are *not* Settlement Class Members, either because they were household members of another confirmed claimant or because they provided information confirming that they did not hold a housing voucher during the relevant time. *Id.* As a result, there are 316 claimants whose

---

[11] As noted above, many claimants' housing vouchers were confirmed through more than one method because these efforts were conducted simultaneously. Thus, there is overlap between the claims verified by HUD and/or EOHCL and/or PHAs and/or via documentation.

housing vouchers have not yet been verified through the methods described above, but have not been definitively ruled ineligible. *Id.* ¶ 10. Class Counsel estimate that they will need an additional 30 days, until December 9, 2024, to ensure that all of the verification processes described above and in the Settlement Agreement have been completely exhausted such that all claimants have been given sufficient opportunity to prove that they are Settlement Class Members and entitled to payment. *Id.*[12] Class Counsel and Epiq will use this additional time to: (1) continue following up with the remaining 20 PHAs who have not yet checked their databases for the claimants who identified those PHAs on their Claim Forms and (2) provide unverified claimants a final opportunity to submit supporting documentation. *Id.* If, by December 9, 2024, Class Counsel or Epiq has not been able to verify that a claimant held a housing voucher during the relevant time period, that claimant will be sent notification that their status as a Member of the Settlement Classes could not be confirmed and they will not receive payment under the Settlement.

E. Estimated Awards

Confirmed Settlement Class Members who have submitted valid and timely Claim Forms will receive *pro rata* payments from the Settlement Fund based on their membership in one or both Settlement Classes. Ex. 1 § 4.7.1. Members of the Income-Based Settlement Class *only* or the Race-Based Settlement Class *only* will receive a 1X share of the Settlement Fund, and members of both Classes will receive a 1.5X share. Ex. 1 § 4.7.1.1. To date, Class Counsel has confirmed that 421 claimants are eligible to receive payment under the Settlement. Of these, 243 are members of both Settlement Classes (and thus entitled to a 1.5X share), and 178 are members of only one of the Settlement Classes (and thus entitled to a 1X share). Webber Decl. ¶ 11. Thus, if no additional claimants are verified as Settlement Class Members, each member of only one

---

[12] Plaintiffs request that the Court allow the claims verification process to continue beyond the Final Approval Hearing. The number of additional claims likely to be verified will not significantly impact the estimated awards that Settlement Class Members are likely to receive (*see* Section IV.E, *infra*). Courts routinely allow the claims verification process to continue even beyond Final Approval. *See, e.g., Express Freight Int'l v. Hino Motors*, Case No. 1:22-cv-22483, Doc No. 160 (S.D. Fla. April 1, 2024) (claims deadline remained open even after final approval hearing).

Settlement Class will receive an estimated payment of $1,553.17 and each claimant who is a member of both Settlement Classes will receive an estimated payment of $2,329.75.[13] If all 316 outstanding claimants were to be verified as Settlement Class Members, assuming the same ratio of single-Settlement Class members to two-Settlement Class members, each member of only one Settlement Class would receive an estimated payment of $887.20 and each claimant who is a member of both Settlement Classes will receive an estimated payment of $1,330.83. Therefore, the range of awards for single-Settlement Class members is approximately $887.20 to $1,553.17, and the range for two-Settlement Class members is approximately $1,330.83 to $2,329.75.

## V.    ARGUMENT

Under Rule 23(e), a class action settlement must be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Before conducting the fairness determination, the Court should resolve two preliminary matters. First, final approval of a class action settlement requires "confirmation that notice was conducted in a reasonable manner, consistent with Fed.R.Civ.P. 23 and due process concerns." *Bezdek v. Vibram USA Inc*., 79 F. Supp. 3d 324, 336 (D. Mass. 2015). Second, the Court must determine that the requirements of Rule 23(a) and (b) have been satisfied. *Id.* If the Court is satisfied that Notice was adequate and that the Settlement Classes should be certified for purposes of settlement, then the Court conducts a separate fairness analysis of the Settlement. As discussed below, the instant Settlement satisfies all these requirements. As such, Plaintiffs' request for certification of the Settlement Classes and Final Approval of the Settlement should be granted.

### A.  Notice Was Adequate.

Notice of a class action settlement must be "reasonably calculated to reach the absent class members." *Reppert v. Marvin Lumber & Cedar Co*., 359 F.3d 53, 56 (1st Cir.2004). The notice must include "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class

---

[13] Estimated awards are based on Epiq's projected costs ($312,406) and the assumption that the Court will award a total of $20,000 in service awards to Plaintiffs. The estimates are subject to change based on actual settlement administration costs, the Court's decision on service awards, and the possibility that housing voucher status can be confirmed for additional claimants.

claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed.R.Civ.P. 23(c)(2).

Here, the Court has already determined that the proposed Notice constituted the "best notice practicable under the circumstances" and satisfies Rule 23(e) and due process. Prelim. Approval Order at 3. The Parties and Settlement Administrator have complied with this Court's Order to distribute Notice pursuant to the terms of the Settlement Agreement, the Notice was reasonably tailored to reach absent settlement class members, it contained all of the information required by Rule 23, and all Settlement Class Members were given sufficient opportunity to file a claim, objection, or request for exclusion. *See* Section IV.B, *supra*. Thus, Notice was adequate.

### B.  The Settlement Classes Should be Certified for Settlement Purposes.

The Court previously found that the requirements of Rule 23 were met when it conditionally certified the Classes for purposes of settlement. *See* Prelim. Approval Order at 1–2. For the same reasons, the Court should now finally certify the Settlement Classes.

### (i)  Plaintiffs Satisfy the Requirements of Rule 23(a).

First, the Settlement Classes are sufficiently large that joinder is impracticable, meeting Rule 23(a)'s numerosity requirement. SafeRent provided a list of more than 30,000 individuals who applied for housing in Massachusetts during the Class Period and who were assigned a SafeRent Score lower than the threshold that a housing provider set to recommend "accept" on an application.  Because SafeRent does not maintain data on the race or voucher status of housing applicants, a claims process was needed to identify which of these individuals were Settlement Class Members.  In total, 821 individuals submitted timely claim forms. Azari Decl. ¶ 26. And of these, Class Counsel has so far verified that 421 claimants are qualifying Settlement Class Members. Webber Decl. ¶ 9. Thus, there can be no question that Plaintiffs satisfy numerosity. *See Bezdek*, 79 F. Supp. 3d at 337.

Second, there are common questions of law and fact at issue. The gravamen of Plaintiffs'

allegations in this lawsuit is that SafeRent, through the SafeRent Score product, has caused the disproportionate denial of housing to tenant applicants in Massachusetts who use housing vouchers, allegedly in violation of the FHA and Massachusetts Discrimination Law. That is a common contention for each Settlement Class Member, and it can be satisfied using evidence common to the class. There are additional common questions, such as whether SafeRent as a tenant screening provider can be held liable under the FHA and whether SafeRent's Score product is justified by the business necessity defense. The existence of these common questions satisfies the commonality requirement. *See New Eng. Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-CV-11148, 2009 WL 10703302, at *2–3 (D. Mass. Mar. 30, 2009).

Third, typicality is satisfied because Plaintiffs' "injuries arise from the same events or course of conduct as do the injuries of the class" and Plaintiffs' claims and those of the Settlement Classes "are based on the same legal theory." *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008). Here, Plaintiffs' claims arise out of the exact same allegations—SafeRent's use of certain credit and tenant information in its calculation of the SafeRent Score provided to housing providers, which Plaintiffs allege resulted in the disproportionate denial of housing to applicants using vouchers. Because Plaintiffs allege that each member of the Settlement Classes was denied housing pursuant to the same practice by SafeRent, typicality is satisfied.

Fourth, the requirement for fair and adequate representation is met. Named Plaintiffs Louis and Douglas have faithfully participated in this litigation for over two years, including maintaining regular contact with their counsel, providing information and documents upon counsel's request, familiarizing themselves with the facts and issues presenting in the case and attending the hearing on Defendants' motion to dismiss. *See Jean-Pierre v. J&L Cable TV Servs., Inc*., 538 F.Supp.3d 208, 212 (D. Mass. 2021) (finding adequacy satisfied where each named plaintiff was involved in the prosecution of his claims and interests were aligned with the class).

The Settlement Classes are also adequately represented by competent attorneys with expertise in litigating housing and consumer rights class actions. *See Jean-Pierre*, 538 F.Supp.3d at 212. Plaintiffs are represented by Greater Boston Legal Services, a Massachusetts nonprofit that

regularly provides legal advocacy to low-income renters who use housing vouchers; the National Consumer Law Center, a national nonprofit based in Massachusetts, which, for over 50 years, has worked for economic justice for low-income and other disadvantaged people; and the law firm of Cohen Milstein Sellers & Toll PLLC, one of the leading firms in the country handling major complex plaintiff-side civil rights and fair housing litigation, based in Washington, DC. *See* Mot. for Attorneys' Fees, Ex. 3 (Webber Decl.), Ex. 4 (Kaplan Decl.), Ex. 5 (Kavanaugh Decl.).

### (ii) Plaintiffs Satisfy the Requirements of Rule 23(b)(2).

Plaintiffs also satisfy the requirements of Rule 23(b)(2). A class may be certified under Rule 23(b)(2) if the prerequisites of Rule 23(a) are met and the defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Classes certified under Rule 23(b)(2) "frequently serve as the vehicle for civil rights actions and other institutional reform cases." *Hawkins ex rel. Hawkins v. Comm'r of N.H. Dep't of Health & Human Servs.*, No. 99-143, 2004 WL 166722, at *4 (D.N.H. Jan. 23, 2004).

As detailed above, Plaintiffs have advanced a common contention in this litigation: that SafeRent, through the SafeRent Score product, has caused the denial of housing to rental applicants who use housing vouchers. Put differently, Plaintiffs allege that SafeRent, by marketing and selling the SafeRent Score product and applying that product to applicants with vouchers, has acted or refused to act on grounds generally applicable to the Classes. Accordingly, the Settlement Classes may be certified pursuant to Rule 23(b)(2).

### (iii) Plaintiffs Satisfy the Requirements of Rule 23(b)(3).

Finally, Plaintiffs satisfy the requirements of Rule 23(b)(3). The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Plaintiffs allege that all Settlement Class Members are entitled to the same legal remedies premised on SafeRent's same alleged wrongdoing, and the issues affecting every Settlement Class Member are substantially the same. Thus, the Settlement Classes are sufficiently cohesive to satisfy predominance.

Superiority requires a class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Here, where hundreds of Settlement Class Members have submitted Settlement Claims premised on a common issue, a class action is the most feasible mechanism for resolving the dispute. Moreover, the Settlement Class Members here are individuals using housing vouchers, who, by definition, are people with limited financial means and are thus unlikely to bring costly individual lawsuits. A class action is therefore the superior method for resolving these claims.

C.    The Settlement Agreement Is Fair, Reasonable, and Adequate.

A court may only finally approve a class settlement after finding that it is "fair, reasonable, and adequate," which requires considering whether: (i) the class representatives and class counsel adequately represented the class; (ii) the proposed settlement was negotiated at arm's length; (iii) the relief provided for the class was adequate; and (iv) the proposal treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2). The fairness inquiry "involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement," and should be guided in part by judicial policy favoring the resolution of class actions. *Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters' Health Benefits Fund,* 582 F.3d 30, 44 (1st Cir. 2009).

In granting Preliminary Approval, this Court found that it would "likely be able to approve the proposed Settlement set forth in the Agreement as fair, reasonable, and adequate pursuant to Fed. R. Civ. P. 23(e)(2)." Prelim. Approval Order at 2. The Court determined that the Agreement was the "product of arm's length negotiations between competent counsel, reached with the aid of an experienced professional mediator, and comes after adequate investigation of the facts and legal issues." *Id.* at 2. The Court also preliminarily found that the "relief provided in the Settlement to the Settlement Classes is adequate, taking into account, among other things, the costs, risks, and delay of trial and appeal, and the proposed method of distributing compensation to the Settlement Classes; and that the Settlement treats Settlement Class Members equitably relative to one another." *Id.* at 2. For these same reasons, the Court should grant Final Approval of the Settlement.

17

(i)  The Settlement Classes Are Adequately Represented.

First, the Classes are adequately represented because the interests of the Settlement Class Representatives do not "conflict with the interests of any of the class members." *See Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). The Class Representatives and Settlement Class Members are people who (a) used publicly-funded housing vouchers during the Class Period and (b) were denied housing because of their SafeRent Score—all of whom will be able to obtain relief by the terms of the proposed Settlement. Accordingly, the Class Representatives seek "the same remedy . . . based on an identical theory" as the rest of the class, rendering their interests "coextensive with the class." *Reid v. Donelan*, 297 F.R.D. 185, 191 (D. Mass. 2014).

Second, Plaintiffs have retained experienced and competent counsel who have fairly and adequately protected the interests of the proposed classes throughout the litigation and during the negotiation of the proposed Settlement. *See id;* Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). Plaintiffs' Counsel have substantial experience litigating and negotiating settlements in class actions, including in the areas of housing, civil rights, and consumer rights law. *See* Section IV.A.i, *supra*. Plaintiffs' Counsel invested substantial time and resources in litigating this case and in negotiating the Agreement on a contingent basis. Section IV.A.i, *supra*. Accordingly, there is ample evidence that undersigned counsel vigorously and fully represented the interests of the Classes in the litigation leading to settlement. *See Connor B. v. Patrick*, 272 F.R.D. 288, 297 (D. Mass. 2011).

(ii)  The Settlement Was the Product of Arm's-Length Negotiations.

"A settlement is presumed to be reasonable when it is achieved by arm's length negotiations conducted by experienced counsel." *Nat'l Ass'n of Deaf v. MIT*, No. 15-CV-30024, 2020 WL 1495903, at *4 (D. Mass. Mar. 27, 2020)). When determining whether an agreement was the product of an arm's-length negotiation, courts often consider the complexity and duration of the litigation, whether meaningful discovery was completed prior to settlement, whether the parties utilized a formal mediation process to negotiate the agreement, and whether the agreement was conditioned on an award of attorneys' fees and costs. *See, e.g.*, *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-11280, 2017 WL 5177610, at * 2 (D. Mass. Nov. 8, 2017).

Plaintiffs researched and investigated this case for nearly a year, collecting a substantial amount of relevant material from public sources, before even filing the lawsuit. *See* Mot. for Attorneys' Fees and Exs. 3–5 attached thereto. The Parties then litigated this case for over a year, including briefing and arguing SafeRent's motion to dismiss. And while formal discovery was not conducted, Plaintiffs requested and received documents and information both before and after the mediation session with Judge Welsh, allowing Plaintiffs to better understand the strengths and weaknesses in the case, and the potential damages the class could recover if litigation were successful. *See Robinson v. Nat'l Student Clearinghouse*, 14 F.4th 56, 59 (1st Cir. 2021) (upholding final approval under similar circumstances). After settlement negotiations that extended over three months, using a formal mediation process, the Parties settled all contested issues in the litigation, the terms of which are memorialized in the Agreement. Negotiation of the terms of the Settlement, moreover, was conducted without regard to the payment of Plaintiffs' attorneys' fees and costs, which was the last term that was negotiated.

(iii) <u>The Settlement Provides More Than Adequate Relief to the Classes.</u>

The proposed Settlement provides Settlement Class Members with immediate, tangible benefits that outweigh "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C). Perhaps most importantly, the Settlement provides the Settlement Classes the full extent of injunctive relief they would have obtained had Plaintiffs succeeded in this case. *See* Section III.B, *supra*; *Bezdek*, 79 F.Supp.3d at 346 ("Injunctive relief has been recognized as a meaningful component of a settlement agreement, particularly where it mimics the injunctive relief that the plaintiffs could achieve following trial."). Further, the change in SafeRent's screening practices will be national, whereas if the litigation was successful it would have, at most, required a change in SafeRent's Massachusetts screening practices. SafeRent will also pay a sum of $1,175,000, which will be used to make payments to Settlement Class Members to compensate them for the past denial of housing, which are estimated to be substantial. *See* Sections III.C. and IV.E, *supra*.

By contrast, although Plaintiffs are confident they would have been successful were the underlying litigation adjudicated, the number of novel legal issues raised in this case would have

required extensive additional briefing, argument, and discovery, and therefore increased litigation risks and costs. Moreover, even complete success on liability would still have left disputes over the magnitude of damages recoverable by class members, and even disputes over whether damages could be resolved on a class basis. *See Robinson*, 14 F.4th 60 (final approval appropriate where "settlement was preferable to continued litigation given the litigation risks for both sides"). The overwhelmingly positive reaction of the Settlement Class Members also "constitutes strong evidence" that the settlement is fair and "supports judicial approval." *Hill v. State St. Corp.*, 2015 WL 127728, at \*8 (D. Mass. Jan. 8, 2015) (citations omitted). Notice yielded only one objection from a non-class member[14] and eight valid requests for exclusion. *See* Section IV.C, *supra*.

(iv)  The Proposed Settlement Treats Class Members Equitably.

Finally, the Settlement treats Settlement Class Members fairly and equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). All terms of the proposed Settlement apply equally, without qualification or reservation, to each Settlement Class Member, ensuring that all Settlement Class Members benefit in the same manner and to the same extent from the Settlement. The relief is "apportioned between Class Members in a way that 'takes appropriate account of differences among their claims,'" and payment "is specifically tailored to their claims in the litigation." *Sparks v. Mills*, 626 F.Supp.3d 131, 138 (D. Maine 2022) (quoting 2018 Advisory Committee Note to Fed. R. Civ. P. 23). Awarding a 1.5X share of the Settlement Fund to members of both the Income-Based Settlement Class and the Race-Based Settlement Class ensures that these Settlement Class Members are fairly compensated for releasing both income-based and race-based claims.

**VI.    CONCLUSION**

For the foregoing reasons, Plaintiffs request that the Court grant the Motion.

---

[14] Plaintiffs do not believe the Court is under any obligation to consider this objection, given that the objector was not a Settlement Class Member and does not have any interest in the settlement. *See* Doc No. 116; *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 602 F.Supp.2d 277, 283 (D. Mass. 2009) (court is only obligated to consider the interests of third parties that would be *affected* by the settlement). Nonetheless, the concerns of the objector are addressed by the claims process described in Section IV.D, *supra*.

Dated: November 8, 2024

Respectfully submitted,

*/s/ Christine E. Webber*
Christine E. Webber (*pro hac vice*)
Brian Corman (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Ave. N.W.
Fifth Floor
Washington, D.C., 20005
Tel.: (202) 408-4600
cwebber@cohenmilstein.com
bcorman@cohenmilstein.com

Todd S. Kaplan (Bar No. 634710)
GREATER BOSTON LEGAL SERVICES
197 Friend Street
Boston, MA, 02114
Tel.: (617) 371-1234
tkaplan@gbls.org

Shennan Kavanagh (Bar No. 655174)
Ariel C. Nelson (Bar No. 705704)
Stuart Rossman (of counsel)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Boston, MA, 02110
Tel.: (617) 542-8010

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

 I hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system on November 8, 2024.


Dated: November 8, 2024          <u>s/ *Christine E. Webber*   </u>